IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ANDY YU, derivatively on behalf of OPKO HEALTH, INC., | |
| Plaintiff, | **Case No. _____** |
| vs. | |
| PHILLIP FROST, ADAM LOGAL, JUAN F. RODRIGUEZ, JANE H. HSIAO, STEVEN RUBIN, ROBERT A. BARON, THOMAS E. BEIER, DMITRY KOLOSOV, RICHARD M. KRASNO, RICHARD A. LERNER, JOHN A. PAGANELLI, RICHARD C. PFENNIGER, ALICE LIN-TSING YU, and FROST GAMMA INVESTMENTS TRUST, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| OPKO HEALTH, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### INTRODUCTION

Plaintiff Andy Yu ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of

Nominal Defendant OPKO Health, Inc. ("OPKO" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Phillip Frost, Adam Logal, Juan

F. Rodriguez, Jane H. Hsiao, Steven Rubin, Robert A. Baron, Thomas E. Beier, Dmitry Kolosov,

Richard M. Krasno, Richard A. Lerner, John A. Paganelli, Richard C. Pfenniger, Alice Lin-Tsing

Yu (collectively, the "Individual Defendants"), and Frost Gamma Investments Trust ("FGIT," and

together with OPKO and the Individual Defendants, the "Defendants") for breaches of their

fiduciary duties as controlling shareholder, directors and/or officers of OPKO, unjust enrichment,

1

and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OPKO, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by OPKO's directors, officers, and controlling shareholder starting on September 26, 2013 and continuing through the present (the "Relevant Period").

2.      OPKO is a healthcare company that invests in and acquires other healthcare companies, in addition to developing its own products. As stated by Oracle Partners' Larry Feinberg, Defendant Philip Frost, OPKO's Chief Executive Officer and Chairman, "views OPKO as his holding company. It is his Berkshire Hathaway of health care."[1]

3.      During the Relevant Period, Defendant Frost coordinated with FGIT and a number of individuals not named herein to orchestrate pump-and-dump schemes involving at least two microcap companies.

---

[1]    Matt    Schifrin,    *Meet    Miami's    Renaissance    Billionaire*,    FORBES    (Jan.    24,    2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

4. Defendant Frost, along with a group of other individual and institutional investors (the "Frost Conspirators"), acquired interests in small companies and where those companies were not already public, merged them into shell companies controlled by the Frost Conspirators. The Frost Conspirators then commissioned stock promoters to write positive articles and engaged in manipulative trading which raised the price of those companies' shares. The Frost Conspirators then sold their shares in a coordinated fashion, thereby enriching themselves at the expense of other investors. The Frost Conspirators failed to disclose that they were operating as a group, or that they were not passive investors. The misconduct alleged in this paragraph is referred to collectively herein as the "Pump & Dump Misconduct."

5. The Pump & Dump Misconduct was revealed on September 7, 2018, when the SEC filed a complaint against Defendants Frost, OPKO, FGIT and a number of other individual and entity defendants. The SEC issued a press release the same day announcing the filing of the complaint.

6. On this news, the price of OPKO stock dropped $1.01 per share, or 18%, from the previous day's closing price, trading at $4.58 per share at 2:34 PM EDT on September 7, 2018, when NASDAQ halted trading of OPKO shares.

7. The suspension was lifted on September 14, 2018. Upon the resumption of trading, the price of OPKO shares fell an additional $0.68, or approximately 15%, closing at $3.90 on September 14, 2018.

8. During the Relevant Period, FGIT and the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

9. Also during the Relevant Period, the Individual Defendants and FGIT personally made and/or caused the Company to make a series of materially false and misleading statements

3

regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants and FGIT willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) OPKO, Defendant Frost, FGIT, and a number of other individuals and entities were engaged in the Pump & Dump Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its shares would be suspended from trading; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.     FGIT and the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     In light of FGIT and the Individual Defendants' misconduct, which has subjected OPKO, its Chief Executive Officer ("CEO"), and FGIT to an action alleging violations of the securities laws brought by the SEC pending in the United States District Court for the Southern District of New York (the "SEC Action"); the Company, its CEO, its Chief Financial Officer ("CFO"), and its former CFO to being defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey and two federal securities fraud class action lawsuits pending in this District, and the Company and its CEO to being defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Actions"); the need to undertake internal investigations, and losses due to the unjust enrichment of FGIT and the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12. The Individual Defendants' misconduct also subjected OPKO and its CEO to a pro se action in the United States District Court for the District of Minnesota for fraud and tortious interference with prospective business advantage (the "Pro Se Action"). On July 11, 2018, the Honorable Magistrate Judge Becky R. Thorson issued a Report and Recommendation recommending, among other things, that the Pro Se Action be dismissed without prejudice for lack of personal jurisdiction over the defendants. On September 13, 2018, the Honorable Judge Wilhelmina M. Wright adopted Magistrate Judge Thorson's Report and Recommendation, dismissing the Pro Se Action.

13. The Company has been substantially damaged as a result of FGIT and the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of FGIT, the CEO and Company's liability in the SEC Action, the substantial likelihood of the CEO, CFO, and former CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the OPKO Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District because OPKO is headquartered in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of OPKO. Plaintiff has continuously held OPKO common stock at all relevant times. Plaintiff is a citizen of New York.

## Nominal Defendant OPKO

22.     OPKO is a Delaware corporation with its principal executive offices at 4400 Biscayne Blvd., Miami, Florida 33137. OPKO's shares trade on the NASDAQ under the ticker symbol "OPK."

## Defendant Frost Gamma Investments Trust

23.     The Frost Gamma Investments Trust ("FGIT") is a Florida trust, formed in or around 2002. According to the Company's Schedule 14A filed with the SEC on April 30, 2018 (the "2018 Proxy Statement"), as of April 18, 2018, Defendant FGIT beneficially owned 189,325,505 shares of the Company's common stock, which represented 33.54% of outstanding shares on that date.[2] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, FGIT owned approximately $609.6 million worth of OPKO stock.

24.     FGIT is also a named Defendant in the SEC Action. The 2018 Proxy Statement explains that Defendant Frost controls FGIT:

> *Frost Gamma Investments Trust (the "Gamma Trust"), a trust controlled by Dr. Phillip Frost*, our Chairman of the Board and Chief Executive Officer, Dr. Jane H. Hsiao, our Vice Chairman and Chief Technical Officer, and Steven D. Rubin, our Executive Vice President – Administration and a member of our Board, are each members of The Frost Group, LLC (the "Frost Group"), an entity which beneficially owns approximately 3.59% of our common stock as of April 18, 2018. Furthermore, the Gamma Trust beneficially owns approximately 33.54% of our common stock as of April 18, 2018.

(Emphasis added.)

---

[2] Includes a convertible note which is convertible into 5,000,000 shares of common stock. Also includes 20,091,062 shares of common stock held by The Frost Group, LLC, of which FGIT is a principal member. FGIT disclaims beneficial ownership of the common stock held by The Frost Group, LLC. FGIT has sole voting and dispositive power over 169,234,443 shares of the Company's common stock and shared voting and dispositive power over 20,091,062 shares of the Company's common stock.

### Defendant Frost

25.     Defendant Dr. Phillip Frost ("Frost") has served as the Company's CEO and Chairman since 2007. According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Frost beneficially owned 196,624,883 shares of the Company's common stock, which represented 34.76% of outstanding shares on that date.[3] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Frost owned at least $633.1 million worth of OPKO common stock.

26.     For the fiscal year ended December 31, 2016, Defendant Frost received $3,060,600 in compensation from the Company. This included $960,000 in salary, $2,090,000 in option awards, and $10,600 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Frost received $970,800 in compensation from the Company. This included $960,000 in salary, and $10,800 in all other compensation.

27.     The Company's 2018 Proxy Statement stated the following about Defendant Frost:

**Phillip Frost, M.D.**[4] Dr. Frost has been the Chief Executive Officer of the Company and Chairman of the Board since March 2007. Dr. Frost was named Chairman of the Board of Ladenburg Thalmann Financial Services Inc. ("Ladenburg Thalmann") (NYSE American:LTS), an investment banking, asset management, and securities brokerage firm providing services through its principal

---

[3] Includes 164,234,443 shares of common stock and a convertible note, which is convertible into 5,000,000 shares of common stock, held by FGIT. It also includes options to purchase 1,175,000 shares of common stock exercisable within 60 days of April 18, 2018 held by Defendant Frost. Defendant Frost is the trustee and Frost Gamma Limited Partnership is the sole and exclusive beneficiary of FGIT. Defendant Frost is one of two limited partners of Frost Gamma Limited Partnership. The general partner of Frost Gamma Limited Partnership is Frost Gamma Inc. and the sole stockholder of Frost Gamma, Inc. is Frost-Nevada Corporation. Defendant Frost is also the sole stockholder of Frost-Nevada Corporation. The number of shares included above also includes 3,055,427 shares of common stock owned directly by Frost Nevada Investments Trust, of which the Defendant Frost is the trustee and Frost-Nevada, L.P. is the sole and exclusive beneficiary. Defendant Frost is one of five limited partners of Frost-Nevada, L.P. and the sole shareholder of Frost-Nevada Corporation, the sole general partner of Frost-Nevada, L.P. The number of shares included above also includes 20,091,062 shares of common stock owned directly by The Frost Group, LLC. FGIT is a principal member of The Frost Group, LLC. Defendant Frost and FGIT disclaim beneficial ownership of these shares of common stock. Does not include 2,851,830 shares of Common Stock held by the Phillip and Patricia Frost Philanthropic Foundation, Inc., of which Defendant Frost is one of three directors. Phillip Frost, M.D. has sole voting and dispositive power over 176,533,821 shares of the Company's common stock and shared voting and dispositive power over 20,091,062 shares of the Company's common stock.

[4] Emphasis in original unless otherwise noted throughout.

8

operating subsidiary, Ladenburg Thalmann & Co. Inc., in July 2006 and has been a director of Ladenburg Thalmann from 2001 until 2002 and again since 2004. Dr. Frost serves as a director for Castle Brands (NYSE American:ROX), a developer and marketer of premium brand spirits, and Cocrystal Pharma, Inc. (NASDAQ GM:COCP), a publicly traded biotechnology company developing new treatments for viral diseases. He serves as a member of the Board of Trustees of the University of Miami, the Skolkovo Foundation Scientific Advisory Council in Russia, the Shanghai Institute for Advanced Immunochemical Studies in China, and The Florida Council of 100 and as a Trustee of each of the Miami Jewish Home for the Aged and the Mount Sinai Medical Center. He serves as Chairman of Temple Emanu-El, Governor of Tel Aviv University and is a member of the Executive Committee of The Phillip and Patricia Frost Museum of Science. Dr. Frost served as a director of Teva Pharmaceutical Industries, Limited, or Teva (NYSE:TEVA) from January 2006 until February 2015 and had served as Chairman of the Board of Teva from March 2010 until December 2014 and as Vice Chairman from January 2006 until March 2010. Dr. Frost previously served as Vice Chairman of Cogint, Inc., and as a director for Sevion Therapeutics, Inc. prior to its merger with Eloxx Pharmaceuticals, Inc., SafeStitch Medical Inc. prior to its merger with TransEnterix, Inc., and PROLOR Biotech, Inc. prior to its acquisition by the Company in August 2013, and as Governor and Co-Vice Chairman of the American Stock Exchange (now NYSE American). Dr. Frost had served as Chairman of the Board of Directors and Chief Executive Officer of IVAX Corporation ("IVAX") from 1987 until its acquisition by Teva in January 2006. Dr. Frost was Chairman of the Board of Directors of Key Pharmaceuticals, Inc. from 1972 until the acquisition of Key Pharmaceuticals, Inc. by Schering Plough Corporation in 1986.

Dr. Frost has successfully founded several pharmaceutical companies and overseen the development and commercialization of a multitude of pharmaceutical products. This combined with his experience as a physician and chairman and/or chief executive officer of large pharmaceutical companies has given him insight into virtually every facet of the pharmaceutical business and drug development and commercialization process. He is a demonstrated leader with keen business understanding and is uniquely positioned to help guide our Company through its transition from a development stage company into a successful, multinational biopharmaceutical and diagnostics company.

28.     Defendant Frost is a citizen of Florida.

**Defendant Logal**

29.     Defendant Adam Logal ("Logal") has served as the Company's CFO since 2014.

According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Logal beneficially owned

1,052,358 shares of the Company's common stock.[5] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Logal owned approximately $3.4 million worth of OPKO stock.

30.     For the fiscal year ended December 31, 2016, Defendant Logal received $1,655,600 in compensation from the Company. This included $600,000 in salary, $1,045,000 in option awards, and $10,600 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Logal received $610,800 in compensation from the Company. This included $600,000 in salary, and $10,800 in all other compensation.

31.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Logal made the following purchases of Company stock:

| Date | Number of Shares | Price | Cost |
|------|------------------|-------|------|
| September 14, 2015 | 1,000 | $ 9.95 | $ 9,948 |
| September 15, 2017 | 1,500 | $ 6.03 | $ 9,045 |
| March 13, 2018 | 2,065 | $ 3.40 | $ 8,415 |

During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Logal made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| March 14, 2017 | 112,975 | $ 8.07 | $ 911,674 |
| March 13, 2015 | 24 | $ 14.56 | $ 349 |
| March 13, 2015 | 576 | $ 14.61 | $ 8,415 |
| March 13, 2015 | 500 | $ 14.62 | $ 7,308 |
| March 13, 2015 | 38,888 | $ 14.64 | $ 569,320 |
| March 13, 2015 | 1,500 | $ 14.65 | $ 21,968 |

---

[5] Includes options to acquire 887,500 shares of common stock exercisable within 60 days of April 18, 2018.

Thus, in total, before the fraud was exposed, he sold 154,463 Company shares on inside information, for which he received over $1.5 million. Accounting for the cost of his stock purchases, Defendant Logal received a net of over $1.49 million during the Relevant Period as a result of his trading in Company stock. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32.     The Company's 2018 Proxy Statement stated the following about Defendant Logal:

**Adam Logal**. Mr. Logal has served as OPKO's Sr. Vice President and Chief Financial Officer since March 2014, Vice President of Finance, Chief Accounting Officer and Treasurer from July 2012 until March 2014, and Director of Finance, Chief Accounting Officer and Treasurer from March 2007 until July 2012. He currently serves on the board of directors of VBI Vaccines, Inc. (NASDAQ:VBIV), a commercial-stage biopharmaceutical company which develops, produces and markets next generation of vaccines to address unmet needs in infectious disease and immuno-oncology and as a director of Xenetics Biosciences, Inc. (NASDAQ CM:XBIO), a clinical-stage biopharmaceutical company focused on discovery, research and development of next-generation biologic drugs and novel orphan oncology therapeutics. From 2002 to 2007, Mr. Logal served in senior management of Nabi Biopharmaceuticals, a publicly traded, biopharmaceutical company engaged in the development and commercialization of proprietary products. Mr. Logal held various positions of increasing responsibility at Nabi Biopharmaceuticals, last serving as Senior Director of Accounting and Reporting.

33.     Defendant Logal is a citizen of Florida.

**Defendant Rodriguez**

34.     Defendant Juan F. Rodriguez ("Rodriguez") served as the Company's CFO from 2012 to April 1, 2014.

35.     The Company's Form 10-K/A filed on April 29, 2013 stated the following about Defendant Rodriguez:

**Juan F. Rodriguez.** Mr. Rodriguez has served as our Senior Vice President and Chief Financial Officer since July 2012. Mr. Rodriguez served as a consultant to Cognitec Systems, GmbH, a German software developer, from 2007 to 2012. Mr. Rodriguez currently serves as the Chairman of the Advisory Board of Cognitec.

From 1995 to 2007, Mr. Rodriguez served as an executive officer of Kos Pharmaceuticals, Inc., a publicly traded, specialty pharmaceutical company engaged in the development and commercialization of proprietary products, which was sold to Abbott Laboratories in late 2006. During his more than twelve years at Kos, Mr. Rodriguez held various positions of increasing responsibility, last serving as Senior Vice President, Controller and Corporate Administration. Prior to joining Kos, Mr. Rodriguez was employed by Arthur Andersen LLP. Mr. Rodriguez is a Certified Public Accountant and obtained his Bachelor of Science in Accounting from Florida International University.

36.    Upon information and belief, Defendant Rodriguez is a citizen of Florida.

## Defendant Hsiao

37.    Defendant Dr. Jane H. Hsiao ("Hsiao") has served as Chief Technical Officer, Vice Chairman, and a Company director since 2007. According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Hsiao beneficially owned 33,328,037 shares of the Company's common stock, which represented 5.94% of outstanding shares on that date.[6] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Hsiao owned approximately $107.3 million worth of OPKO stock.

38.    For the fiscal year ended December 31, 2016, Defendant Hsiao received $2,851,600 in compensation from the Company. This included $900,000 in salary, $1,881,000 in option awards, and $70,600 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hsiao received $915,800 in compensation from the Company. This included $900,000 in salary, and $15,800 in all other compensation.

39.    The Company's 2018 Proxy Statement stated the following about Defendant Hsiao:

---

[6] Includes a convertible note which is convertible into 1,000,000 shares of common stock. Also includes options to purchase 937,500 shares of common stock exercisable within 60 days of April 18, 2018. Also includes 1,000,000 shares of common stock held by each of The Chiin Hsiung Hsiao Family Trust A and The Chiin Hsiung Hsiao Family Trust B, both of which Dr. Hsiao serves as the sole trustee, 4,617,404 shares of common stock held by Hsu Gamma Investment, L.P., for which Defendant Hsiao serves as General Partner. Does not include 20,091,062 shares of common stock held by The Frost Group, LLC, of which Defendant Hsiao is a member. Defendant Hsiao disclaims beneficial ownership of the shares of common stock held by The Frost Group, LLC.

**Jane H. Hsiao, Ph.D., MBA.** Dr. Hsiao has served as Vice-Chairman and Chief Technical Officer of the Company since May 2007 and as a director since February 2007. Dr. Hsiao has served as Chairman of the Board of Non-Invasive Monitoring Systems, Inc. (OTC US:NIMU), a medical device company, since October 2008 and was named Interim Chief Executive Officer of Non-Invasive Monitoring Systems, Inc. in February 2012. Dr. Hsiao is also a director of each of TransEnterix, Inc. (NYSE American:TRXC), a medical device company, Neovasc, Inc. (NASDAQ CM::NVCN), a company developing and marketing medical specialty vascular devices, and Cocrystal Pharma, Inc. (NASDAQ GM:COCP). Dr. Hsiao previously served as a director for PROLOR Biotech, Inc. prior to its acquisition by the Company in August 2013, and as Chairman of the Board of SafeStitch Medical, Inc. prior to its merger with TransEnterix, Inc. Dr. Hsiao served as the Vice Chairman-Technical Affairs of IVAX from 1995 to January 2006. Dr. Hsiao served as Chairman, Chief Executive Officer and President of IVAX Animal Health, IVAX's veterinary products subsidiary, from 1998 to 2006.

Dr. Hsiao's background in pharmaceutical chemistry and strong technical expertise, as well as her senior management experience, allow her to play an integral role in overseeing our product development and regulatory affairs and in navigating the regulatory pathways for our products and product candidates. In addition, as a result of her role as director and/or chairman of other companies in the biotechnology and life sciences industry, she also has a keen understanding and appreciation of the many regulatory and development issues confronting pharmaceutical and biotechnology companies.

40.    Upon information and belief, Defendant Hsiao is a citizen of Florida.

**Defendant Rubin**

41.    Defendant Steven D. Rubin ("Rubin") has served as a member of the Board and as the Company's Executive Vice President – Administration since 2007. According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Rubin beneficially owned 7,412,650 shares of the Company's common stock, which represented 1.32% of outstanding shares on that date.[7] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Rubin owned approximately $23.9 million worth of OPKO stock.

---

[7] Includes options to purchase 1,720,735 shares of common stock exercisable within 60 days of April 18, 2018. Defendant Rubin is a member of The Frost Group, LLC, which holds 20,091,062 shares of common stock. Defendant Rubin disclaims beneficial ownership of the shares of common stock held by The Frost Group, LLC

42.     For the fiscal year ended December 31, 2016, Defendant Rubin received $2,701,600 in compensation from the Company. This included $810,000 in salary, $1,881,000 in option awards, and $10,600 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Rubin received $820,800 in compensation from the Company. This included $810,000 in salary, and $10,800 in all other compensation.

43.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rubin made the following purchases of Company stock:

| Date | Number of Shares | Price | Cost |
|---|---|---|---|
| August 20, 2015 | 2,000 | $ 12.40 | $ 24,800 |
| March 30, 2016 | 1,000 | $ 10.17 | $ 10,170 |
| December 30, 2016 | 2,000 | $ 9.18 | $ 18,360 |
| February 8, 2017 | 2,000 | $ 8.11 | $ 16,220 |
| May 11, 2017 | 2,000 | $ 6.91 | $ 13,820 |
| May 31, 2017 | 2,000 | $ 6.10 | $ 12,200 |
| March 7, 2018 | 6,000 | $ 3.25 | $ 19,500 |

During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rubin made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| April 14, 2014 | 100,000 | $ 8.58 | $ 857,700 |
| April 15, 2014 | 79,300 | $ 8.10 | $ 642,615 |

Thus, in total, before the fraud was exposed, he sold 179,300 Company shares on inside information for which he received approximately $1.4 million. Accounting for the cost of his stock purchases, Defendant Rubin received a net of approximately $1.39 million during the Relevant Period as a result of his trading in Company stock. His insider sales made with knowledge of

material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

44.     The Company's 2018 Proxy Statement stated the following about Defendant Rubin:

**Steven D. Rubin.** Mr. Rubin has served as Executive Vice President – Administration since May 2007 and as a director of the Company since February 2007. Mr. Rubin currently serves on the board of directors of VBI Vaccines, Inc. (NASDAQ CM:VBIV), a commercial-stage biopharmaceutical company which develops, produces and markets next generation of vaccines to address unmet needs in infectious disease and immuno-oncology, Red Violet, Inc. (NASDAQ CM:RDVT), a software and services company, Kidville, Inc. (OTCBB:KVIL), which operates large, upscale facilities, catering to newborns through five-year-old children and their families and offers a wide range of developmental classes for newborns to five-year-olds, Non-Invasive Monitoring Systems, Inc. (OTC US:NIMU), a medical device company, Cocrystal Pharma, Inc. (NASDAQ GM:COCP), a publicly traded biotechnology company developing new treatments for viral diseases, Eloxx Pharmaceuticals, Inc. (OTC US:ELOX), a clinical stage biopharmaceutical company dedicated to treating patients suffering from rare and ultra-rare disease caused by premature termination codon nonsense mutations, Castle Brands, Inc. (NYSE American:ROX), a developer and marketer of premium brand spirits, Neovasc, Inc. (NASDAQ CM:NVCN), a company that develops and markets medical specialty vascular devices, and ChromaDex Corp. (NASDAQ CM:CDXC), a science-based, integrated nutraceutical company devoted to improving the way people age. Mr. Rubin previously served as a director of Cogint, Inc. (NASDAQ GM:COGT), an information solutions provider focused on the data-fusion market, prior to the spin-off of its data and analytics operations and assets into Red Violet, Inc., Sevion Therapeutics, Inc., prior to its merger with Eloxx Pharmaceuticals, Inc., Dreams, Inc. (NYSE American:DRJ), a vertically integrated sports licensing and products company, Safestitch Medical, Inc. prior to its merger with TransEnterix, Inc., SciVac Therapeutics, Inc. prior to its merger with VBI Vaccines, Inc., Tiger X Medical, Inc. prior to its merger with BioCardia, Inc., and PROLOR Biotech, Inc., prior to its acquisition by the Company in August 2013. Mr. Rubin also served as the Senior Vice President, General Counsel and Secretary of IVAX from August 2001 until September 2006.

Mr. Rubin brings extensive leadership, business, and legal experience, as well as tremendous knowledge of our business and the pharmaceutical industry generally, to the Board. He has advised pharmaceutical companies in several aspects of business, regulatory, transactional, and legal affairs for more than 25 years. His experience as a practicing lawyer, general counsel, management executive and board member to multiple public companies, including several pharmaceutical and life sciences companies, has given him broad understanding and expertise, particularly relating to strategic planning and acquisitions.

45.     Upon information and belief, Defendant Rubin is a citizen of Florida.

**Defendant Baron**

46.     Defendant Robert A. Baron ("Baron") served as a Company director from 2003 to January 23, 2017.

47.     For the fiscal year ended December 31, 2016, Defendant Baron received $102,350 in compensation from the Company, comprised of $28,750 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Defendant Baron received $2,500 in compensation from the Company, in fees earned or paid in cash.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Baron made the following purchases of Company stock:

| Date | Number of Shares | Price | | Cost | |
|---|---|---|---|---|---|
| June 29, 2015 | 2,000 | $ | 15.81 | $ | 31,620 |
| June 10, 2015 | 3,000 | $ | 16.06 | $ | 48,180 |

During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Baron made the following sales of Company stock:

| Date | Number of Shares | Price | | Proceeds | |
|---|---|---|---|---|---|
| May 13, 2016 | 23,984 | $ | 9.82 | $ | 235,523 |
| May 13, 2016 | 4,000 | $ | 9.83 | $ | 39,320 |
| May 13, 2016 | 900 | $ | 9.84 | $ | 8,852 |
| May 13, 2016 | 5,616 | $ | 9.84 | $ | 55,261 |
| May 13, 2016 | 3,000 | $ | 9.85 | $ | 29,535 |
| January 10, 2014 | 32,824 | $ | 8.48 | $ | 278,348 |
| January 10, 2014 | 1,700 | $ | 8.49 | $ | 14,425 |
| January 10, 2014 | 11,200 | $ | 8.49 | $ | 95,088 |
| January 10, 2014 | 400 | $ | 8.49 | $ | 3,396 |
| January 10, 2014 | 406 | $ | 8.50 | $ | 3,451 |
| January 10, 2014 | 200 | $ | 8.51 | $ | 1,702 |

Thus, in total, before the fraud was exposed, he sold 84,230 Company shares on inside information for which he received approximately $764,900. Accounting for the cost of his stock purchases, Defendant Baron received a net of approximately $685,100 during the Relevant Period as a result of his trading in Company stock. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's Schedule 14A filed with the SEC on March 25, 2016 (the "2016 Proxy Statement") stated the following about Defendant Baron:

> **Robert A. Baron.** Mr. Baron has served as a director of the Company since 2003. Mr. Baron is currently a director of Green States Energy, an independent power producer focused on developing, acquiring, owning, and operating clean energy generation facilities to provide clean, reliable electric service to local governments and utilities, as well as commercial and industrial clients, Union Springs Integrative Medicine, a healthcare company committed to providing a diversified portfolio of prescription quality, naturally derived healthcare products and Premier Holding Corporation (OTC: PRHL), an energy efficiency products provider. Mr. Baron was President of Cash City, Inc., a payday advance and check cashing business, from 1999 to 2003. From 1997 to 1999, Mr. Baron was the President of East coast operations for CSS/TSC, Inc., a distributor of blank t-shirts, fleece and accessories and a subsidiary of Tultex, Inc. Mr. Baron previously served as a director of Andover Medical, Inc. and Hemobiotech, Inc (OTC: HMBT).
>
> Mr. Baron's history as an operating executive in a variety of industries combined with his experience as a director in other public companies, including other pharmaceutical and medical equipment manufacturers, allows him to bring strategic insight to the Board with respect to our business as well as emerging technologies and business models. Through these experiences, Mr. Baron has experience with audit and corporate governance related issues and he uses these skills as a member of the Audit Committee and Corporate Governance and Nominating Committee of our Board.

50.     Upon information and belief, Defendant Baron is a citizen of Ohio.

**Defendant Beier**

51.     Defendant Thomas E. Beier ("Beier") served as a Company director from 2008 to June 15, 2017.

52.     For the fiscal year ended December 31, 2016, Defendant Beier received $88,600 in

compensation from the Company, comprised of $15,000 in fees earned or paid in cash and $73,600

in option awards. For the fiscal year ended December 31, 2017, Defendant Beier received $9,167

in compensation from the Company, comprised of fees earned or paid in cash.

53.     The Company's 2016 Proxy Statement stated the following about Defendant Beier:

**Thomas E. Beier.** Mr. Beier has served as a director of the Company since January 2008. Previously, he was Senior Vice President of Finance and Chief Financial Officer of IVAX from October 1997 until August 2007, and from December 1996 until October 1997, he served as Vice President-Finance for IVAX. Before joining IVAX, Mr. Beier served as Executive Vice President and Chief Financial Officer of Intercontinental Bank.

As a result of Mr. Beier's long tenure as a chief financial officer, he brings with him a strong financial and operational background and provides valuable business leadership and management experience and insights into many aspects of our business. Mr. Beier also brings financial expertise to the Board.

54.     Upon information and belief, Defendant Beier is a citizen of Florida.

**Defendant Kolosov**

55.     Defendant John Kolosov Jr. ("Kolosov") served as a Company director from 2012

to June 15, 2017.

56.     For the fiscal year ended December 31, 2016, Defendant Kolosov received $88,600

in compensation from the Company, comprised of $15,000 in fees earned or paid in cash and

$73,600 in option awards. For the fiscal year ended December 31, 2017, Defendant Kolosov

received $11,667 in compensation from the Company, comprised of fees earned or paid in cash.

57.     The Company's 2016 Proxy Statement stated the following about Defendant

Kolosov:

**Dmitry Kolosov**. Mr. Kolosov has served as a director of the Company since June 2012. Mr. Kolosov, an attorney, presently serves as CEO of LLC Green-G Logistic, an innovative waste management company operating in Moscow, Russia, and as a director and CEO of InterX LLC, a privately owned drug design and research company. From 2010 through 2013, Mr. Kolosov served as the Vice President,

18

Chief of Staff, and Member of the Management Board of the Skolkovo Foundation, a nonprofit organization in Russia charged by Russian President Dmitry Medvedev with creating a new science and technology city in the Moscow suburb of Skolkovo, which comprises a university, research institutions, centers of collective usage, business incubator, technology transfer and commercialization office, corporate offices and research and development centers, as well as residential space and social infrastructure. From 2002 until 2010 when he joined the Skolkovo Foundation, Mr. Kolosov served in various positions, including as Executive Secretary of the Board of Directors and Head of Shareholder Relations, and as Advisor to the Executive Chairman of the Board, of TNK-BP, a joint venture between BP plc and the Alfa-Access-Renova consortium, and among the ten largest private oil companies in the world. Mr. Kolosov currently serves on the Board of Directors of Pharmsynthez OJSC (MICEX-LIFE), a Russian biopharmaceutical company that specializes in the development, manufacture and distribution of pharmaceuticals. Mr. Kolosov previously served as a director for Ladenburg Thalmann Financial Services Inc. (NYSE MKT:LTS), an investment banking, asset management, and securities brokerage firm providing services through its principal operating subsidiary, Ladenburg Thalmann & Co. Inc.

58.     Upon information and belief, Defendant Kolosov is a citizen of Russia.

**Defendant Krasno**

59.     Defendant Dr. Richard M. Krasno ("Krasno") has served as a Company director since February 2017, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Krasno beneficially owned 133,333 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Krasno owned over $429,332 worth of OPKO stock.

60.     For the fiscal year ended December 31, 2017, Defendant Krasno received $229,954 in compensation from the Company, comprised of $31,354 in fees earned or paid in cash and $198,600 in option awards.

61.     The Company's 2018 Proxy Statement stated the following about Defendant Krasno:

---

[8] Includes options to acquire 60,000 shares of common stock exercisable within 60 days of April 18, 2018. Also includes 73,333 shares of common stock held by the Richard M. Krasno Trust, for which Defendant Krasno is Trustee.

**Richard M. Krasno, Ph.D.** Dr. Krasno was appointed to the Company's Board of Directors on February 9, 2017. Dr. Krasno served as the executive director of the William R. Kenan, Jr. Charitable Trust (the "Trust") from 1999 to 2014, and from 1999 to 2010, as President of the four affiliated William R. Kenan, Jr. Funds. Prior to joining the Trust, Dr. Krasno was the President of the Monterey Institute of International Studies in Monterey, California. From 2004 to 2012, Dr. Krasno also served as a Director of the University of North Carolina Health Care System and served as chairman of its board of directors from 2009 to 2012. From 1981 to 1998, he served as President and Chief Executive Officer of the Institute of International Education in New York. He also served as Deputy Assistant Secretary of Education in Washington, D.C. from 1979 to 1980. Dr. Krasno currently serves as a Director of Ladenburg Thalmann (NYSE American:LTS), Castle Brands, Inc. (NYSE American:ROX) and BioCardia, Inc. (OTC US:BCDA). Dr. Krasno holds a Bachelor of Science from the University of Illinois and a Ph.D. from Stanford University.

Dr. Krasno's pertinent skills and experience, including his financial literacy and expertise, managerial experience and the knowledge he has attained through his service as a director of publicly-traded corporations have added and will continue to add valuable insight to our Board on a wide range of business and operational issues.

62.     Upon information and belief, Defendant Krasno is a citizen of Florida.

**Defendant Lerner**

63.     Defendant Dr. Richard A. Lerner ("Lerner") has served as a Company director since 2007. According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Lerner beneficially owned 351,172 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Lerner owned over $1.1 million worth of OPKO stock.

64.     For the fiscal year ended December 31, 2016, Defendant Lerner received $96,100 in compensation from the Company, comprised of $22,500 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Defendant Lerner received

---

[9] Includes options to acquire 165,000 shares of common stock exercisable within 60 days of April 18, 2018. Also includes 166,172 shares of common stock held by the Lerner Family Trust, for which Defendant Lerner and Nicola Lerner are Trustees and 20,000 shares of common stock held by Defendant Lerner's spouse.

$79,800 in compensation from the Company, comprised of $30,000 in fees earned or paid in cash

and $49,800 in option awards.

65.     The Company's 2018 Proxy Statement stated the following about Defendant

Lerner:

**Richard A. Lerner, M.D.** Dr. Lerner has served as a director of the Company since
March 2007. Dr. Lerner served as President of The Scripps Research Institute, a
private, non-profit biomedical research organization, from 1986 until 2011 and is
currently serving as an institute professor. Dr. Lerner is a member of numerous
scientific associations, including the National Academy of Science and the Royal
Swedish Academy of Sciences. Dr. Lerner serves as director of Intra-Cellular
Therapies, Inc. (NASDAQ:ITCI) a biotechnology company. He previously served
as a director of Kraft Foods, Inc., Teva and Sequenom, Inc.

As a result of Dr. Lerner's long tenure as president of a major biomedical research
organization, he provides valuable business, scientific, leadership, and management
expertise that helps drive strategic direction and expansion at OPKO. His
experience and training as a physician and a scientist enables him to bring valuable
advice to the Board, including a critical perspective on drug discovery and
development and provide a fundamental understanding of the potential pathways
contributing to disease.

66.     Upon information and belief, Defendant Lerner is a citizen of California.

**Defendant Paganelli**

67.     Defendant John A. Paganelli ("Paganelli") has served as a Company director since

2003, and is a member of the Audit Committee. He previously served as the Company's interim

CEO and Secretary from 2005 to 2007, as chairman of the Board from 2003 to 2007. According

to the 2018 Proxy Statement, as of April 18, 2018, Defendant Paganelli beneficially owned

478,515 shares of the Company's common stock. [10] Given that the price per share of the

Company's common stock at the close of trading on April 18, 2018 was $3.22, Paganelli owned

over $1.5 million worth of OPKO stock.

---

[10] Includes options to acquire 120,000 shares of common stock exercisable within 60 days of April 18, 2018.
Also includes 9,175 shares of common stock held by Defendant Paganelli's spouse.

68.     For the fiscal year ended December 31, 2016, Defendant Paganelli received

$97,350 in compensation from the Company, comprised of $23,750 in fees earned or paid in cash

and $73,600 in option awards. For the fiscal year ended December 31, 2017, Defendant Paganelli

received $83,758 in compensation from the Company, comprised of $33,958 in fees earned or paid

in cash and $49,800 in option awards.

69.     The Company's 2018 Proxy Statement stated the following about Defendant

Paganelli:

> **John A. Paganelli.** Mr. Paganelli has served as a director of the Company since
> December 2003. Mr. Paganelli served as the Company's Interim Chief Executive
> Officer and Secretary from June 29, 2005 through March 27, 2007, the Company's
> Interim Chief Financial Officer from June 29, 2005 through July 1, 2005, and
> Chairman of our Board from December 2003 through March 27, 2007. Mr.
> Paganelli served as President and Chief Executive Officer of Transamerica Life
> Insurance Company of New York from 1992 to 1997. Since 1987, Mr. Paganelli
> has been a partner in RFG Associates, a financial planning organization. Mr.
> Paganelli is also the Managing Partner of Pharos Systems Partners, LLC, an
> investment company, and he is Chairman of the Board of Pharos Systems
> International, a software company. He was Vice President and Executive Vice
> President of PEG Capital Management, an investment advisory organization, from
> 1987 until 2000. From 1980 to January 2003, Mr. Paganelli was an officer and
> director-stockholder of Mike Barnard Chevrolet, Inc., an automobile dealership.
> Mr. Paganelli also serves as a director of Western New York Energy, LLC and is
> on the Board of Trustees of Paul Smith's College.
>
> With his significant experience in investment management and operations, Mr.
> Paganelli is able to add valuable expertise and insight to our Board on a wide range
> of operational and financial issues. As one of the longest tenured members of our
> Board, he also has substantial knowledge and familiarity regarding our historical
> operations.

70.     Upon information and belief, Defendant Paganelli is a citizen of New York.

**Defendant Pfenniger**

71.     Defendant Richard C. Pfenniger, Jr. ("Pfenniger") has served as a Company

director since 2008, and is the Chair of the Audit Committee. According to the 2018 Proxy

Statement, as of April 18, 2018, Defendant Pfenniger beneficially owned 310,000 shares of the

Company's common stock.[11] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Pfenniger owned approximately $1 million worth of OPKO stock.

72.     For the fiscal year ended December 31, 2016, Defendant Pfenniger received $98,600 in compensation from the Company, comprised of $25,000 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Defendant Pfenniger received $109,700 in compensation from the Company, comprised of $35,000 in fees earned or paid in cash and $74,700 in option awards.

73.     The Company's 2018 Proxy Statement stated the following about Defendant Pfenniger:

> **Richard C. Pfenniger, Jr.** Mr. Pfenniger is a private investor and has served as a director of the Company since January 2008. Mr. Pfenniger served as Interim CEO of Vein Clinics of America, Inc., a privately held company that specializes in the treatment of vein disease, from May 2014 to February 2015 and as Interim CEO of IntegraMed America, Inc., a privately held company that manages outpatient fertility medical centers, from January 2013 to June 2013. He served as Chief Executive Officer and President for Continucare Corporation, a provider of primary care physician and practice management services, from 2003 until 2011, and served as Chairman of the Board of Directors of Continucare Corporation from 2002 until 2011. Previously, Mr. Pfenniger served as the Chief Executive Officer and Vice Chairman of Whitman Education Group, Inc. from 1997 through June 2003. Prior to joining Whitman, he served as the Chief Operating Officer of IVAX from 1994 to 1997, and, from 1989 to 1994, he served as the Senior Vice President-Legal Affairs and General Counsel of IVAX Corporation. Prior thereto he was engaged in the private practice of law. Mr. Pfenniger currently serves as a director of GP Strategies Corporation (NYSE:GPX), a corporate education and training company, TransEnterix, Inc. (NYSE American:TRXC), a medical device company, BioCardia, Inc. (OTC US:BCDA), clinical-stage regenerative medicine company developing novel therapeutics for cardiovascular diseases, Wright Investors' Services Holdings, Inc. (OTC US:WISH), an investment management and financial advisory firm, and IntegraMed America. He previously served as a director of Vein Clinics of America and Safestitch Medical, Inc. prior to its merger with TransEnterix, Inc.

---

[11] Includes options to acquire 140,000 shares of common stock exercisable within 60 days of April 18, 2018.

As a result of Mr. Pfenniger's multi-faceted experience as chief executive officer, chief operating officer and general counsel, he is able to provide valuable business, leadership, and management advice to the Board in many critical areas. In addition, Mr. Pfenniger's knowledge of the pharmaceutical and healthcare business has given him insights on many aspects of our business and the markets in which we operate. Mr. Pfenniger also brings financial expertise to the Board, including through his service as Chairman of our Audit Committee.

74.     Upon information and belief, Defendant Pfenniger is a citizen of Florida.

## Defendant Yu

75.     Defendant Dr. Alice Lin-Tsing Yu ("Yu") has served as a Company director since 2009. According to the 2018 Proxy Statement, as of April 18, 2018, Defendant Yu beneficially owned 200,000 shares of the Company's common stock.[12] Given that the price per share of the Company's common stock at the close of trading on April 18, 2018 was $3.22, Yu owned approximately $644,000 worth of OPKO stock.

76.     For the fiscal year ended December 31, 2016, Defendant Yu received $88,600 in compensation from the Company, comprised of $15,000 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Defendant Yu received $69,800 in compensation from the Company, comprised of $20,000 in fees earned or paid in cash and $49,800 in option awards.

77.     The Company's 2018 Proxy Statement stated the following about Defendant Yu:

**Alice Lin-Tsing Yu, M.D., Ph.D.** Dr. Yu was appointed to the Company's Board in April 2009. Since mid-2013, Dr. Yu has served as Distinguished Chair Professor and Co-Director of The Institute of Stem Cell & Translational Cancer Research at Chang Gung Memorial Hospital. From 2003 to May, 2013, Dr. Yu served as Distinguished Research Fellow and Associate Director at the Genomics Research Center, Academia Sinica, in Taiwan. She has also served as a Professor of Pediatrics for the University of California in San Diego since 1994. Previously, she was the Chief of Pediatric Hematology Oncology at the University of California in San Diego. Dr. Yu has also served in several government-appointed positions and is a member of numerous scientific committees and associations.

---

[12] Includes options to acquire 100,000 shares of common stock exercisable within 60 days of April 18, 2018.

Dr. Yu is an accomplished physician, professor, and researcher who brings a unique perspective to our Board on a variety of healthcare related issues. As a pioneer in immunotherapy of neuroblastoma, Dr. Yu was instrumental in developing a monoclonal anti-GD2 (Dinutuximab) from IND through early phase studies and phase III trials, and facilitating its FDA approval on March 10, 2015. The insight and experience gained from her distinguished record of achievement at several highly respected academic medical institutions, as well as her experience as a practicing physician, continues to be valuable to our efforts to develop and commercialize our pipeline of diagnostic and therapeutic products.

78.     Upon information and belief, Defendant Yu is a citizen of Taiwan.

## **FIDUCIARY DUTIES OF FGIT AND THE INDIVIDUAL DEFENDANTS**

79.     By reason of their positions as controlling shareholder, officers, directors, and fiduciaries of OPKO, and because of their ability to control the business and corporate affairs of OPKO, FGIT and the Individual Defendants owed OPKO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage OPKO in a fair, just, honest, and equitable manner. The Individual Defendants and FGIT were and are required to act in furtherance of the best interests of OPKO and its shareholders so as to benefit all shareholders equally.

80.     Each controlling shareholder, director and officer of the Company owes to OPKO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

81.     FGIT and the Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of OPKO, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

82.     To discharge their duties, the controlling shareholder, officers and directors of OPKO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

83.     FGIT and each Individual Defendant, by virtue of its, his, or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of FGIT and the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of OPKO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that FGIT and the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised OPKO's Board at all relevant times.

84.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants – along with FGIT, as a controlling shareholder – had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

85.     To discharge their duties, the officers and directors of OPKO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of OPKO were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to OPKO's own Code of Conduct and Business Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how OPKO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of OPKO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that OPKO's operations would comply with all applicable laws and OPKO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

27

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

86.     FIGT and each of the Individual Defendants further owed to OPKO and the shareholders the duty of loyalty requiring that each favor OPKO's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

87.     At all times relevant hereto, the Individual Defendants were the agents of each other and of OPKO and were at all times acting within the course and scope of such agency.

88.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with OPKO, each of the Individual Defendants and FGIT had access to adverse, non-public information about the Company.

89.     FGIT and the Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by OPKO.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90.     In committing the wrongful acts alleged herein, FGIT and the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. FGIT and the Individual Defendants caused the Company to conceal the true facts as alleged herein. FGIT and

28

the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

91.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise FGIT and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act.

92.     FGIT and the Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, FGIT and the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of OPKO was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

93.     FGIT and each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, FGIT and each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

94.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of OPKO, and was at all times acting within the course and scope of such agency.

## **OPKO'S CODE OF CONDUCT AND BUSINESS ETHICS**

95.     OPKO's Code of Conduct and Business Ethics (the "Code of Conduct") provides

that "the Company expects that OPKO and each of its subsidiaries, and their respective directors,

officers[,] employees, contractors, and agents (each, a 'Covered Person') will obey all applicable

laws and regulations, as well as all Company codes, policies, procedures and directives."

96.     The Code of Conduct further provides that "[t]he corporate policies that are

outlined here should be understood and followed by all Covered Persons."

97.     The Code of Conduct provides, regarding violations of the Code of Conduct, that

Violation of these policies could, in many instances, subject OPKO and the
individuals involved to criminal or civil actions, fines, and lawsuits for damages.
Also, violation of these policies could subject a director, office , employee, and
agent to discipline up to and including termination of employment or other
relationship with OPKO.

98.     In relevant part, the Code of Conduct provides, as to conflicts of interest, that:

The Company's policy is to prohibit such conflicts of interest unless the procedures
set forth below are followed. Where a conflict[t] exists, it must be resolved to the
satisfaction of the Company in order for the relationship to continue. ***Each Covered
Person has an obligation to disclose any conflict or appearance of a conflict[t] of
interest to the Chief Compliance Office[r], a member of the Legal Department,
Compliance Committee or Audit Committee of the Board of Directors.*** Conflict
situations and related party transactions will be ultimately reviewed and considered
for approval/rejection by the Audit Committee in accordance with the Company's
Related Party Transaction Policies and Procedures. ***Any activity which even
appears to present a conflict must be avoided or terminated unless, after such
disclosure, the Audit Committee, determines that, in accordance with Company
policy, the activity is not harmful to the Company or otherwise improper.*** The end
result of the process of disclosure, discussion and review may well be approval of
certain relationships or related party transactions on the ground that, despite
appearances, they are not harmful to the Company. However, conflicts and
appearances of conflicts of interest are generally prohibited (even if they do not
harm the Company) unless they have gone through this process. The approval of a
relationship or related party transaction or the determination in the manner set forth
above that an activity is not harmful to the Company or otherwise improper shall
in no event be deemed a waiver of any provision of this Code of Conduct.

(Emphasis added.)

99.     In relevant part, the Code of Conduct provides, as to use of inside information, that:

***OPKO's insider trading policy forbids its directors, officers, and employees from using for personal advantage information that they acquire during the course of their relationship with the Company that has not been publicly disclosed*** ("inside information"). This information could be used for personal advantage in a number of ways. One way is associated with trading in OPKO stock or listed options.

The trading of OPKO stock or listed options in the market by directors, officers and employees based upon material inside information, or by others, who have acquired inside information from such persons, is forbidden. Such trading, in addition to raising obvious ethical considerations, subjects the user of such information to legal risks and could prove embarrassing to the individual and to the Company. All directors, officers and employees must exercise caution not to disclose inside information to outsiders, either intentionally or inadvertently, under any circumstances, whether at meetings held as part of the business day or at informal after-hours discussions.

(Emphasis added.)

100.    The Code of Conduct continues, noting that the prohibition on insider trading

includes trading in securities in other companies, providing, in relevant part, that:

In addition to the above, none [sic] Covered Person should buy or sell securities in any other company about which he or she has material inside information obtained in the performance of his or her duties at OPKO.

101.    The Code of Conduct provides, with respect to community relations, in relevant

part, that:

OPKO has a commitment to function as a good corporate citizen. OPKO recognizes that constructive and transparent interaction with society and a positive relationship with host communities are important to achieving the Company's goals of saving and sustaining lives and becoming an outstanding corporate citizen. These goals are achieved by conducting business, whenever possible, so as to contribute to the overall economic vitality of the host community; by operating facilities in accordance with applicable laws; and by supporting and encouraging public policies and initiatives that enhance the proper operation of the business and take into account legitimate employee and community interests.

Each director, office r, [sic] and employee is a representative of the Company in the community, in which he or she lives and works. ***Directors, officers, and employees should therefore act in a manner, which enhances the Company's relationships with the communities in which it does business.***

(Emphasis added.)

102.    The Code of Conduct provides, with respect to "Accurate Financial Records," that:

All of OPKO's books, records, accounts, and financial statements must be maintained in reason able [sic] detail and must appropriately and accurately reflect all OPKO transactions as required under applicable law. No false or artific[i]al entries shall be made in the records of the Company for any reason, and no payment on behalf of the Company shall be approved or made with the intention or understanding that any part of such payment is to be used for any purpose other than that described by the documents supporting the payment. ***Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying OPKO internal reports, reports filed with the Securities and Exchange Commission or press releases issued by the Company should strive to ensure that OPKO's financial and other disclosure is timely, accurate and transparent and that OPKO's reports and press releases contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of the Company's business and finances and the quality and integrity of the Company's accounting and disclosures.***

Any employee having information or knowledge of any hidden fund or asset, of any false or artificial[l] entry in the books and records of the Company, or of any such payment shall promptly notify the Chief Compliance Officer or any other member of the Legal Department, Compliance Committee or Audit Committee.

(Emphasis added.)

103.    The Code of Conduct provides, with respect to "Responding to media and Public Enquiries," that:

***The Company is committed to delivering accurate and reliable information to the media, financial analysts, investors and other members of the public. All public disclosures, including forecasts, press releases, speeches and other communications will be honest, accurate, and timely.*** No one is authorized to speak with the press, financial analysts, or other members of the financial community without specific authorization to do so by the Chief Executive Officer or the Board of Directors. All requests for financial or other related information about the Company or inquiries from the media or public should be referred to an office r [sic] of OPKO Health. Requests for information from regulators or the Government should be promptly referred to the Legal Department.

(Emphasis added.)

104.    The Code of Conduct provides, with respect to waivers of the Code of Conduct,

that:

> Any waiver of this Code of Conduct for executive officers or directors including, where required by applicable laws, the Company's principal executive office[r], principal financial office[r], principal accounting officer or controller (or persons performing similar functions) may be authorized only by our Board of Directors or the Audit Committee and will be disclosed to stockholders as required by applicable laws, rules and regulations.

105.    The Code of Conduct provides, with respect to reporting obligations, in relevant

part:

> ***All Covered Persons are responsible for complying at all times with the provisions of this Code of Conduct and for reporting any potential violation of this Code of Conduct***, and other OPKO codes, policies, procedures or directives. To this effect, Covered persons may reach out to their supervisors, the Chief Compliance Officer or the designated Compliance Office or compliance responsible person in their respective entity.

(Emphasis added.)

106.    The Code of Conduct provides, with respect to Compliance with the Code of

Conduct, in relevant part:

> OPKO strives to serve the overall interests of its customers, suppliers, employees, communities, and shareholders. OPKO believes that strict compliance by all directors, officers, and employees with this Code of Conduct will best serve the interests of the Company and its constituencies. Accordingly, violations of the Code of Conduct will not be tolerated and will result in penalties ranging from warnings and reprimands to discharges as deemed appropriate by the Company. Willful disregard of criminal statutes underlying this Code of Conduct may require the Company to refer such violation for criminal prosecution or civil action.

> Each supervisor has the responsibility for employees, including agents, consultants, and other representatives of the Company under his or her direction to: (1) continually stress to all employees the need for a commitment to the principles of the Code of Conduct; (2) ensure that their departments operate in accordance with the highest principles of business ethics; and (3) maintain a workplace environment that encourages open communication regarding the importance of operating under these principles and to reinforce the lines of communications available to employees to resolve concerns related to the Code of Conduct.

> . . . ***Each OPKO director, office[r], and employee is charged with the responsibility of familiarizing himself or herself with the Code of Conduct and reporting each violation or potential violation of the Code of Conduct of which he or she becomes aware.*** The Company strongly encourages employees to work with their supervisors on matters concerning the interpretation and application of the Code of Conduct and in making reports. If any employee feels that he or she may not discuss a particular situation with his or her supervisor, such employee should feel free to discuss the matter with any member of the Legal Department, Compliance Committee or with any of the executive officers of the Company.

(Emphasis added.)

107.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' and FGIT's scheme to issue materially false and misleading statements to the public and facilitate and disguise FGIT's and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. Three of the Individual Defendants violated the Code of Conduct by selling Company shares while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## FGIT AND THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

108.    During the Relevant Period, Defendant Frost coordinated with the other Frost Conspirators to perpetrate the Pump & Dump Misconduct.

109.    According to the Pro Se Action, Frost Conspirators and SEC Action defendants Barry C. Honig and Michael Brauser had offices in the IVAX Corporation ("IVAX") building, where OPKO is headquartered, in 2011. Upon information and belief, this geographic proximity facilitated coordination of the Frost Conspirators' actions.

110.    The Frost Conspirators acquired interests in microcap companies at a discount, inflated the share prices of those companies through paid promotions and manipulative trading, and then dumped their shares in concert, harming investors.

111.    In order to artificially inflate share prices, the Frost Conspirators commissioned articles promoting companies that were the subject of the Pump & Dump Misconduct, including MabVax Therapeutics Holdings, Inc. ("MabVax") and BioZone Pharmaceuticals, Inc. ("BioZone"). These articles specifically touted investments made by Defendant Frost and OPKO for the purpose of promoting companies that were the subject of the Pump & Dump Misconduct. For example:

(a) On September 26, 2013, John H. Ford published an article on the website *Seeking Alpha* titled "Opko And Its Billionaire CEO Invested In Biozone." The article pointed to Defendant Frost and OPKO's BioZone holdings to promote and inflate the price of BioZone securities in light of Defendant Frost's reputation as a successful biotech investor. The article stated, in relevant part:

> I recently established a position in BioZone Pharmaceuticals (BZNE.OB) based on the company's undervaluation, its patented QuSomes technology, and the fact that Opko . . . and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.) BioZone's strong patent portfolio, multibillion-dollar addressable markets, and current revenue stream, make it an ideal asymmetrical trade, with large upside potential, and limited downside risk.

John H. Ford was paid 180,000 BioZone shares in exchange for this favorable article by Barry C. Honig, which was not disclosed.

(b) On September 30, 2013, Samuel J. Rae published an article on *Benzinga* titled "Why BioZone Pharmaceuticals, Inc. Could Be The Next Big Name In Drug Administration Technology," touting investments by Defendant Frost to inflate the price of BioZone securities.

In fact, Defendant Frost's name appears in the very first sentence of the article, and the piece concludes by stating "the track record of Dr. Frost is undeniable, and BioZone stock offers investors an early opportunity to buy into what could be his next big success."

(c) On April 8, 2015, an article was published on the website *Seeking Alpha* titled "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics." The article, published under the pseudonym Wall Street Advisors, pointed to Defendant Frost and OPKO's MabVax investment to promote and inflate the price of MabVax securities in light of Defendant Frost's reputation as a successful biotech investor.

(d) On July 1, 2015, John H. Ford published another article on the website *Seeking Alpha* titled "MabVax: Near-Term Catalysts Could Push Shares From $2 To Over $5." The article pointed to Defendant Frost and OPKO's MabVax investment to promote and inflate the price of MabVax securities in light of Defendant Frost's reputation as a successful biotech investor. For example, the article stated, in relevant part:

**Dr. Phillip Frost and Opko investments validate MabVax's technology**

*One of the primary reasons I've invested in MabVax is based on Dr. Phillip Frost's and Opko's (NYSEMKT:OPK),[ ]recent investment in the company.* Dr. Frost and Opko were the lead investor's [sic] in an $11.7 million deal. Undoubtedly Dr. Frost and his team of scientists conducted a high level of due diligence, which validates MabVax's technology.

One of the most important questions for investors is whether or not MabVax's technology works. Given the size of Dr. Frost's and Opko investments, in my opinion that question has been answered in the affirmative. In other words, *Dr. Frost and Opko would not have invested in MabVax unless they believed the science was solid.*

I first became aware of Dr. Frost when I wrote about his flagship company Opko. At the time of my first Opko article, the shares were trading at $4, and have since risen above $19. *Opko is a great company, and its involvement with MabVax will be positive for MabVax.*

Another example of Dr. Frost's success includes his investment in Cocrystal Pharma (OTC:COCP) at $.30 per share. Co[c]rystal has traded above $1.50 this

> year, providing more than a 5X return. I have done well investing in companies backed by Dr. Frost and MabVax could be one of his best performers.

(Bold heading in original. Bold & italic emphasis added.)

112.    John H. Ford has published numerous articles touting companies associated with Defendant Frost, including MusclePharm Corporation and OPKO. Not only is John H. Ford a named defendant in the SEC Action, he entered into a settlement with the SEC and judgment was entered against him on September 21, 2018, as discussed further below.

113.    In advance of the publication of at least some of these articles, some of the Frost Conspirators engaged in trading activity calculated to create the impression that there was market interest in the stock of the companies that were the subject of the Pump & Dump Misconduct.

114.    On April 6, 2018, two days prior to the publication of a promotional article on *Seeking Alpha* regarding MabVax noted above, OPKO, Defendant Frost, and Defendant FGIT, among others, acquired interests in MabVax through a Series E private placement, according to the SEC Action.

115.    The price per share of the promoted companies' stocks responded favorably to the above-referenced articles. For example:

(a) As a result of the September 26, 2018 *Seeking Alpha* article, the price per share of BioZone stock rose approximately 58% between September 25, 2013 and September 27, 2018, as trading volume exploded.

(b) In response to the April 8, 2015 *Seeking Alpha* article, the price per share of MabVax stock rose from a closing price of $1.91 per share on April 1, 2015 to close at $4.30 per share on April 9, 2015.

116.     Following the publication of these articles, Defendant Frost and other Frost Conspirators dumped shares upon the market at artificially inflated prices en masse, enriching themselves at the expense of unsuspecting investors. For example, the SEC Action alleges that:

a) Between October 1 and October 4, 2013, Defendant Frost sold 1,987,991 shares of BioZone at artificially inflated prices, netting approximately $1.1 million in proceeds.

b) Between April 6 and June 30, 2015, certain defendants in the SEC Action sold MabVax shares, netting proceeds in excess of $5.5 million.

117.     Despite operating as a coordinated group, certain of the Frost Conspirators failed to disclose that they were investing as a group in SEC filings. For example, Defendant Frost failed to disclose that he acquired shares in MabVax with an intention to control management, filing a Schedule 13G with the SEC on April 10, 2015 falsely indicating he and FGIT were passive investors in MabVax and failing to disclose he was working with other Frost Conspirators.

118.     Further, in light of OPKO's role as one of the Frost Conspirators, Defendant Frost should have filed a Schedule 13D with the SEC revealing OPKO's ownership of MabVax.

119.     BioZone, the Company touted in the article published on *Seeking Alpha* on September 26, 2013 and noted above, merged with Cocrystal Discovery, Inc. on or about January 3, 2014. The resulting entity was renamed Cocrystal Pharma, Inc.

120.     Despite the involvement of Defendant Frost, OPKO, and FGIT in the Pump & Dump Misconduct, the Company failed to disclose the Pump & Dump Misconduct, or its potential effects on OPKO, during the Relevant Period. Instead, the Company continues to deny any involvement in the Pump & Dump Misconduct, as further detailed below.

### Materially False and Misleading Statements

121.    On November 12, 2013, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2013 (the "2013 Q3 10-Q"). The 2013 Q3 10-Q was signed by Defendant Logal.

122.    Attached to the 2013 Q3 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Frost and Rodriguez, attesting to the accuracy of financial reporting in the 2013 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

123.    On March 3, 2014, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Frost, Hsiao, Rubin, Rodriguez, Logal, Baron, Beier, Kolosov, Lerner, Paganelli, Pfenniger and Yu.

124.    Regarding the Company's "Growth Strategy," the 2013 10-K stated, in relevant part:

> We expect our future growth to come from . . . opportunistically pursuing complementary, accretive, or strategic acquisitions and investments.
>
> * * *
>
> We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .
>
> • *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

125.     Regarding the Company's "Strategic Investments," the 2013 10-K stated, in

relevant part:

In February 2012, we purchased from Biozone Pharmaceuticals, Inc., a publicly-
traded company engaged in the manufacture and sale of pharmaceutical and
cosmetic products ("BZNE"), $1.7 million of 10% secured convertible promissory
notes (the "BZNE Notes"), convertible into BZNE common stock at a price equal
to $0.20 per share, which BZNE Notes are due and payable on February
24, 2014 and ten year warrants (the "Warrants") to purchase 8.5 million shares of
BZNE common stock at an exercise price of $0.40 per share. On January 3, 2014,
BZNE finalized its planned merger with Cocrystal Discovery, Inc. ("Cocrystal"), a
privately-held biopharmaceutical company in which we made an investment in
September 2009 (refer below and to Note 12 for details regarding our investment
in Cocrystal). In January 2014, we invested an additional $.5 million in the
combined Biozone-Cocrystal entity pursuant to which we acquired 1 million shares
of Biozone's common stock and 1 million warrants to acquire additional Biozone
common stock. As of December 31, 2013, we owned an approximately 16% equity
position in BZNE. . . .

126.     Concerning Defendant Frost and his significance to the Company, the 2013 10-K

stated:

***Our success is dependent to a significant degree upon the involvement and efforts
of our Chairman and Chief Executive Officer, Phillip Frost, M.D.***

Our success is dependent to a significant degree upon the efforts of our Chairman
and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business.
The departure of our CEO for whatever reason or the inability of our CEO to
continue to serve in his present capacity could have a material adverse effect upon
our business, financial condition, and results of operations. Our CEO has a highly
regarded reputation in the pharmaceutical and medical industry and attracts
business opportunities and assists both in negotiations with acquisition targets,
investment targets, and potential joint venture partners. Our CEO has also provided
financing to the Company, both in terms of a credit agreement and equity
investments. If we lost his services, our relationships with acquisition and
investment targets, joint ventures, and investors may suffer and could cause a
material adverse impact on our operations, financial condition, and the value of our
Common Stock.

127.     Attached to the 2013 10-K were SOX Certifications signed by Defendants Frost

and Rodriguez, attesting to the accuracy of financial reporting in the 2013 10-K. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

128. On May 9, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2014 (the "Q1 2014 10-Q"). The Q1 2014 10-Q was signed by Defendant Logal.

129. The Q1 2014 10-Q represented that OPKO had "previously made investments in Biozone Pharmaceuticals, Inc. ('Biozone') and Cocrystal Discovery, Inc. ('Cocrystal')," and that the Company's possessed a 16% stake in Cocrystal valued at approximately $5.5 million.

130. Attached to the Q1 2014 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2014 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

131. On August 11, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2014 (the "Q2 2014 10-Q"). The Q2 2014 10-Q was signed by Defendant Logal.

132. The Q2 2014 10-Q represented that OPKO had "previously made investments in Biozone Pharmaceuticals, Inc. ('Biozone') and Cocrystal Discovery, Inc. ('Cocrystal')," and that the Company's possessed a 16% stake in Cocrystal valued at approximately $5.5 million.

133. Attached to the Q2 2014 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2014 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

134.    On November 7, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2014 (the "Q3 2014 10-Q"). The Q3 2014 10-Q was signed by Defendant Logal.

135.    The Q3 2014 10-Q represented that OPKO had "previously made investments in Biozone Pharmaceuticals, Inc. ('Biozone') and Cocrystal Discovery, Inc. ('Cocrystal')," and that the Company's possessed a 15% stake in Cocrystal valued at approximately $5.5 million.

136.    Attached to the Q3 2014 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2014 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

137.    On February 27, 2015, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Frost, Hsiao, Rubin, Logal, Baron, Beier, Kolosov, Lerner, Paganelli, Pfenniger and Yu.

138.    Regarding the Company's "Growth Strategy," the 2014 10-K stated, in relevant part:

> We expect our future growth to come from . . . opportunistically pursuing complementary, accretive, or strategic acquisitions and investments.
>
> * * *
>
> We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .
>
> • *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

139.     Regarding the Company's "Related Party Transactions," the 2014 10-K stated, in

relevant part:

> In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014,
> Biozone completed a merger with Cocrystal, another entity in which we have an
> equity investment, to which Cocrystal was the surviving entity, and the name of the
> issuer was changed to Cocrystal Pharma, Inc. ("CPI"). Dr. Frost previously invested
> in both Biozone and Cocrystal. Effective January 16, 2014, we invested an
> additional $0.5 million in the company as part of a $2.75 million private placement
> and received 1.0 million shares of common stock and 1.0 million 10-year warrants
> exercisable at $0.50 per share. At December 31, 2014, we hold an 8% ownership
> interest in CPI.

140.     Concerning Defendant Frost and his significance to the Company, the 2014 10-K

stated:

> ### Our success is dependent to a significant degree upon the involvement and efforts
> of our Chairman and Chief Executive Officer, Phillip Frost, M.D.
>
> Our success is dependent to a significant degree upon the efforts of our Chairman
> and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business.
> The departure of our CEO for whatever reason or the inability of our CEO to
> continue to serve in his present capacity could have a material adverse effect upon
> our business, financial condition, and results of operations. Our CEO has a highly
> regarded reputation in the pharmaceutical and medical industry and attracts
> business opportunities and assists both in negotiations with acquisition targets,
> investment targets, and potential joint venture partners. Our CEO has also provided
> financing to the Company, both in terms of a credit agreement and equity
> investments. If we lost his services, our relationships with acquisition and
> investment targets, joint ventures, and investors may suffer and could cause a
> material adverse impact on our operations, financial condition, and the value of our
> Common Stock.

141.     Attached to the 2014 10-K were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the 2014 10-K. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

142. On May 11, 2015, the Company filed its quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended March 31, 2015 (the "Q1 2015 10-Q"). The Q1 2015 10-Q was

signed by Defendant Logal.

143. Regarding "Related Party Transactions," the Q1 2015 10-Q stated, in relevant part:

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At March 2015, we hold an 8% ownership interest in COCP.

144. Attached to the Q1 2015 10-Q were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the Q1 2015 10-Q. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

145. On August 5, 2015, the Company filed its quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q was

signed by Defendant Logal.

146. Regarding "Related Party Transactions," the Q2 2015 10-Q stated, in relevant part:

In April 2015, we made a $2.5 million investment in a private placement transaction with MabVax Therapeutics Holdings, Inc. pursuant to which we acquired 33,333 shares of MabVax Series E Convertible Preferred Stock and warrants to purchase 1,666,667 shares of MabVax common stock. Prior to our investment in MabVax, Dr. Frost held shares in MabVax indirectly through an entity in which he has an ownership interest. Dr. Frost, as well as non-affiliated investors, invested in the private placement transaction on the same financial terms. In connection with the OPKO investment, Steven Rubin, our Executive Vice President, Administration, was appointed as an advisor to MabVax, and we have the right to designate two board members.

* * *

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At June 30, 2015, we hold an 8% ownership interest in COCP. . .

147.    Attached to the Q2 2015 10-Q were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the Q2 2015 10-Q. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

148.    On November 9, 2015, the Company filed its quarterly report on Form 10-Q with

the SEC for the fiscal quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-

Q was signed by Defendant Logal.

149.    Regarding "Related Party Transactions," the Q3 2015 10-Q stated, in relevant part:

In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At September 30, 2015, we hold an 8% ownership interest in COCP.

We hold investments in Zebra (ownership 28%), Sevion (3%), Neovasc (5%), ChromaDex Corporation (2%), MabVax (0%), and ARNO (4%). The acquisition of these investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. . . . In October 2015, we made an additional $375 thousand investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock. . . .

150.    Attached to the Q3 2015 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2015 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

151.    On February 29, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Frost, Hsiao, Rubin, Logal, Baron, Beier, Kolosov, Lerner, Paganelli, Pfenniger and Yu.

152.    Regarding the Company's "Growth Strategy," the 2015 10-K stated, in relevant part:

> We expect our future growth to come from . . . opportunistically pursuing complementary, accretive, or strategic acquisitions and investments.
>
> * * *
>
> We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .
>
> • *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

153.    Regarding the Company's "Related Party Transactions," the 2015 10-K stated, in relevant part:

> In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal Discovery, Inc. ("Cocrystal"), another entity in which we had an equity investment. The name of the issuer was changed to Cocrystal Pharma, Inc. ("COCP"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants

exercisable at $0.50 per share. At December 31, 2015, we hold an 8% ownership interest in COCP.

154.    Concerning Defendant Frost and his significance to the Company, the 2015 10-K stated:

### *Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D.*

Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business. The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations. Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments. If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our ˙ Common Stock.

155.    Attached to the 2015 10-K were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the 2015 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

156.    On May 9, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q was signed by Defendant Logal.

157.    Regarding "Related Party Transactions," the Q1 2016 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Sevion (3%), Neovasc (4%), ChromaDex Corporation (2%), MabVax (1%), COCP (8%) and ARNO (4%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. . . . In October 2015, we made an additional $0.4 million investment in

47

MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock.

158.     Attached to the Q1 2016 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2016 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

159.     On August 8, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q was signed by Defendant Logal.

160.     Regarding "Related Party Transactions," the Q2 2016 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Sevion (3%), Neovasc (4%), ChromaDex Corporation (2%), MabVax (1%), COCP (8%) and ARNO (4%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. . . . In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock.

161.     Attached to the Q2 2016 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2016 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

162.     On November 7, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q was signed by Defendant Logal.

163.     Regarding "Related Party Transactions," the Q3 2016 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Sevion (3%), Neovasc (4%), ChromaDex Corporation (2%), MabVax (4%), COCP (8%) and ARNO (5%). These investments were considered related party transactions as a result of our

executive management's ownership interests and/or board representation in these entities. . . . In October 2015, we made an additional \$0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at \$1.10 and 170,454 warrants to purchase shares of common stock. . . . *In August 2016 we invested an additional \$1.0 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. In September 2016 we invested an additional \$2.0 million in COCP for 4,878,050 shares of its common stock.*

(Emphasis added.)

164.    Attached to the Q3 2016 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2016 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

165.    On March 1, 2017, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Frost, Hsiao, Rubin, Logal, Beier, Krasno, Lerner, Paganelli, Pfenniger and Yu.

166.    Regarding the Company's "Growth Strategy," the 2016 10-K stated, in relevant part:

We expect our future growth to come from . . . opportunistically pursuing complementary, accretive, or strategic acquisitions and investments.

\* \* \*

We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including: . . . .

• *Early stage investments.* We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

167.    Regarding the Company's "Related Party Transactions," the 2016 10-K stated, in

relevant part:

> We hold investments in Zebra (ownership 28%), Sevion (3%), Neovasc (4%),
> ChromaDex Corporation (2%), MabVax (4%), COCP (8%), ARNO (5%),
> NIMS 1% and BioCardia (5%). These investments were considered related party
> transactions as a result of our executive management's ownership interests and/or
> board representation in these entities. See further discussion of our investments in
> Note 4. . . . In October 2015, we made an additional $0.4 million investment in
> MabVax pursuant to which we acquired 340,909 shares of common stock
> at $1.10 and 170,454 warrants to purchase shares of common stock. . . . In August
> 2016 we invested an additional $1.0 million in MabVax for 207,900 shares of its
> common stock and warrants to purchase 415,800 shares of its common stock. In
> September 2016, we invested an additional $2.0 million in COCP for 4,878,050
> shares of its common stock.

168.    Concerning Defendant Frost and his significance to the Company, the 2016 10-K

stated:

> ***Our success is dependent to a significant degree upon the involvement and efforts***
> ***of our Chairman and Chief Executive Officer, Phillip Frost, M.D.***
>
> Our success is dependent to a significant degree upon the efforts of our Chairman
> and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business.
> The departure of our CEO for whatever reason or the inability of our CEO to
> continue to serve in his present capacity could have a material adverse effect upon
> our business, financial condition, and results of operations. Our CEO has a highly
> regarded reputation in the pharmaceutical and medical industry and attracts
> business opportunities and assists both in negotiations with acquisition targets,
> investment targets, and potential joint venture partners. Our CEO has also provided
> financing to the Company, both in terms of a credit agreement and equity
> investments. If we lost his services, our relationships with acquisition and
> investment targets, joint ventures, and investors may suffer and could cause a
> material adverse impact on our operations, financial condition, and the value of our
> Common Stock.

169.    Attached to the 2016 10-K were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the 2016 10-K. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

170. On May 10, 2017, the Company filed its quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended March 31, 2017 (the "Q1 2017 10-Q"). The Q1 2017 10-Q was

signed by Defendant Logal.

171. Regarding "Related Party Transactions," the Q1 2017 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 28%), Sevion (3%), Neovasc (4%), ChromaDex Corporation (2%), MabVax (4%), COCP (8%) ARNO (0%), NIMS (1%) and BioCardia (5%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. See further discussion of our investments in Note 5. . . . In August 2016 we invested an additional $1.0 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. In September 2016 we invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

172. Attached to the Q1 2017 10-Q were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the Q1 2017 10-Q. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

173. On August 8, 2017, the Company filed its quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended June 30, 2017 (the "Q2 2017 10-Q"). The Q2 2017 10-Q was

signed by Defendant Logal.

174. Regarding "Related Party Transactions," the Q2 2017 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Sevion (2%), Neovasc (4%), ChromaDex Corporation (2%), MabVax (4%), COCP (9%) ARNO (0%), NIMS (1%), BioCardia (5%) and Eloxx (3%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities.

\* \* \*

In May 2017, we invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. We had also invested an additional $1.0 million in MabVax in August 2016 for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock.

In April 2017, we invested an additional $1.0 million in COCP for 4,166,667 shares of its common stock, and in September 2016, we had invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

175.    Attached to the Q2 2017 10-Q were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the Q2 2017 10-Q. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

176.    On November 8, 2017, the Company filed its quarterly report on Form 10-Q with

the SEC for the fiscal quarter ended September 30, 2017 (the "Q3 2017 10-Q"). The Q3 2017 10-

Q was signed by Defendant Logal.

177.    Regarding "Related Party Transactions," the Q3 2017 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Sevion (2%), Neovasc (4%), ChromaDex Corporation (2%), MabVax (4%), COCP (9%) ARNO (0%), NIMS (1%), BioCardia (5%) and Eloxx (3%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities.

* * *

*In July 2017, we invested an additional $0.1 million in MabVax for 152,143 shares of common stock* and in May 2017, we invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. We had also invested an additional $1.0 million in MabVax in August 2016 for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. In April 2017, we invested an additional $1.0 million in COCP for 4,166,667 shares of its common stock, and in September 2016, we had invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

(Emphasis added.)

178.    Attached to the Q3 2017 10-Q were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the Q3 2017 10-Q. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

179. On March 1, 2018, the Company filed its annual report on Form 10-K with the SEC

for the fiscal quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was

signed by Defendants Frost, Hsiao, Rubin, Logal, Krasno, Lerner, Paganelli, Pfenniger and Yu.

180. Regarding the Company's "Growth Strategy," the 2017 10-K stated, in relevant

part:

We expect our future growth to come from . . . opportunistically pursuing
complementary, accretive, or strategic acquisitions and investments.

\* \* \*

We have and expect to continue to be opportunistic and pursue complementary or
strategic acquisitions, licenses and investments. Our management team has
significant experience in identifying, executing and integrating these transactions.
We expect to use well-timed, carefully selected acquisitions, licenses and
investments to continue to drive our growth, including: . . .

• *Early stage investments*. We have and may continue to make investments in early
stage companies that we perceive to have valuable proprietary technology and
significant potential to create value for OPKO as a shareholder.

181. Regarding the Company's "Related Party Transactions," the 2017 10-K stated, in

relevant part:

We hold investments in Zebra (ownership 29%), Neovasc (5%), ChromaDex
Corporation (1%), MabVax (2%), COCP (9%), NIMS 1% and BioCardia (5%).
These investments were considered related party transactions as a result of our
executive management's ownership interests and/or board representation in these
entities. See further discussion of our investments in Note 4.

\* \* \*

In July 2017, we invested an additional $0.1 million in MabVax for 152,143 shares
of common stock and in May 2017, we invested an additional $0.5 million in
MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of
Series I Preferred Stock. We had also invested an additional $1.0 million in
MabVax in August 2016 for 207,900 shares of its common stock and warrants to
purchase 415,800 shares of its common stock.

In April 2017, we invested an additional $1.0 million in COCP
for 4,166,667 shares of its common stock, and in August 2016, we had invested an
additional $2.0 million in COCP for 4,878,050 shares of its common stock.

182.    Concerning Defendant Frost and his significance to the Company, the 2017 10-K

stated:

> ***Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D.***
>
> Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business. The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations. Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments. If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.

183.    Attached to the 2017 10-K were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of the financial reporting in 2017 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

184.    On April 30, 2018, the Company issued the 2018 Proxy Statement. Defendants Frost, Hsiao, Rubin, Krasno, Lerner, Paganelli, Pfenniger and Yu solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[13]

---

[13] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

185.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that

"[t]he Company has adopted a Code of Business Conduct and Ethics that applies to all employees,

officers, and directors of the Company."

186.    With respect to the Company's investments, the 2018 Proxy Statement admitted, in

relevant part:

> As of December 31, 2018,[14] we hold investments in Cocrystal Pharma, Inc.
> ("COCP")(9%),. . . MabVax Therapeutics Holdings, Inc. ('MabVax')(2%) . . . In
> May 2017, we invested an additional $0.5 million in MabVax for 285,714 shares
> of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. In July
> 2017, we invested an additional $0.1 million in MabVax for 152,143 shares of its
> common stock.

However, the 2018 Proxy Statement failed to disclose the Pump & Dump Misconduct related to

MabVax and Cocrystal Pharma, Inc.

187.    The 2018 Proxy Statement was false and misleading because, despite assertions to

the contrary, its Code of Conduct was not followed, as multiple Individual Defendants engaged in

insider trading while allowing false and misleading statements to be issued to the investing public.

188.    Further, the 2018 Proxy Statement failed to disclose that: (1) OPKO, Defendant

Frost, FGIT, and a number of other individuals and entities were engaged in the Pump & Dump

Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from

government agencies, including the SEC, and its shares would be suspended from trading; (3) the

Company failed to maintain internal controls; and (4) as a result of the foregoing, the Company's

public statements were materially false and misleading at all relevant times.

189.    On May 10, 2018, the Company filed its quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended March 31, 2018 (the "Q1 2018 10-Q"). The Q1 2018 10-Q was

signed by Defendant Logal.

---

[14] Upon information and belief, this is a drafting error, and should read December 31, **2017**.

190.    Regarding "Related Party Transactions," the Q1 2018 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Neovasc (1%), ChromaDex Corporation (0%), MabVax (2%), COCP (9%), NIMS (1%) and BioCardia (5%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. See further discussion of our investments in Note 5.

In February 2018, we invested an additional $1.0 million in COCP for a convertible note, which is convertible into 123,456 shares of its common stock. In April 2017, we invested an additional $1.0 million in COCP for 138,889 shares of its common stock, and in August 2016, we had invested an additional $2.0 million in COCP for 162,602 shares of its common stock.

* * *

In July 2017, we invested an additional $0.1 million in MabVax for 50,714 shares of common stock and in May 2017, we invested an additional $0.5 million in MabVax for 1,667 shares of Series L Preferred Stock and 107,607 shares of Series I Preferred Stock.

191.    Attached to the Q1 2018 10-Q were SOX Certifications signed by Defendants Frost

and Logal, attesting to the accuracy of financial reporting in the Q1 2018 10-Q. The SOX

Certifications further attested that all fraud and any material changes to the Company's internal

control over financial reporting had been disclosed.

192.    On August 7, 2018, the Company filed its quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended June 30, 2018 (the "Q2 2018 10-Q"). The Q2 2018 10-Q was

signed by Defendant Logal.

193.    Regarding "Related Party Transactions," the Q2 2018 10-Q stated, in relevant part:

We hold investments in Zebra (ownership 29%), Neovasc (1%), ChromaDex Corporation (0%), MabVax (2%), COCP (9%), NIMS (1%) and BioCardia (5%). These investments were considered related party transactions as a result of our executive management's ownership interests and/or board representation in these entities. See further discussion of our investments in Note 5.

In February 2018, we invested an additional $1.0 million in COCP for a convertible note, which is convertible into 123,456 shares of its common stock. In April 2017, we invested an additional $1.0 million in COCP for 138,889 shares of its common

56

stock, and in August 2016, we had invested an additional $2.0 million in COCP for 162,602 shares of its common stock.

\* \* \*

In July 2017, we invested an additional $0.1 million in MabVax for 50,714 shares of common stock and in May 2017, we invested an additional $0.5 million in MabVax for 1,667 shares of Series L Preferred Stock and 107,607 shares of Series I Preferred Stock.

194.    Attached to the Q2 2018 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2018 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

195.    The statements referenced in ¶¶ 121-183 and 190-194 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) OPKO, Defendant Frost, FGIT, and a number of other individuals and entities were engaged in the Pump & Dump Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its shares would be suspended from trading; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

196.    On September 7, 2018, the SEC issued a press release announcing the filing of a complaint against, among others, Defendant Frost, OPKO, and FGIT. The release, titled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes," stated, in relevant part:

> *The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales*

*and caused significant harm to retail investors who were left holding virtually worthless stock*.

According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes. *Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes*. Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.

"As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement. "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."

*The SEC's complaint*, which was filed in federal district court in Manhattan, *charges* Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, *Frost*, Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., *OPKO Health Inc., Frost Gamma Investments Trust*, Southern Biotech Inc., and Stetson Capital Investments Inc. *with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief*.

(Emphasis added.)

197.    On this news, the price of OPKO stock dropped $1.01 per share, or 18%, from the

previous day's closing price, trading at $4.58 per share at 2:34 PM EDT on September 7, 2018, at

which time NASDAQ halted trading of OPKO shares.

## **False and Misleading Statements Continue**

198.    The Company has continued to deny the Pump & Dump Misconduct. In a press

release issued September 7, 2018, the Company commented on the SEC Action, stating as follows:

MIAMI, Sept. 07, 2018 -- OPKO Health, Inc. (NASDAQ: OPK) provided the following comment on the lawsuit filed by the U.S. Securities and Exchange Commission earlier today.

"OPKO learned today that the Securities and Exchange Commission has filed a lawsuit in the Southern District of New York against a number of individuals and entities, including OPKO and its CEO and Chairman Phillip Frost. The SEC failed to provide notice of its intent to sue prior to filing the complaint, which contains serious factual inaccuracies. Had the SEC followed its own standard procedures, OPKO and Dr. Frost would gladly have provided information that would have answered a number of the SEC's apparent questions, and filing of this lawsuit against them could have been avoided. OPKO and Dr. Frost have always prided themselves on adhering to the highest standards of financial disclosure, and they are confident that once a proper investigation is completed and the facts of the case have been fully disclosed, the matter will be resolved favorably for them."

The Company noted that the complaint does not contain any allegations about OPKO's financial practices, financial statements or business practices.

Although the Company refuted the claims, it was unable to identify any of the "factual inaccuracies" in the SEC's complaint.

199.    On September 11, 2018, the Company issued a press release updating investors on NASDAQ's suspension of trading in OPKO stock, stating, in relevant part:

MIAMI, Sept. 11, 2018 -- OPKO Health, Inc. (NASDAQ: OPK) has had trading in its common stock halted by The Nasdaq Stock Market, and *the exchange has advised OPKO that the halt will continue until the company responds (to Nasdaq's satisfaction) to the exchange's request for information related to the previously reported lawsuit filed by the U.S. Securities and Exchange Commission against a number of individuals and entities, including OPKO and its CEO and Chairman Phillip Frost.* As noted previously, the lawsuit does not contain any allegations about OPKO's financial practices, financial statements or business practices, and OPKO is confident that once a proper investigation is completed and the facts of the case have been fully disclosed, the matter will be resolved favorably for the company. OPKO is working expeditiously to respond to Nasdaq's request for information, but it cannot currently estimate when trading will resume.

(Emphasis added.)

200.    On September 14, 2018, Defendant Frost released a statement in response to the

SEC Action, which stated, in relevant part:

> "I was stunned by the SEC's lawsuit and deny the allegations it contains against
> me. It was particularly disturbing that the SEC departed from its own longstanding
> practice of providing advance notice and a meaningful opportunity to address their
> questions in advance of filing an action.["]

> "The allegations against me are belied by common sense, my history of supporting
> promising scientific technology, and the facts. I invested in two of the entities
> identified in the complaint. These investments were made because I understood the
> entities presented promising medical developments and a real opportunity to deliver
> value for shareholders. I remain a significant long-term shareholder in both
> companies.["]

> "Nothing is more important to me than my integrity and I am deeply proud of the
> role I have played over many decades in developing medicines and diagnostic tools
> that have improved many lives. I intend to fight the charges that have been brought
> against me and will fight to clear my name."

201.    The statements referenced in ¶¶ 198-200 above were materially false and

misleading and failed to disclose material facts necessary to make the statements made not false

and misleading. Specifically, the Individual Defendants failed to disclose that: (1) OPKO,

Defendant Frost, FGIT, and a number of other individuals and entities were engaged in the Pump

& Dump Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory

scrutiny from government agencies, including the SEC, and its shares would be suspended from

trading; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing,

the Company's public statements were materially false and misleading at all relevant times.

### Trading of OPKO Stock Resumes, and the SEC Action Continues to Develop

202.    OPKO stock resumed trading on September 14, 2018. Upon the resumption of

trading, the price of OPKO shares fell an additional $0.68, or approximately 15%, closing at $3.90

on September 14, 2018.

203. On September 21, 2018, the Court in the SEC Action entered a judgment against defendant John H. Ford. John H. Ford agreed to settle the SEC Action, without admitting or denying the allegations against him, in exchange for prohibitions on violating the federal securities laws in the future, a permanent bar from participating in any offering of penny stock, a civil penalty, disgorgement of all gains and prejudgment interest thereon. The amount of disgorgement and the civil penalty are to be determined by the Court.

## DAMAGES TO OPKO

204. As a direct and proximate result of the Individual Defendants' conduct, OPKO is losing and expending many millions of dollars.

205. Such expenditures include, but are not limited to, legal fees associated with the SEC Action and Pro Se Action filed against the Company and its CEO, the Securities Class Actions filed against the Company, its CEO, its CFO, and its former CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

206. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

207. As a direct and proximate result of FGIT and the Individual Defendants' conduct, OPKO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and FGIT and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

208.     Plaintiff brings this action derivatively and for the benefit of OPKO to redress injuries suffered, and to be suffered, as a result of FGIT and the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of OPKO, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

209.     OPKO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

210.     Plaintiff is, and has been at all relevant times, a shareholder of OPKO. Plaintiff will adequately and fairly represent the interests of OPKO in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

211.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

212.     A pre-suit demand on the Board of OPKO is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Frost, Hsiao, Rubin, Krasno, Lerner, Paganelli, Pfenniger and Yu (the "Director-Defendants") and non-party Robert S. Fishel (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine directors that were on the Board at the time this action was commenced.

213.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

62

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of over $1.5 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

214.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

215.    Additional reasons that demand on Director-Defendant Frost is futile follow. Director-Defendant Frost has served as the Chairman of the Board and CEO since 2007. Thus, as the Company admits in the 2018 Proxy Statement, Director-Defendant Frost is a non-independent director. Director-Defendant Frost receives handsome compensation for his services to OPKO, including over $3 million in 2016 and $870,800 in 2017. Director-Defendant Frost was responsible for all of the false and misleading statements and omissions that were made, including those in the foregoing periodic filings with the SEC, each of which he either signed or signed a SOX Certification for. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. His large Company stock holding, worth at least $633.1 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to

make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Frost is a Director-Defendant in the both the SEC Action and the Securities Class Actions. For these reasons, too, Director-Defendant Frost breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on Director-Defendant Rubin is futile follow. Director-Defendant Rubin has served as a Company director and as Executive Vice President – Administration since 2007. Thus, as the Company admits in the 2018 Proxy Statement, Director-Defendant Rubin is a non-independent director. He receives handsome compensation, including over $2.7 million in 2016 and $820,800 in 2017. As a long-time Company director and executive during the Relevant Period, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Director-Defendant Rubin signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. His insider sales before the fraud was exposed, which yielded over $1.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Further, Director-Defendant Rubin has strong personal and professional connections with Director-Defendant Frost: in 2017 *Forbes* reported that Director-Defendant Rubin is a "regular lunch mate" of Director-Defendant Frost, and the two men have frequent face

to face meetings.[15] Further, Director-Defendant Rubin has been involved in securities violations with Director-Defendant Frost in the past. A class action lawsuit for violations of the securities laws was filed in the Southern District of Florida against Searchmedia Holdings Limited, and Defendants Frost, Rubin, and Beier (among others) in 2010 and was partially settled in 2013 for consideration of $2.75 million. Thus, for these reasons, too, Director-Defendant Rubin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Director-Defendant Hsiao is futile follow. Director-Defendant Hsiao has served as the Company's Vice-Chairman and Chief Technical Officer since 2007. Thus, as the Company admits in the 2018 Proxy Statement, Director-Defendant Hsiao a non-independent director. She receives handsome compensation, including approximately $2.9 million in 2016 and $915,800 in 2017. As a long-time Company director and Chief Technical Officer, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Director-Defendant Hsiao signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. She also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Director-Defendant Hsiao also shares a close relationship with Director-Defendant Frost, who faces a substantial likelihood of liability in the SEC Action and the Securities Class Actions. In profiling Director-Defendant Hsiao, Forbes described Director-Defendant Hsiao as Director-Defendant "Frost's close confidante and business

---

[15] Matt    Schifrin,    *Meet    Miami's    Renaissance    Billionaire*,    FORBES    (Jan.    24,    2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

partner [who] has been working with him for year[s] at various pharma outfits." In January 2017, Forbes reported that Director-Defendant Frost "lunches daily with senior executives, including Dr. Jane Hsiao . . . whose late husband, Charles, cofounded Ivax with Frost."[16] Director-Defendant Hsiao also coordinated with Director-Defendant Frost to perpetrate the Pump & Dump Misconduct. The complaint in the Pro Se Action alleges that Brian Keller, one of the Frost Conspirators, represented to the pro se plaintiff that Director-Defendant Hsiao was involved in negotiating with Nian Wu, a chemist involved with BioZone in response to the pro se plaintiff's assertion to Brian Keller that activities of the Frost Conspirators at BioZone constituted fraud. In a conference call held with analysts and investors on March 1, 2018, Director-Defendant Frost touted the confidence that he and Director-Defendant Hsiao had in OPKO, stating his confidence had been confirmed by his "investing an additional $25 million into the Company, alongside my colleague Dr. Jane Hsiao." These connections extend to shared philanthropic interests: the Phillip and Patricia Frost Museum of Science includes the Hsiao Family Special Exhibition Gallery. Further, as recently as June 2018, Director-Defendant Hsiao's Jane Hsiao Asian Art Endowment funded an exhibit at the Frost Art Museum at Florida International University, underscoring the depth of her social and professional connections with Director-Defendant Frost. Thus, for these reasons, too, Director-Defendant Hsiao breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Paganelli is futile follow. Defendant Paganelli has served as a Company director since 2003 and is a member of the Audit Committee. As a long-time Company director and member of the Audit Committee, he conducted little, if any,

---

[16]    Matt   Schifrin,   *Meet   Miami's   Renaissance   Billionaire*,   FORBES   (Jan.   24,   2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Paganelli signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Paganelli breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Lerner is futile follow. Defendant Lerner has served as a Company director since 2007. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Lerner signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Lerner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Pfenniger is futile follow. Defendant Pfenniger has served as a Company Director since 2008, and is a Chairman of the Audit Committee. He receives handsome compensation, including $109,700 in 2017. As a Company

director and Chairman of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Pfenniger signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Pfenniger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221. Additional reasons that demand on Defendant Yu is futile follow. Defendant Yu has served as a Company director since 2009. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Yu signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. She also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Yu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

222. Additional reasons that demand on Defendant Krasno is futile follow. Defendant Krasno has served as a Company Director since February 2017, and is a member of the Audit

Committee. He receives handsome compensation, including $229,954 in 2017. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Krasno signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Krasno breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223.    Additional reasons that demand on the Board is futile follow.

224.    As described above, one of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Director-Defendant Rubin received proceeds of over $1.5 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and thus excused.

225.    As noted in the 2018 Proxy Statement, the Company engages a number of ongoing transactions with entities associated with Director-Defendant Frost. These arrangements include:

(a)    A five-year lease between the Company and Frost Real Estate Holdings, LLC, entered into January 1, 2014, pursuant to which the Company initially paid $81,000 per month for approximately 29,000 square feet of office space. Beginning in 2018 and running into 2019, the rent increased to $86,000 per month.[17]

---

[17] The 2018 Proxy Statement asserts that the rent was reduced by $216,000 for the cost of tenant improvements.

(b)     The Company uses an airplane owned by a company beneficially owned by Director-Defendant Frost, for which that company is reimbursed. The Company paid approximately $361,000 and $298,000 in fiscal years 2017 and 2016, respectively for the use of the private plane.

Thus, the Company has indirectly paid Director-Defendant Frost approximately $4.45 million in rent during the Relevant Period and $659,000 over the past two fiscal years for air travel. Therefore, in addition to those reasons named above, demand is futile as to Director-Defendant Frost because he lacks independence as a result of these contracts.

226.    Demand in this case is excused because the Directors are beholden to and controlled by Director-Defendant Frost, who controls the Company by virtue of his share ownership, which provided him with approximately 64% of the total shareholder voting power as of April 18, 2018.[18] These shareholdings provide Director-Defendant Frost with significant control over the continued employment of the remaining Directors, especially Director-Defendants Hsiao and Rubin, who are also executives of OPKO. Director-Defendants Krasno and Pfenniger are also beholden to Director-Defendant Frost because of the handsome compensation they receive as Directors. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Director-Defendant Frost's control over them and his substantial likelihood of liability in the SEC Action, the Securities Class Actions and in the present action, and demand is excused.

227.    Demand in this case is excused because the Directors, eight of whom are named as defendants in this action, and one of whom is a defendant in both the SEC Action and the Securities

---

[18] The 2018 Proxy Statement reports that, as of April 18, 2018, Defendant Frost beneficially owned 34.76% of the Company's outstanding stock, and FGIT beneficially owned 33.54% of the Company's outstanding stock. Defendant Frost is the trustee and Frost Gamma Limited Partnership is the sole and exclusive beneficiary of FGIT. Accounting for shares included in the reported in the beneficial ownership of both Defendant Frost and FGIT (5 million though a convertible note held by FGIT and 20,091,062 held by the Frost Group LLC), Defendant Frost could exercise voting power, directly or indirectly, over 64.45% of the Company's common stock as of April 18, 2018, based on a reported 559,473,568 shares outstanding as of that date.

Class Actions, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

228. Many of the Individual Defendants, including four current Directors, have connections dating back decades through IVAX. The tenures of these Individual Defendants at IVAX overlap as follows:

(a) Director-Defendant Frost was the CEO & Chairman of IVAX from 1987 to 2006.

(b) Director-Defendant Hsiao was the Vice Chair – Technical Affairs from 1995 to 2006.

(c) Director-Defendant Rubin was the General Counsel and Secretary from 2001 to 2006.

(d) Director-Defendant Pfenniger was the Chief Operating Officer from 1994 to 1997, and Senior Vice President of Legal Affairs and General Counsel from 1989-1994.

(e) Defendant Beier was Senior Vice President of Finance and CFO from 1997 to 2007. Upon information and belief, these Individual Defendants developed social and professional connections during their shared tenures as senior executives of IVAX which prevent them from evaluating a demand with independence.

229. Director-Defendants Frost, Hsiao, and Rubin have particularly strong personal and professional connections. They, along with FGIT, are each members of The Frost Group, LLC, a private equity firm specializing in PIPE investments founded in 2006. The Frost Group, LLC

beneficially owned approximately 3.59% of the Company's outstanding stock as of April 18, 2018.

230.    The strong connections between Director-Defendants Frost, Hsiao, and Rubin are further evidenced by their shared memberships on company boards. Director-Defendants Frost, Hsiao, and Rubin all currently serve on the board of Cocrystal Pharma, Inc., which was a subject of the Puma & Dump Misconduct. Further, all three previously served on the Board of several other companies, including Safestitch Medical, Inc. prior to its merger with TransEnterix (along with Director-Defendant Pfenniger) and PROLOR Biotech, Inc., prior to its acquisition by the Company in August 2013.

231.    Director-Defendants Frost and Rubin also both previously served on the boards of: (1) Cogint, Inc.; and (2) Sevion Therapeutics, Inc. prior to its merger with Eloxx Pharmaceuticals, Inc.

232.    Director-Defendants Frost, Rubin, and Krasno all serve together on the board of Castle Brands, Inc.

233.    Director-Defendants Frost and Krasno serve on the board of Ladenburg Thalmann Financial Services Inc., and Defendant Kolosov formerly served on the board of Ladenburg Thalmann Financial Services Inc.

234.    Director-Defendants Frost and Pfenniger serve together on the Board of Trustees of the Frost Science Museum, where Director-Defendant Pfenniger is the Vice Chairman of the board.

235.    Director-Defendants Frost and Lerner both previously served on the board of Teva Pharmaceuticals Industries, Limited.

236.    As a result of these long-time personal and professional connections, combined with the substantial likelihood of liability that Director-Defendant Frost faces in the SEC Action and the Securities Class Actions, none of Director-Defendants Frost, Hsiao, Rubin, Krasno, Lerner, or Pfenniger can evaluate a demand with independence, and thus, demand is excused.

237.    Several of the Director-Defendants serve together on boards outside of OPKO:

(a)    Director-Defendant Hsiao is the board chair of Non-Invasive Monitoring Systems, Inc., where Defendant Rubin also serves as a Director.

(b)    Director-Defendants Hsiao and Pfenniger both serve on the board of TransEnterix, Inc.

(c)    Director-Defendants Krasno and Pfenniger both serve on the board of BioCardia, Inc.

Upon information and belief, Director-Defendants Hsiao, Rubin, Pfenniger and Krasno have developed social and professional connections as a result of their shared service on these boards. As a result of these social and professional connections, Director-Defendants Hsiao, Rubin, Pfenniger and Krasno are unable to evaluate a demand with independence, and therefore, demand on them is excused.

238.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in FGIT and the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise FGIT and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law,

while one of the Director-Defendants engaged in insider trading. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

239. OPKO has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for OPKO any part of the damages OPKO suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

240. FGIT's and the Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

241. The acts complained of herein constitute violations of fiduciary duties owed by OPKO's officers and directors (along with FGIT), and these acts are incapable of ratification.

242. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of OPKO. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

74

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of OPKO, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

243.    If there is no directors' and officers' liability insurance, then the Directors will not cause OPKO to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

244.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

245.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

247.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

248.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

249.     Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) OPKO, Defendant Frost, FGIT, and a number of other individuals and entities were engaged in the Pump & Dump Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its shares would be suspended from trading; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

250.     Moreover, the 2018 Proxy Statement as false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them.

251.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

252.     The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Frost, Hsiao, Rubin, Krasno, Lerner, Paganelli, Pfenniger, and Yu, which allowed them to continue breaching their fiduciary duties to OPKO.

253.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

254.     Plaintiff on behalf of OPKO has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants and FGIT for Breach of Fiduciary Duties

255.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.     Each Individual Defendant and FGIT owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of OPKO's business and affairs.

257.     Each of the Individual Defendants and FGIT violated and breached his, her or its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

258.     The Individual Defendants' and FGIT's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.

The Individual Defendants and FGIT intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of OPKO.

259. In breach of their fiduciary duties owed to OPKO, the Individual Defendants and FGIT willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) OPKO, Defendant Frost, FGIT, and a number of other individuals and entities were engaged in the Pump & Dump Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and its shares would be suspended from trading; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

260. The Individual Defendants and FGIT failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

261. In further breach of their fiduciary duties, FGIT and the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

262. The Individual Defendants and FGIT had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants and FGIT had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were

committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of OPKO's securities and disguising insider sales.

263.    The Individual Defendants and FGIT had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants and FGIT had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of OPKO's securities and engaging in insider sales.

264.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

265.    As a direct and proximate result of the Individual Defendants' and FGIT's breaches of their fiduciary obligations, OPKO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and FGIT are liable to the Company.

266.    Plaintiff on behalf of OPKO has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants and FGIT for Unjust Enrichment

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and FGIT were unjustly enriched at the expense of, and to the detriment of, OPKO.

269.     The Individual Defendants and FGIT either benefitted financially from the Pump & Dump Misconduct or based on improper conduct received bonuses, stock options, or similar compensation from OPKO that was tied to the performance or artificially inflated valuation of OPKO, or received compensation that was unjust in light of the Individual Defendants' and FGIT's bad faith conduct.

270.     Plaintiff, as a shareholder and a representative of OPKO, seeks restitution from the Individual Defendants and FGIT and seeks an order from this Court disgorging all profits, including from insider transactions, and/or excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and FGIT due to their wrongful conduct and breach of their fiduciary and contractual duties.

271.     Plaintiff on behalf of OPKO has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of OPKO, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants and FGIT breached or aided and abetted the breach of their fiduciary duties to OPKO;

(c)     Determining and awarding to OPKO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and FGIT, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing OPKO, the Individual Defendants, and FGIT to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect OPKO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of OPKO to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding OPKO restitution from each of the Individual Defendants and FGIT;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: October 2, 2018

Respectfully submitted,

_____
Walter J. Mathews
Fla. Bar No.: 0174319

**MATHEWS GIBERSON LLP**
200 S. Andrews Avenue, Suite 800
Fort Lauderdale, FL 33301
Telephone: (954) 463-1929
Fax. (954) 653-2963
Email: wjm@mathewsllp.com

Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Andy Yu am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this th day of September 2018.

9/21/2018 9:23:46 AM PDT

DocuSigned by:

41BB3D63AD424F3...
Andy Yu