UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ANDY YU, derivatively on behalf of OPKO HEALTH, INC., <br><br> Plaintiff, <br><br> vs. <br><br> PHILLIP FROST, ADAM LOGAL, JUAN F. RODRIGUEZ, JANE H. HSIAO, STEVEN RUBIN, ROBERT A. BARON, THOMAS E. BEIER, DMITRY KOLOSOV, RICHARD M. KRASNO, RICHARD C. PFENNIGER, ALICE LIN-TSING YU, RICHARD A. LERNER, and FROST GAMMA INVESTMENTS TRUST, <br><br> Defendants, <br><br> and <br><br> OPKO HEALTH, INC., <br><br> Nominal Defendant. | **Case No. 1:18-cv-24060-KMW** <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Andy Yu ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant OPKO Health, Inc. ("OPKO" or the "Company"), files this Verified First Amended Shareholder Derivative Complaint against Individual Defendants Phillip Frost ("Frost"), Adam Logal ("Logal"), Juan F. Rodriguez ("Rodriguez"), Jane H. Hsiao ("Hsiao"), Steven Rubin ("Rubin"), Robert A. Baron ("Baron"), Thomas E. Beier ("Beier"), Dmitry Kolosov ("Kolosov"), Richard M. Krasno ("Krasno"), Richard C. Pfenniger ("Pfenniger"), Alice Lin-Tsing Yu ("Yu"), Richard A. Lerner ("Lerner") (collectively, the "Individual Defendants"), and Frost Gamma Investments Trust ("FGIT," and together with OPKO and the Individual Defendants, the

1

"Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of OPKO and for unjust enrichment, and against the Individual Defendants for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants and FGIT, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OPKO, legal filings, news reports, securities analysts' reports and advisories about OPKO, the complaint and related filings in the action filed by the SEC styled as *SEC v. Honig, et al.,* Case No. 18-cv-8175 (S.D.N.Y.) (the "SEC Action"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by OPKO's directors, officers, and controlling shareholder starting on September 26, 2013 and continuing through the present (the "Relevant Period").

2.      OPKO is one of a series of publicly held companies controlled by Frost and his affiliates. OPKO's directors are willing to let Frost use such companies to further Frost's personal investments and they frequently join him in these investments. The sheer number of entanglements between Frost and the members of OPKO's Board of Directors (the "Board") are so extensive through joint investments that OPKO's SEC filings repeatedly failed to keep up with the complex web of relationships and often failed to accurately disclose the conflicts.

3.     This action focuses on two categories of misconduct that have caused at least four categories of harm to OPKO:  (a) causing OPKO to participate in a stock pump and dump scheme, which resulted in (i) OPKO purchasing – but then holding – artificially inflated shares of microcap companies that were the subject of that scheme, while also (ii) subjecting OPKO to a securities action brought by the SEC for OPKO's participation in that pump and dump scheme -- although unlike other participants in the scheme OPKO did not dump its microcap company shares; and (b) causing OPKO to make false and misleading statements of material fact to OPKO investors that artificially inflated OPKO's share price by failing to disclose the pump and dump scheme, which resulted in (iii) OPKO being named as a defendant in multiple securities class actions brought by OPKO investors, and (iv) the reelection of Defendants who served as Company directors who then continued to breach their fiduciary duties to OPKO by continuing to cause the Company to issue false and misleading statements to OPKO investors and by failing to institute adequate internal controls.

4.     During the Relevant Period, Frost, OPKO's Chief Executive Officer ("CEO") and Chairman, coordinated with FGIT and a number of individuals not named as defendants herein, including Barry C. Honig ("Honig") and Michael Brauser ("Brauser"), to orchestrate pump and dump schemes involving at least two microcap companies (the "Microcap Companies") that have given rise to significant damages to OPKO.

5.     Specifically, Frost, along with a group of other individual and institutional investors, along with FGIT (the "Frost Conspirators"), acquired and, with the assistance of the other Individual Defendants, caused OPKO to acquire, interests in the Microcap Companies, and where those companies were not already public, merged them into publicly traded shell companies controlled by the Frost Conspirators. The Frost Conspirators then commissioned stock promoters

to write positive articles and engaged in manipulative trading that raised the price of those companies' shares. The Frost Conspirators then sold their shares in a coordinated fashion, thereby enriching themselves at the expense of investors in the Microcap Companies—including OPKO, as OPKO did not dump its shares in the Microcap Companies like the Frost Conspirators. The Frost Conspirators failed to disclose that they were operating as a group, and that they were not passive investors. The misconduct alleged in this paragraph is referred to collectively herein as the "Pump & Dump Misconduct."

6.      The Frost Conspirators caused OPKO to become implicated in the Pump & Dump Misconduct by causing OPKO to (a) purchase shares in the Microcap Companies controlled by the Frost Conspirators, and (b) fail to report that it was investing in those companies as a group with the Frost Conspirators, in violation of the federal securities laws.

7.      As a result, on September 7, 2018, the SEC Action was filed against OPKO and Frost, FGIT and a number of other individual and entity defendants, alleging various violations of the federal securities laws. Because the Frost Conspirators and the other Individual Defendants caused OPKO to participate in the Pump & Dump Scheme, OPKO was named as a defendant in the SEC Action.  Unlike the Frost Conspirators, however, the SEC Action does not allege that OPKO intentionally dumped its shares of the Microcap Companies controlled by the Frost Conspirators. Instead, OPKO held the Microcap Companies stock while the Frost Conspirators dumped their Microcap Companies stock. For the foregoing two reasons, OPKO is a complete victim of the Frost Conspirators' scheme.

8.      In January 2019, the court in the SEC Action approved consent orders entering judgment against Frost, OPKO, and FGIT. Under the judgment against Frost, Frost agreed to pay a civil penalty of $5 million plus disgorgement of his ill-gotten gains and was barred from

participating in any offering of a penny stock with limited exceptions. Under the judgment against OPKO, which Rubin signed on behalf of the Company, OPKO agreed to pay a civil penalty of $100,000 and agreed to corporate governance reforms to protect the Company from future investment-related misconduct by Frost. Under the judgment against FGIT, FGIT was barred from participating in any offering of a penny stock. All three parties were also permanently enjoined from making further violations of certain provisions of the Securities Act of 1933 (the "Securities Act') and the Securities Exchange Act of 1934 (the "Exchange Act").

9.      Separately, also during the Relevant Period, the Individual Defendants willfully and recklessly made and/or caused OPKO to make false and misleading statements to OPKO investors that failed to disclose the Pump & Dump Misconduct, the fallout and its impact on OPKO, and OPKO's lack of adequate controls. These false statements and omissions made by OPKO artificially inflated the price of OPKO stock, damaging OPKO investors, and thus causing OPKO to be named as a defendant in several securities federal securities fraud class action lawsuits in several jurisdictions which were consolidated in this District (the "Securities Class Actions").

10.     The Individual Defendants also caused false and misleading statements and omissions to be made in the Schedule 14A filed with the SEC on March 25, 2016 (the "2016 Proxy Statement"), the Schedule 14A filed with the SEC on April 28, 2017 (the "2017 Proxy Statement") and the Schedule 14A filed with the SEC on April 30, 2018 (the "2018 Proxy Statement"), which damaged OPKO by causing investors to approve undeserved and excessive compensation packages and to reelect Defendants who were serving as directors of OPKO, who then continued to breach their fiduciary duties against OPKO.

11.     OPKO has been substantially damaged as a result of Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct. Defendants' misconduct has subjected:

(a) OPKO, its CEO, and FGIT to being defendants in the SEC Action and the penalties agreed to in the consent judgments; (b) OPKO, its CEO, its Chief Financial Officer ("CFO"), and its former CFO to potential liability as defendants in the Securities Class Actions; (c) OPKO and its CEO to potential liability as defendants in an action in the United States District Court for the District of Minnesota for fraud and tortious interference with prospective business advantage (the "MN Action"); (d) OPKO to the shareholder approval of excessive compensation tied to performance of executives and directors and to the reelection of Defendants who served as Company directors, who then continued breaching their fiduciary duties against OPKO; and (e) OPKO to holding the artificially inflated shares of the Microcap Companies that were part of the Pump & Dump Misconduct.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the SEC Action and Securities Class Actions based on violations of the Exchange Act and the Securities Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is proper in this District because OPKO is headquartered in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

18.     Plaintiff is a current shareholder of OPKO. Plaintiff has continuously held OPKO common stock at all relevant times. Plaintiff is a citizen of New York.

**Nominal Defendant OPKO**

19.     OPKO is a Delaware corporation with its principal executive offices at 4400 Biscayne Blvd., Miami, Florida 33137. OPKO's shares trade on the NASDAQ under the ticker symbol "OPK."

20.     OPKO is a healthcare company that invests in and acquires other healthcare companies, in addition to developing its own products. As stated by Oracle Partners' Larry Feinberg, Frost "views OPKO as his holding company. It is his Berkshire Hathaway of health care."[1]

---

[1]   Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

**Defendant Frost Gamma Investments Trust**

21.    FGIT is a Florida trust, formed in or around 2002. According to OPKO's 2018 Proxy Statement, as of April 18, 2018, FGIT beneficially owned 189,325,505 shares of OPKO's common stock, which represented 33.54% of outstanding shares on that date.

22.    According to the 2018 Proxy Statement, Frost controls FGIT. Frost is in fact the trustee of FGIT.

**Defendant Frost**

23.    Frost has served as OPKO's CEO and Chairman since 2007 when he founded the Company. According to OPKO's SEC filings, Frost is the Company's "chief operating decision-maker." According to the 2018 Proxy Statement, as of April 18, 2018, Frost beneficially owned 196,624,883 shares of OPKO's common stock, which represented 34.76% of outstanding shares on that date. Frost is the trustee for FGIT.

24.    Frost maintained longstanding relationships with John A. Paganelli ("Paganelli") and Lerner, who together comprised the Company's Nominating Committee. Thus, through his relationships with both members of the Nominating Committee (as detailed below) and his general control of OPKO, Frost was able to effectively choose each member of OPKO's Board.

25.    For the fiscal year ended December 31, 2016, Frost received $3,060,600 in compensation from OPKO. This included $960,000 in salary, $2,090,000 in option awards, and $10,600 in all other compensation. For the fiscal year ended December 31, 2017, Frost received $970,800 in compensation from OPKO. This included $960,000 in salary, and $10,800 in all other compensation.

26.    Frost is a citizen of Florida.

**Defendant Logal**

27.     Logal has served as OPKO's CFO since 2014. According to the 2018 Proxy Statement, as of April 18, 2018, Logal beneficially owned 1,052,358 shares of OPKO's common stock.

28.     For the fiscal year ended December 31, 2016, Logal received $1,655,600 in compensation from OPKO. This included $600,000 in salary, $1,045,000 in option awards, and $10,600 in all other compensation. For the fiscal year ended December 31, 2017, Logal received $610,800 in compensation from OPKO. This included $600,000 in salary, and $10,800 in all other compensation.

29.     During the period of time when the Individual Defendants caused OPKO to materially misstate information to the investing public to keep the stock price inflated, and before the scheme was exposed, Logal made the following purchases of Company stock:

| Date | Number of Shares | Price | Cost |
|---|---|---|---|
| September 14, 2015 | 1,000 | $    9.95 | $    9,948 |
| September 15, 2017 | 1,500 | $    6.03 | $    9,045 |
| March 13, 2018 | 2,065 | $    3.40 | $    8,415 |

During that same period, Logal made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 14, 2017 | 112,975 | $    8.07 | $    911,674 |
| March 13, 2015 | 24 | $    14.56 | $    349 |
| March 13, 2015 | 576 | $    14.61 | $    8,415 |
| March 13, 2015 | 500 | $    14.62 | $    7,308 |
| March 13, 2015 | 38,888 | $    14.64 | $    569,320 |
| March 13, 2015 | 1,500 | $    14.65 | $    21,968 |

Thus, in total, before the fraud was exposed, he sold 154,463 Company shares on inside information, for which he received over $1.5 million. Accounting for the cost of his stock

purchases, Logal received a net of over $1.49 million during the Relevant Period as a result of his trading in Company stock.

30.     Logal is a citizen of Florida.

**Defendant Rodriguez**

31.     Rodriguez served as OPKO's CFO from 2012 to April 1, 2014.

32.     Upon information and belief, Rodriguez is a citizen of Florida.

**Defendant Hsiao**

33.     Hsiao has served as the Company's Chief Technical Officer, Vice Chairman, and a Company director since 2007. According to the 2018 Proxy Statement, as of April 18, 2018, Hsiao beneficially owned 33,328,037 shares of OPKO's common stock, which represented 5.94% of outstanding shares on that date.

34.     For the fiscal year ended December 31, 2016, Hsiao received $2,851,600 in compensation from OPKO. This included $900,000 in salary, $1,881,000 in option awards, and $70,600 in all other compensation. For the fiscal year ended December 31, 2017, Hsiao received $915,800 in compensation from OPKO. This included $900,000 in salary, and $15,800 in all other compensation.

35.     Upon information and belief, Hsiao is a citizen of Florida.

**Defendant Rubin**

36.     Rubin has served as a member of the Board and as OPKO's Executive Vice President – Administration since 2007. According to the 2018 Proxy Statement, as of April 18, 2018, Rubin beneficially owned 7,412,650 shares of OPKO's common stock, which represented 1.32% of outstanding shares on that date.

37.     For the fiscal year ended December 31, 2016, Rubin received $2,701,600 in compensation from OPKO. This included $810,000 in salary, $1,881,000 in option awards, and $10,600 in all other compensation. For the fiscal year ended December 31, 2017, Rubin received $820,800 in compensation from OPKO. This included $810,000 in salary, and $10,800 in all other compensation.

38.     During the period of time when the Individual Defendants caused OPKO to materially misstate information to the investing public to keep the stock price inflated, and before the scheme was exposed, Rubin made the following purchases of Company stock:

| Date | Number of Shares | Price | Cost |
|---|---|---|---|
| August 20, 2015 | 2,000 | $ 12.40 | $ 24,800 |
| March 30, 2016 | 1,000 | $ 10.17 | $ 10,170 |
| December 30, 2016 | 2,000 | $ 9.18 | $ 18,360 |
| February 8, 2017 | 2,000 | $ 8.11 | $ 16,220 |
| May 11, 2017 | 2,000 | $ 6.91 | $ 13,820 |
| May 31, 2017 | 2,000 | $ 6.10 | $ 12,200 |
| March 7, 2018 | 6,000 | $ 3.25 | $ 19,500 |

During that same period, Rubin made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| April 15, 2014 | 79,300 | $ 8.10 | $ 642,615 |
| April 14, 2014 | 100,000 | $ 8.58 | $ 857,700 |

Thus, in total, before the fraud was exposed, he sold 179,300 Company shares on inside information for which he received over $1.5 million. Accounting for the cost of his stock purchases, Rubin received a net of approximately $1.39 million during the Relevant Period as a result of his trading in Company stock.

39.     Upon information and belief, Rubin is a citizen of Florida.

**Defendant Baron**

40.     Baron served as a Company director from 2003 to January 23, 2017.

41.     For the fiscal year ended December 31, 2016, Baron received $102,350 in compensation from OPKO, comprised of $28,750 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Baron received $2,500 in compensation from OPKO, in fees earned or paid in cash.

42.     During the period of time when the Individual Defendants caused OPKO to materially misstate information to the investing public to keep the stock price inflated, and before the scheme was exposed, Baron made the following purchases of Company stock:

| Date | Number of Shares | Price | Cost |
|------|------------------|-------|------|
| June 10, 2015 | 3,000 | $ 16.06 | $ 48,180 |
| June 29, 2015 | 2,000 | $ 15.81 | $ 31,620 |

During that same period, Baron made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| May 13, 2016 | 23,984 | $ 9.82 | $ 235,523 |
| May 13, 2016 | 4,000 | $ 9.83 | $ 39,320 |
| May 13, 2016 | 900 | $ 9.84 | $ 8,852 |
| May 13, 2016 | 5,616 | $ 9.84 | $ 55,261 |
| May 13, 2016 | 3,000 | $ 9.85 | $ 29,535 |
| January 10, 2014 | 32,824 | $ 8.48 | $ 278,348 |
| January 10, 2014 | 1,700 | $ 8.49 | $ 14,425 |
| January 10, 2014 | 11,200 | $ 8.49 | $ 95,088 |
| January 10, 2014 | 400 | $ 8.49 | $ 3,396 |
| January 10, 2014 | 406 | $ 8.50 | $ 3,451 |
| January 10, 2014 | 200 | $ 8.51 | $ 1,702 |

Thus, in total, before the fraud was exposed, he sold 84,230 Company shares on inside information for which he received approximately $764,900. Accounting for the cost of his stock purchases, Baron received a net of approximately $685,100 during the Relevant Period as a result of his trading in Company stock.

43.     Upon information and belief, Baron is a citizen of Ohio.

**Defendant Beier**

44.     Beier served as a Company director from 2008 to June 15, 2017.

45.     For the fiscal year ended December 31, 2016, Beier received $88,600 in compensation from OPKO, comprised of $15,000 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Beier received $9,167 in compensation from OPKO, comprised of fees earned or paid in cash.

46.     Upon information and belief, Beier is a citizen of Florida.

**Defendant Kolosov**

47.     Kolosov served as a Company director from 2012 to June 15, 2017.

48.     For the fiscal year ended December 31, 2016, Kolosov received $88,600 in compensation from OPKO, comprised of $15,000 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Kolosov received $11,667 in compensation from OPKO, comprised of fees earned or paid in cash.

49.     Upon information and belief, Kolosov is a citizen of Russia.

**Defendant Krasno**

50.     Krasno has served as a Company director since February 2017 and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of April 18, 2018, Krasno beneficially owned 133,333 shares of OPKO's common stock.

51.     For the fiscal year ended December 31, 2017, Krasno received $229,954 in compensation from OPKO, comprised of $31,354 in fees earned or paid in cash and $198,600 in option awards.

52.     Upon information and belief, Krasno is a citizen of Florida.

**Defendant Pfenniger**

53.    Pfenniger has served as a Company director since 2008, and is the Chair of the Audit Committee. According to the 2018 Proxy Statement, as of April 18, 2018, Pfenniger beneficially owned 310,000 shares of OPKO's common stock.

54.    For the fiscal year ended December 31, 2016, Pfenniger received $98,600 in compensation from OPKO, comprised of $25,000 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Pfenniger received $109,700 in compensation from OPKO, comprised of $35,000 in fees earned or paid in cash and $74,700 in option awards.

55.    Upon information and belief, Pfenniger is a citizen of Florida.

**Defendant Yu**

56.    Yu has served as a Company director since 2009. According to the 2018 Proxy Statement, as of April 18, 2018, Yu beneficially owned 200,000 shares of OPKO's common stock.

57.    For the fiscal year ended December 31, 2016, Yu received $88,600 in compensation from OPKO, comprised of $15,000 in fees earned or paid in cash and $73,600 in option awards. For the fiscal year ended December 31, 2017, Yu received $69,800 in compensation from OPKO, comprised of $20,000 in fees earned or paid in cash and $49,800 in option awards.

58.    Upon information and belief, Yu is a citizen of Taiwan.

**Defendant Lerner**

59.    Lerner has served as a Company director since 2007. Lerner has invested alongside Frost in several biotech startups and has been the beneficiary of several conflicted related party transactions where OPKO funds were used to further the personal investments of Frost and Lerner.

60.    Although Lerner is not a direct employee of OPKO, OPKO owns 29% of Zebra Biologic, Inc. ("Zebra"), which is a privately held business founded by Frost and Lerner.

61.     In total, Lerner has earned more than $927,000 in compensation for his services on OPKO's Board.

62.     Upon information and belief, Lerner is a citizen of Florida.

## SUBSTANTIVE ALLEGATIONS

### Frost Controls OPKO and Uses OPKO for His and His Affiliates' Personal Interest

63.     Frost and many of the Individual Defendants have a long, professional history with each other. The relationships between Defendants, and particularly between Frost and each of the other Defendants, are complex and interwoven.

64.     Frost has been nicknamed the "Warren Buffett of biotech" having made billions of dollars in the industry and is considered a savvy investor. Frost served as the Chairman of Key Pharmaceuticals, which he sold for $836 million in 1986; the Chairman and CEO of IVAX Corporation ("IVAX"), which he sold to Teva Pharmaceuticals Industries ("Teva") in 2005 for $7.6 billion; and, after the IVAX sale, the Vice Chairman and then Chairman of Teva.

65.     Frost, along with Hsiao's late husband, Charles Hsiao, were top executives at Key Pharmaceuticals and together created IVAX, a generic-drug business. Pfenniger also worked for Frost at IVAX, serving as Senior Vice President – Legal Affairs and General Counsel. Pfenniger was later promoted to Chief Operating Officer of IVAX.

66.     Frost created OPKO in 2007 through the merger of three companies: Acuity Pharmaceuticals ("Acuity"), Froptix Corporation ("Froptix"), and eXegenics, Inc. ("eXegenics"). Paganelli was CEO and Chairman of eXegenics at the time, and Baron was a director of eXegenics.

67.     As OPKO's Chairman, CEO, founder, and controlling shareholder, Frost has absolute control over OPKO with nearly 35% of the Company's common shares, both directly and through FGIT and The Frost Group LLC ("Frost Group") and has asserted his absolute control

over Opko during the Relevant Period. The Frost Group is a private investment group controlled by Frost that also includes FGIT, Hsiao, Rubin, and non-party Subbarao Uppaluri ("Uppaluri"), who was OPKO's CFO from May 2007 to July 2012. The next largest OPKO shareholders are Hsiao with 5.94% of the voting power followed by Rubin who holds 1.32% of the voting power.

68.     Frost is the Trustee of FGIT and the sole, indirect owner of the beneficiary of FGIT. Frost, FGIT, Hsiao, and Rubin collectively own and control 42% of OPKO's equity and voting power.

69.     Frost also has control over OPKO's Board membership. Paganelli and Lerner are on OPKO's Nominating Committee. Given Frost's longtime relationships with Paganelli and Lerner, Frost has considerable influence and has chosen each Board member.

70.     In addition to his financial and voting control over OPKO, Frost is touted as its visionary. The Company's SEC filings routinely state that the OPKO is "led by Dr. Frost" and that the Company's success is dependent on Frost's continued involvement because his departure would have a "material adverse effect" on the Company.

71.      Further, Frost is well-known in the investment community. Companies in which he is involved were considered to have a "Frost premium" prior to the initiation of the SEC Action.

72.     Frost has used, and continues to use, OPKO to enter into related party transactions to his benefit as well as the benefit of his affiliates. These transactions include:

a)     OPKO's lease for its corporate headquarters is with Frost's real estate venture, Frost Real Estate Holdings, LLC ("Frost Real Estate"). OPKO's annual lease with Frost Real Estate is over $1.1 million.

(b)     OPKO pays another Frost entity for the use of a corporate jet, and has paid over $1.23 million over the last three years for Frost and OPKO executives to use it.

(c)     In November 2016, OPKO entered into a Pledge Agreement to contribute $1 million over four years to fund the Frost Science Museum.

## Pump & Dump Misconduct

73.     During the Relevant Period, Frost coordinated with the other Frost Conspirators to perpetrate the Pump & Dump Misconduct.

74.     The Individual Defendants caused OPKO to participate in the Pump & Dump Misconduct.

75.     In the pump and dump scheme, the Frost Conspirators acquired interests in the Microcap Companies, including BioZone Pharmaceuticals, Inc. ("BioZone") and MabVax Therapeutics Holdings, Inc. ("MabVax"), at a discount. The Individual Defendants also caused OPKO to acquire interests in the Microcap Companies. Then the Frost Conspirators and OPKO (as caused by the Individual Defendants, who controlled OPKO) inflated the share prices of the Microcap Companies through paid promotions and manipulative trading. Finally, the Frost Conspirators (but not OPKO) dumped their shares of the Microcap Companies in concert, harming investors that were left holding the inflated shares.

## Frost Uses OPKO in the BioZone/Cocrystal Pump and Dump Scheme

76.     According to the SEC Action, the first pump and dump scheme began in late 2010 when Honig and several of his associates purchased one-third of a publicly traded shell company, International Surf Resorts, Inc. ("ISRI"). Shortly thereafter, Frost and Brauser purchased half of the remaining two-third shares of ISRI. Each of them purchased shares through an intermediary in order to conceal their investment in ISRI. Roberto Prego-Novo ("Prego-Novo"), an associate of Frost, was installed as ISRI's sole director.

77.     In late 2010, Frost and his associates approached BioZone's management, including Brian Keller ("Keller"), BioZone's Chief Scientific Officer, and Daniel Fisher ("Fisher"), BioZone's CEO, to propose a reverse merger in which privately held BioZone would become public by combining with IRSI.

78.     Frost, Honig, and Brauser told Fisher that the reverse merger would allow BioZone to raise between $8 million to $15 million for research on BioZone's drug-delivery technology, QuSomes.

79.     In January 2011, BioZone and the Frost Group, which included Frost, Honig, and Brauser, sent BioZone a binding letter of intent that memorialized the Frost Group's intent to invest in BioZone, on letterhead from the "Honig, Brauser, Frost Group." In February 2011, Keller organized several meetings with Frost, Keller, Lee Michael Pederson ("Pederson"), who was BioZone's patent attorney, Honig, Elliot Maza ("Maza"), who Frost and his associates later installed as BioZone's Interim CEO, CFO, and Secretary, and eventually as permanent CEO, and Prego-Novo.

80.     BioZone and ISRI entered into a securities purchase agreement for the reverse merger. The agreement included the same notice address for both Aero Pharmaceuticals, Inc. ("Aero"), a company owned by Frost and his associates that BioZone was to acquire after merging with ISRI, and BioZone. That was also the same business address for OPKO, Frost, Honig, and several other Frost and Honig related entities including FGIT.

81.     Frost received significant personal benefits as a direct result of the ISRI-BioZone merger. Contemporaneous with that deal, Frost, Honig, and Brauser had ISRI purchase certain unprofitable assets that Frost held. After the merger, BioZone, through a subsidiary, acquired Aero in exchange for more than 8.3 million shares of BioZone common stock. According to a Form 10-

K/A filed by BioZone on September 12, 2013, Frost (through FGIT) owned 46% of Aero's outstanding stock, and an additional 23% was owned by Prego-Novo.

82.     Frost, Honig, and others had hand-picked Prego-Novo to serve as a BioZone director, and he became BioZone's Chairman soon thereafter. As the Form 10-K/A disclosed, after BioZone acquired Aero, "[e]ach of Dr. Frost and Mr. Prego-Novo beneficially owned approximately 10.63% and 4.62%, respectively" of BioZone, which came at a de minimis cost, as "Dr. Frost acquired a portion of his shares in February and March, 2011 for approximately $0.027 per share, while the remainder of his shares were acquired through the cashless exercise of warrants." In this manner, Frost acquired additional BioZone shares extremely cheaply.

83.     Frost, through FGIT, also made loans to BioZone of $400,000 which were secured by a first priority lien on certain BioZone receivables.

84.     In March 2011, the BioZone Pump and Dump Scheme encountered an obstacle as the bank that had veto power over major transactions by BioZone due to a $3 million line of credit refused to approve the ISRI-BioZone transaction. The bank's reasons were, in part, that "[t]he proposed acquisition creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of [the investor group] as a whole, rather than the interests of [BioZone]." Despite this hurdle, Frost and his associates pushed the merger ahead and it closed in June 2011. The bank sent a default notice.

85.     Not only did Frost, Honig, and their associates install Prego-Novo as BioZone's Chairman, they installed Maza as BioZone's Interim CEO, CFO, and Secretary in May 2011, then permanently CEO in August 2011. One month later, under Maza's instructions, BioZone paid off the loan of credit from the bank, thereby removing any obstacle to the BioZone-ISRI merger. To

finance this payment, BioZone took a large loan from Frost in the form of short-term convertible debt at high interest rates.

86.     Further demonstrating Frost's and Honig's influence over Maza, according to the SEC, "Maza … sent Honig, Brauser and [Frost] updates at least every month providing details on business operations and business opportunities, as well as seeking their approval for material business decisions." For instance, the SEC alleged that on February 28, 2013, Maza sent an email to Brauser and Honig reporting that Honig and Frost had approved of proposals from two lenders, and seeking Brauser's agreement as well, asking "[Frost] is OK if you're OK with it. Work for u?"

87.     In December 2011, Fisher filed a whistleblower complaint with the SEC stating that Frost, Honig, Brauser, and related entities and individuals violated securities laws and breached their stock-purchase agreement in connection with the BioZone-ISRI merger. Fisher later filed an action against BioZone, Frost, Brauser, Honig, Keller, Maza for fraud, RICO violations, and securities laws violations. *Fisher v. BioZone Pharmaceuticals, Inc., et al*., No. 12-cv-03716 (N.D. Cal.). After the court denied defendants' motion to dismiss, the parties agreed to settle for $2 million in 2013.

88.     By April 2013, Frost, OPKO, FGIT, the Frost Group, Honig, and Brauser, along with co-investors including Maza, Keller, Stetson, and Prego-Novo, together held almost 45 million BioZone shares, which equaled around 71% of outstanding BioZone stock. Although the securities laws require these individuals to disclose that they were operating as a group, they failed to make this disclosure. Neither BioZone, Frost, OPKO, or any of Frost's associates publicly disclosed the group's control of BioZone.

89.     The BioZone Pump and Dump Scheme also caused another lawsuit. Pederson, BioZone's former patent attorney from 1999 to 2012, was personally involved with meetings with

Frost, Honig, Maza and their associates in 2011 and 2012. Pederson sued OPKO, Frost, Cocrystal Pharma, Inc. ("Cocrystal"), which was the eventual successor entity to BioZone, and Keller, alleging that Frost and his associates engaged in a pump and dump scheme with BioZone. This action was styled *Pederson v. Frost, et al*., No. 17-cv-5580 (D. Minn). Pederson confirmed that in the meetings in 2011, Frost and his associates promised that they would provide $8-15 million in exchange for ownership stake in BioZone, but never delivered the promised funding.

90.     In August and September 2013, the market for BioZone common stock was barely existent. In order to artificially inflate share prices, the Frost Conspirators commissioned articles promoting BioZone. Honig instructed one of his associates to contact John H. Ford ("Ford"), an experienced stock promoter, instructing Ford to write articles specifically touting investments made by Frost and OPKO in BioZone. Honig compensated Ford with 180,000 BioZone shares at the below market price of $0.40 per share.

91.     Beginning in September 2013, Honig and others executed BioZone transactions to falsely create the appearance of investor interest in BioZone. In total, after zero trading volume on September 20, 2013, 302,000 BioZone shares were traded on September 23, 2013. Those trades included purchases by John O'Rouke III ("O'Rouke"), a Frost and Honig associate, from another Honig associate just before the close of trading at a substantially higher price than the price at which BioZone had traded just before the trades, creating the false appearance of an upward trend in BioZone's share price, a practice known as "marking the close."

92.     On September 26, 2013, Ford published an article on the website *Seeking Alpha* titled "Opko And Its Billionaire CEO Invested In Biozone." The article pointed to Frost and OPKO's BioZone holdings to promote and inflate the price of BioZone securities in light of Frost's reputation as a successful biotech investor, stating in relevant part:

> I recently established a position in BioZone Pharmaceuticals (BIOZONE.OB) based on the company's undervaluation, its patented QuSomes technology, and the fact that Opko . . . and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.) BioZone's strong patent portfolio, multibillion-dollar addressable markets, and current revenue stream, make it an ideal asymmetrical trade, with large upside potential, and limited downside risk.

93.     The article also included a question-and-answer interview with Keller in which he explicitly stated that Frost was part of BioZone's growth plan. In response to Ford's question "What's your plan in terms of when to take on a partner?" Keller stated, "Once we are ready to market the product, we will consider marketing and distribution partners. ***It will certainly be something we discuss with Dr. Frost***."

94.     The impact of Ford's article on the market for BioZone shares was immediate. As a result of the article, BioZone's volume rose from around 1,100 shares on September 25, 2013 to over 6 million shares on October 2, 2013 and the price per share of BioZone stock rose approximately 58% between September 25, 2013 and September 27, 2013.

95.     Ford's September 26, 2013 article did not disclose that he was compensated to write the article. Rather, Ford represented that "I am long BioZone. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

96.     Frost, Honig, and their associates profited greatly from the investor interest in BioZone that Ford's article generated. After the "pump" came the "dump," which included Frost's sales of 1,987,991 BioZone shares between October 1, 2013 and October 4, 2013, for proceeds of $1,085,321.74. Collectively, Frost, Honig, Brauser, and affiliated entities and individuals (***not*** including OPKO) sold over 15.7 million BioZone shares between September 23, 2013 and December 27, 2013, for proceeds of nearly $9.3 million.

97.     On September 30, 2013, Samuel J. Rae ("Rae") published an article on *Benzinga* titled "Why BioZone Pharmaceuticals, Inc. Could Be The Next Big Name In Drug Administration Technology." The article touted investments by Frost and was written and published to inflate the price of BioZone securities.  In fact, Frost's name appears in the very first sentence of the article, and the piece concludes by stating "the track record of Dr. Frost is undeniable, and BioZone stock offers investors an early opportunity to buy into what could be his next big success."

98.     In January 2014, BioZone merged with Cocrystal Discovery Inc. ("Old Cocrystal"), a private company in which OPKO had invested beginning in 2009. In May 2009, Frost proposed a $5 million transaction with Old Cocrystal, whereby OPKO would receive 34.47% of Old Cocrystal and exclusive license to the Old Cocrystal technology in the field of ophthalmology. Frost already had personally invested $5 million in Old Cocrystal through the Frost Group and had an agreement to invest another $5 million though the Frost Group. Rather than spend more of his own money, Frost decided to transfer the obligation to invest the second $5 million from the Frost Group to OPKO. Frost, Rubin, and Hsiao all served on the board of Old Cocrystal.

99.     The company formed as the result of the merger of BioZone and Old Cocrystal merger was Cocrystal. OPKO owned 16.4% of Cocrystal, Frost owned 30%, Hsiao owned 1.7%, and Rubin owned 0.2%. Frost, Hsiao, and Rubin began serving as "new" directors of Cocrystal.

100.     In January 2014, OPKO invested $500,000 into Cocrystal as part of a $2.75 million private placement and received 1 million shares of Cocrystal common stock and 1 million 10-year warrants exercisable at $0.50 per share. As of March 2015, OPKO had an 8% ownership interest in Cocrystal.  According to OPKO's Form 10-K for the period ending December 31, 2017, OPKO owned 9% of Cocrystal's equity, Frost, through FGIT, owned 12.2%, Hsiao owned 1% and Rubin also owned shares.

101.    Honig's mechanics of pump and dump schemes are publicly documented. Honig achieved a great deal of notoriety for his role at Venaxis, where he and O'Rourke, with whom Honig shares an office, pumped up the price of Venaxis stock by rechristening the company "Riot Blockchain" near the height of the late-2017 cryptocurrency bubble before selling insider shares. As CNBC reported, this was not "the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse." Indeed, The Wall Street Journal reported[2] that Honig "has scooped up shares in dozens of firms that sometimes morph into hot areas—vaping, solar energy, stem cells and see a stock-price pop. Some have fizzled, raising the ire of other investors."

102.    Further, in a short thesis titled "Opko Health: the Placebo Effect" published in December 2013, Lakewood Capital Management ("Lakewood") identified as cause for concern the extensive relationship between Frost and Honig and Brauser, whom they characterized as "two serial stock promoters that have each been the subject of multiple lawsuits." Among other reasons it claimed supported its short thesis, Lakewood also pointed to the "web of stock promotion" and the fact that there were only two sell-side entities covering OPKO, one of which was Frost's investment bank, Landenburg Thalmann Financial Services ("Landenburg Thalmann").

103.    Moreover, in an article published on sharesleuth.com ("sharesleuth"), Chris Carey ("Carey") identified a number of authors, real and fictitious, who publish articles on sites such as *Seeking Alpha* in which Honig- and Frost-related stocks were touted. Carey and his team "turned up nearly 600 bullish articles about Honig-related companies that fit the pattern of stealth

---

[2] Dave Michaels, "Ex-Teva Chairman, Blockchain Investor Accused of Pump-and- Dump Scheme", The Wall Street J. (Sept. 7, 2018), available online at: https://www.wsj.com/articles/ex-teva-chairman~bloekchain-investor-accused-ofpump-and-dump-scheme-1536351719.

promotional pieces." The Sharesleuth piece identified Ford and Rae among others who were used to pump the value of other stocks related to OPKO. Carey's sharesleuth article also identified by name other entities related to Honig, Frost, and/or OPKO, including ChromaDex Corporation ("ChromaDex"), Senesco Technologies, Inc. ("Senesco," since rebranded Sevion), and VBI Vaccines, Inc. ("VBI").

104.    Sharesleuth was not the first outlet to cover the dealings of Honig, Brauser, and Frost. Freelance journalist Teri Buhl ("Buhl") has dedicated much of the coverage on her website, www.teribuhl.com, to their operations, once noting that Honig's "crew of alleged bad actors … consists of biotech billionaire and philanthropist Philip Frost, his fellow co-investing partners Michael Brauser/John O'Rourke/Marc Groussman, John Ford - the promoter who wrote favorable analysis on stocks, priming them for the 'pump' of Honig's 'pump-and-dump' and Harvey Kesner, a deal lawyer from SIRF LLP linked to a number of Honig's investments."

### Frost Uses OPKO in the MabVax Pump and Dump Scheme

105.    In early 2014, Frost, Honig, and their associates engaged in a similar pump and dump scheme with MabVax. To conduct the MabVax Pump and Dump Scheme, Frost and his co-conspirators again used false articles and coordinated trading to create investor interest.

106.    Similar to the BioZone Pump and Dump Scheme, in early 2014 Honig identified a publicly traded shell company, Telik, Inc. ("Telik") which could be used for a reverse merger for MabVax. At the time, MabVax was seeking research and development funding. On July 8, 2014, MabVax executed a reverse merger into a Telik subsidiary. The primary investors of this deal were Honig and several companies in which he had a large ownership interest.

107.    On March 5, 2015, Honig contacted Frost, Brauser, and several others, stating that MabVax financing was a "real good opportunity" and would allow them to make "make $35

million conservatively in 4 months and our money out [in] 4 weeks. … I will trade out of it for us." After the merger, MabVax conducted two capital raises in March and April of 2015, through which Frost, FGIT, and OPKO acquired an interest in MabVax through Series D and E private placements.

108.    According to MabVax's Schedule 14A dated July 27, 2015, as of July 24, 2015, Frost and entities that he controlled owned 1,333,333 shares of MabVax common stock, or 5.15% of the total outstanding shares, and warrants to purchase 666,667 additional shares.

109.    According to OPKO's Form 10-Q for the quarter ended June 30, 2015, OPKO invested $2.5 million in exchange for 33,333 shares of MabVax's Series E Convertible Preferred Stock and warrants to purchase 1,666,667 shares of MabVax common stock. In connection with OPKO's investment in the MabVax private placement, Rubin was appointed as an advisor to MabVax, and OPKO received the right to designate two board members at MabVax. One of the goals of the private placement financing was to generate market interest in MabVax stock in preparation for the planned pump and dump.

110.    On April 6, 2015, MabVax issued a press release, written by O'Rourke, titled "MabVax Therapeutics Announces Closing of Financing" which emphasized OPKO's and Frost's investments in MabVax to entice potential MabVax investors.

111.    On April 8, 2015, MabVax issued another press release titled "MabVax Therapeutics Catches Eye of Billionaire Investor Dr. Phillip Frost and OPKO Health, which stated in relevant part:

> Investors at MabVax Therapeutics (OTCQB: MBVX) must feel like they're in just the right place at just the right time this week as news of billionaire Bio-Pharma Investor Dr. Phillip Frost, M.D., and his company OPKO Health (NYSE: OPK) have taken a strong interest in the clinical stage cancer immunotherapy company— a $12 million interest. Dr. Frost is the CEO and Chairman of the Board at OPKO

Health, and for those familiar with the good doctor, you already know that **he and OPKO have a strong record of investing in biopharmaceutical firms**.

This week MabVax announced that it closed a private placement with both Dr. Frost and OPKO that netted the company almost $12 million in gross proceeds, and according to the San Diego-based firm, this financing will provide the funds necessary to advance its pipeline of clinical products and to pursue additional preclinical research programs in its pipeline. . . .

**Clearly the company is doing something right when it can capture the attention of investors like Dr. Frost and OPKO Health**, two entities that can certainly help the company further its efforts in bringing its treatments to the clinic.

(Emphasis added).

112.   This press release also quoted Frost speaking about the company's prospects, and continued to discuss Frost, stating in relevant part:

For MabVax shareholders, having Dr. Frost and OPKO on board could prove quite beneficial to the company's future success. After all the list of strategic investments in OPKO is quite impressive. **OPKO's growth strategy includes investing in early-stage companies like MabVax that have valuable proprietary technology and significant potential** to create value for the compan[y's] own shareholders. . . .

Dr. Frost and OPKO have been lauded for a number of strategic holdings that have proven successful . . . . So, now with Dr. Frost and OPKO Health's $12 million investment on board, it further solidifies that MabVax Therapeutics is heading in the right direction.

(Emphasis added).

113.   On April 8, 2015, O'Rouke, though his company ATG Capital LLC ("ATG") and Melechdavid, Inc. ("Melechdavid"), a company owned by Honig and Frost associate Mark Groussman ("Groussman"), traded MabVax shares to create the false appearance of investor interest in MabVax. According to the SEC Action, at least one matched trade was submitted in which Melechdavid and ATG placed matching buy and sell orders at the same share price and at the same time.

114.    On April 8, 2015, an article was published on the website *Seeking Alpha* titled "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics." The article, penned by O'Rourke – but published under the pseudonym Wall Street Advisors, pointed to Frost's and OPKO's MabVax investment to promote and inflate the price of MabVax securities in light of Frost's reputation as a successful biotech investor. The article stated in relevant part:

> OPKO Health has a strong track record of identifying undervalued companies in which to invest.
>
> OPKO most recently announced a strategic investment in MabVax Therapeutics which appears to present another such investment opportunity.
>
> MabVax has a pipeline consisting of two Phase II cancer vaccines, a novel antibody discovery platform, an existing relationship with Juno Therapeutics, and an enticing value proposition.
>
> OPKO Health (NYSEMKT: OPK) has a history of discerning overlooked assets in which to make strategic investments prior to value creation. OPKO stockholders, in turn, get exposure to not only OPKO's core assets, but also to a bevy of smaller, high growth healthcare and biotech assets. OPKO has proven quite adept at then being able to monetize these investments later in their growth cycle, translating to meaningful value creation for OPKO stockholders. Its path from $2 per share when it first went public to its current $14.30 share price is filled with examples of such investments. In this article, I shall take a look at OPKO's most recent strategic investment in MabVax Therapeutics (OTCPK:MBVX), a cancer immunotherapy company. MabVax presents a compelling investment opportunity at its current market cap relative to its pipeline

115.    The price per share of MabVax stock responded favorably to the April 8, 2015 *Seeking Alpha* article. The price per share of MabVax stock rose from a closing price of $1.91 per share on April 1, 2015 to close at $4.30 per share on April 9, 2015. Frost's co-conspirators sold MabVax shares on the market form April 6, 2015 to June 30, 2015 for total proceeds of over $5.6 million.

116.    The MabVax Pump and Dump Scheme continued. On July 1, 2015, Ford published another article on *Seeking Alpha* titled "MabVax: Near-Term Catalysts Could Push Shares From

$2 To Over $5." The article pointed to Frost's and OPKO's MabVax investment to promote and inflate the price of MabVax securities in light of Frost's reputation as a successful biotech investor. As a result of this article, trading volume in MabVax increased by more than 300%.

117.     According to OPKO's SEC filings, after the April 2015 private placement, OPKO invested an additional $375,000 in July 2015 for 340,909 shares of MabVax common stock valued at $1.10 per share and 170,454 warrants to purchase shares of MabVax common stock. In July 2017, OPKO invested another $100,000 in exchange for 1852,1143 shares of MabVax common stock. As of December 31, 2017, OPKO held a 4% ownership position in MabVax.

118.     For those same reasons, the Individual Defendants caused OPKO to fail to disclose that it was operating as a part of that coordinated group.  For example, OPKO should have filed a Schedule 13D with the SEC revealing OPKO's ownership of MabVax.

119.     The Pump & Dump Misconduct harmed OPKO by causing it to be named as a defendant in the SEC Complaint.

120.     Yet, as the Individual Defendants did not cause OPKO to dump its artificially inflated shares of the Microcap Companies, as the Frost Conspirators dumped theirs, the Pump & Dump Misconduct also separately harmed OPKO like the innocent investors in the Microcap Companies were harmed.

**Individual Defendants Made and/or Caused OPKO to Make Materially False and Misleading Statements**

121.     Separately, from at least November 12, 2013 through August 7, 2018, the Individual Defendants made and/or caused OPKO to make materially false and misleading statements and failed to disclose material facts necessary to make the statements made not false and misleading, including that: (1) Frost, FGIT, and a number of other individuals and entities were engaged in, and they together with the other Individual Defendants caused OPKO to become

engaged in, the Pump & Dump Misconduct; (2) as a result of the foregoing, OPKO would be subject to regulatory scrutiny from government agencies, including the SEC, and OPKO's shares would be suspended from trading; and (3) OPKO failed to maintain internal controls (collectively, the "Material Facts").

122.    For example, on November 12, 2013, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2013 (the "2013 Q3 10-Q"). The 2013 Q3 10-Q was signed by Logal. Attached to the 2013 Q3 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Frost and Rodriguez, attesting to the accuracy of financial reporting in the 2013 Q3 10-Q. The 2013 Q3 10-Q failed to disclose the Material Facts.

123.    On March 3, 2014, OPKO filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Frost, Hsiao, Rubin, Rodriguez, Logal, Baron, Beier, Kolosov, Paganelli, Pfenniger, Yu and Lerner. Attached to the 2013 10-K were SOX Certifications signed by Frost and Rodriguez, attesting to the accuracy of financial reporting in the 2013 10-K.

124.    The 2013 10-K failed to disclose the Material Facts. Instead, regarding OPKO's "Growth Strategy," the 2013 10-K misrepresented that OPKO's acquisitions of interests in Microcap Companies like BioZone (part of the Pump & Dump Misconduct) were to OPKO's benefit, stating in relevant part:

> We expect our future growth to come from . . . opportunistically pursuing complementary, accretive, or strategic acquisitions and investments. . . .
>
> • *Early stage investments*. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.

125.     Concerning Frost, the 2013 10-K touted his benefits to OPKO, failing to disclose that he was at the center of the Pump & Dump Misconduct harming OPKO:

> ***Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business.*** The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations. ***Our CEO has a highly regarded reputation in the pharmaceutical and medical industry*** and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners.

(Emphasis added.)

126.     On May 9, 2014, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2014 (the "Q1 2014 10-Q"). The Q1 2014 10-Q was signed by Logal. Attached to the Q1 2014 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2014 10-Q. The Q1 2014 10-Q also failed to disclose the Material Facts.

127.     On August 11, 2014, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2014 (the "Q2 2014 10-Q"). The Q2 2014 10-Q was signed by Logal. Attached to the Q2 2014 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2014 10-Q. The Q2 2014 10-Q similarly failed to disclose the Material Facts.

128.     On November 7, 2014, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2014 (the "Q3 2014 10-Q"). The Q3 2014 10-Q was signed by Logal. Attached to the Q3 2014 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2014 10-Q. The Q3 2014 10-Q also failed to disclose the Material Facts.

129.    On February 27, 2015, OPKO filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Frost, Hsiao, Rubin, Logal, Baron, Beier, Kolosov, Paganelli, Pfenniger, Yu and Lerner. Attached to the 2014 10-K were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the 2014 10-K.

130.    The 2014 10-K once again failed to disclose the Material Facts. Instead, the 2014 10-K made similar misstatements concerning OPKO's "Growth Strategy" and Frost as in the 2013 10-K, noted above. The 2014 10-K further made misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and other Individual Defendants caused and/or allowed OPKO to invest in (including Cocrystal, the entity into which BioZone merged in 2014) were part of the Pump & Dump Misconduct:

> In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal, another entity in which we have an equity investment, to which Cocrystal was the surviving entity, and the name of the issuer was changed to Cocrystal Pharma, Inc. ("CPI"). Dr. Frost previously invested in both Biozone and Cocrystal. Effective January 16, 2014, we invested an additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share. At December 31, 2014, we hold an 8% ownership interest in CPI.

131.    On May 11, 2015, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2015 (the "Q1 2015 10-Q"). The Q1 2015 10-Q was signed by Logal.  Attached to the Q1 2015 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2015 10-Q. The Q1 2015 10-Q failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and other Individual

Defendants caused and/or allowed OPKO to invest in (including Cocrystal) were part of the Pump & Dump Misconduct.

132.    On August 5, 2015, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q was signed by Logal.  Attached to the Q2 2015 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2015 10-Q. Once again, the Q2 2015 10-Q failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and other Individual Defendants caused and/or allowed OPKO to invest in (including Cocrystal and MabVax) were part of the Pump & Dump Misconduct.

133.    On November 9, 2015, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q was signed by Logal.  Attached to the Q3 2015 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2015 10-Q.  The Q3 2015 10-Q again failed to disclose the Material Facts.

134.    On February 29, 2016, OPKO filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Frost, Hsiao, Rubin, Logal, Baron, Beier, Kolosov, Paganelli, Pfenniger, Yu and Lerner. Attached to the 2015 10-K were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the 2015 10-K. The 2015 10-K also failed to disclose the Material Facts. Instead, the 2015 10-K made similar misstatements concerning OPKO's "Growth Strategy," "Related Party Transactions," and Frost as in the filings noted above.

135.     On March 25, 2016, OPKO issued the 2016 Proxy Statement. Frost, Hsiao, Rubin, Kolosov, Paganelli, Pfenniger, Yu, and Lerner solicited the 2016 Proxy Statement, which contained material misstatements and omissions.

136.     The 2016 Proxy Statement stated, regarding OPKO's code of conduct (the "Code of Conduct"), that "[t]he Company has adopted a Code of Business Conduct and Ethics that applies to all employees, officers, and directors of the Company."

137.     With respect to OPKO's investments, the 2016 Proxy Statement represented, in relevant part:

> We hold investments in Cocrystal Pharma, Inc. ("COCP")(8%),. . . MabVax Therapeutics Holdings, Inc. ('MabVax')(1%) . . . In April 2015, we made a $2.5 million investment in a private placement transaction with MabVax pursuant to which we acquired 33,333 shares of MabVax Series E Convertible Preferred Stock and warrants to purchase 1,666,667 shares of MabVax common stock. Prior to our investment in MabVax, Dr. Frost held shares in MabVax indirectly through an entity in which he has an ownership interest. Dr. Frost, as well as non-affiliated investors, invested in the private placement transaction on the same financial terms. In connection with the OPKO investment, Steven Rubin, our Executive Vice President, Administration, was appointed as an advisor to MabVax, and we have the right to designate two board members. In October 2015, we made an additional $375 thousand investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock.

138.     However, the 2016 Proxy Statement failed to disclose the Pump & Dump Misconduct related to MabVax and Cocrystal. The 2016 Proxy Statement also failed to disclose the other Material Facts.

139.     The 2016 Proxy statement included a vote in order to approve the 2016 Equity Incentive Plan. The 2016 Proxy stated, "At the Annual Meeting, stockholders will be asked to approve the OPKO Health, 2016 Equity Incentive Plan…"

140.   The 2016 Proxy statement included the 2016 Equity Incentive Plan as an attachment. The stated purpose of the 2016 Equity Incentive Plan is:

> The purpose of the Plan is to motivate certain Employees, Nonemployee Directors and Independent Contractors to put forth maximum efforts toward the growth, profitability, and success of the Company and Subsidiaries by providing incentives to such Employees, Nonemployee Directors and Independent Contractors either through cash payments and/or through the ownership and performance of the Common Stock. In addition, the Plan is intended to provide incentives which will help the Company attract and retain highly qualified individuals as Employees and Nonemployee Directors and to assist in aligning the interests of such Employees and Nonemployee Directors with those of its shareholders.

Article 10 of the 2016 Equity Incentive Plan, titled "Performance Shares and Performance Units," states that the Committee ("the Board's Compensation Committee or any other committee of the Board appointed to administer this Plan") has discretion to grant Performance Shares to "Employees, Nonemployee Directors, and/or Independent Contractors as additional compensation or in lieu of other compensation for services to the Company." Article 10 goes on to say that the issuance of Performance Shares may be based on, without limitation, "Company-wide, divisional and/or individual performance, as the Committee, in its sole discretion, may determine, and may be based on the performance measures listed in Section 12.3 below." Article 12.3 states the following:

> **Performance Measures**. The Committee shall use the following performance measures (either individually or in any combination) to set performance goals with respect to Awards intended to qualify as Performance-Based Awards: net sales; pretax income before allocation of corporate overhead and bonus; budget; cash flow; earnings per share; net income; financial goals; return on shareholders' equity; return on assets; attainment of strategic and operational initiatives; appreciation in and/or maintenance of the price of the Common Stock or any other publicly-traded securities of the Company; market share; gross profits; earnings before interest and taxes; earnings before interest, taxes, depreciation and amortization; economic value-added models; comparisons with various stock market indices; and/or reductions in costs.

141.    However, the 2016 Proxy statement was false and misleading because it failed to disclose that the shares of OPKO stock were artificially inflated due to not disclosing the Material Facts, thus rendering the executive and director compensation undeserved and excessive.

142.    The 2016 Proxy Statement was also false and misleading because, despite assertions to the contrary, OPKO's Code of Conduct was not followed, as multiple Individual Defendants engaged in insider trading while allowing false and misleading statements to be issued to the investing public.

143.    On May 9, 2016, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q was signed by Logal.  Attached to the Q1 2016 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2016 10-Q.  The Q1 2016 10-Q once again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

144.    On August 8, 2016, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q was signed by Logal.  Attached to the Q2 2016 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2016 10-Q.  The Q2 2016 10-Q again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

145.    On November 7, 2016, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q was signed by Logal.  Attached to the Q3 2016 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2016 10-Q.  The Q3 2016 10-Q again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

146.    On March 1, 2017, OPKO filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Frost, Hsiao, Rubin, Logal, Beier, Krasno, Paganelli, Pfenniger, Yu and Lerner. Attached to the 2016 10-K were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the 2016 10-K. The 2016 10-K again failed to disclose the Material Facts. Instead, the 2016 10-K made similar misstatements concerning OPKO's "Growth Strategy," "Related Party Transactions," and Frost as in the 2014 10-K.

147.    On April 28, 2017, OPKO issued the 2017 Proxy Statement. Frost, Hsiao, Rubin, Krasno, Paganelli, Pfenniger, Yu, and Lerner solicited the 2017 Proxy Statement, which contained material misstatements and omissions.

148.    The 2017 Proxy Statement stated, regarding the Code of Conduct, that "[t]he Company has adopted a Code of Business Conduct and Ethics that applies to all employees, officers, and directors of the Company."

149.    With respect to OPKO's investments, the 2017 Proxy Statement represented, in relevant part:

> We hold investments in Cocrystal Pharma, Inc. ("COCP")(8%),. . . MabVax Therapeutics Holdings, Inc. ('MabVax')(4%) . . . In August 2016, we invested an additional $1 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock. . . . In September 2016, we invested an additional $2 million in COCP for 4,878,050 shares of its common stock. Dr. Frost and Hsiao and Mr. Rubin serve on the Board of Directors of COCP.

However, the 2017 Proxy Statement failed to disclose the Pump & Dump Misconduct related to MabVax and Cocrystal. The 2017 Proxy Statement also failed to disclose the other Material Facts.

150. With respect to the compensation of OPKO's named executive officers, the 2017 Proxy Statement stated that OPKO currently holds a vote every year "Say on Pay." The 2017 Proxy Statement further stated, in relevant part, that the executive compensation program is structured to:

> (i) attract, motivate, and retain talented executives with the skill sets and expertise we need to meet our scientific and business objectives; (ii) be competitive in the marketplace; (iii) tie annual and long-term cash and equity incentives to the achievement of specified performance objectives that will result in increased stockholder value; and (iv) be cost-effective.

The 2017 Proxy statement went on to state that OPKO's Board believed that the executive compensation program "is appropriately based upon our performance and the individual performance and level of responsibility of the executive officers." However, with regard to the compensation program, the 2017 Proxy statement was false and misleading due to not disclosing the Material Facts and that the shares of OPKO stock were thus artificially inflated, thus rendering the executive compensation undeserved and excessive.

151. The 2017 Proxy Statement was also false and misleading because, despite assertions to the contrary, OPKO's Code of Conduct was not followed, as multiple Individual Defendants engaged in insider trading while allowing false and misleading statements to be issued to the investing public.

152.    On May 10, 2017, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2017 (the "Q1 2017 10-Q"). The Q1 2017 10-Q was signed by Logal. Attached to the Q1 2017 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2017 10-Q. The Q1 2017 10-Q also failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

153.    On August 8, 2017, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "Q2 2017 10-Q"). The Q2 2017 10-Q was signed by Logal.  Attached to the Q2 2017 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2017 10-Q. The Q2 2017 10-Q again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

154.    On November 8, 2017, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2017 (the "Q3 2017 10-Q"). The Q3 2017 10-Q was signed by Logal. Attached to the Q3 2017 10-Q were SOX Certifications signed by Defendants Frost and Logal, attesting to the accuracy of financial reporting in the Q3 2017 10-Q. The Q3 2017 10-Q once again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost

Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

155.    On March 1, 2018, OPKO filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Frost, Hsiao, Rubin, Logal, Krasno, Paganelli, Pfenniger, Yu and Lerner. Attached to the 2017 10-K were SOX Certifications signed by Frost and Logal, attesting to the accuracy of the financial reporting in 2017 10-K. The 2017 10-K also failed to disclose the Material Facts. Instead, the 2017 10-K made similar misstatements concerning OPKO's "Growth Strategy," "Related Party Transactions," and Frost as in the 2014 10-K.

156.    On May 10, 2018, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2018 (the "Q1 2018 10-Q"). The Q1 2018 10-Q was signed by Logal. Attached to the Q1 2018 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q1 2018 10-Q. The Q1 2018 10-Q again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

157.    On August 7, 2018, OPKO filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2018 (the "Q2 2018 10-Q"). The Q2 2018 10-Q was signed by Logal. Attached to the Q2 2018 10-Q were SOX Certifications signed by Frost and Logal, attesting to the accuracy of financial reporting in the Q2 2018 10-Q. The Q2 2018 10-Q once again failed to disclose the Material Facts, instead making misstatements about OPKO's "Related Party Transactions" by failing to disclose that the Microcap Companies that the Frost Conspirators and

the other Individual Defendants caused and/or allowed OPKO to invest in (including Mabvax) were part of the Pump & Dump Misconduct.

158.     On April 30, 2018, OPKO issued the 2018 Proxy Statement. Frost, Hsiao, Rubin, Krasno, Paganelli, Pfenniger, Yu, and Lerner solicited the 2018 Proxy Statement, which contained material misstatements and omissions.

159.     The 2018 Proxy Statement stated, regarding the Code of Conduct, that "[t]he Company has adopted a Code of Business Conduct and Ethics that applies to all employees, officers, and directors of the Company."

160.     With respect to OPKO's investments, the 2018 Proxy Statement represented, in relevant part:

> As of December 31, 2018,[3] we hold investments in Cocrystal Pharma, Inc. ("COCP")(9%),. . . MabVax Therapeutics Holdings, Inc. ('MabVax')(2%) . . . In May 2017, we invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. In July 2017, we invested an additional $0.1 million in MabVax for 152,143 shares of its common stock.

However, the 2018 Proxy Statement failed to disclose the Pump & Dump Misconduct related to MabVax and Cocrystal. The 2018 Proxy Statement also failed to disclose the other Material Facts.

161.     With respect to compensation of OPKO's named executive officers, the 2018 Proxy Statement stated that OPKO holds a vote every year, "Say on Pay." The 2018 Proxy statement further stated, in relevant part, that the executive compensation program is structured to:

> (i) attract, motivate, and retain talented executives with the skill sets and expertise we need to meet our scientific and business objectives; (ii) be competitive in the marketplace; (iii) tie annual and long-term cash and equity incentives to the achievement of specified performance objectives that will result in increased stockholder value; and (iv) be cost-effective.

---

[3] Upon information and belief, this is a drafting error, and should read December 31, **2017**.

162.    The 2018 Proxy statement went on to state that OPKO's Board believed that the executive compensation program "is appropriately based upon our performance and the individual performance and level of responsibility of the executive officers." However, with regard to the compensation program, the 2018 Proxy statement was false and misleading due to not disclosing the Material Facts and that the shares of OPKO stock were thus artificially inflated, thus rendering the executive compensation undeserved and excessive.

163.    The 2018 Proxy Statement was also false and misleading because, despite assertions to the contrary, OPKO's Code of Conduct was not followed, as multiple Individual Defendants engaged in insider trading while allowing false and misleading statements to be issued to the investing public.

## The Truth Begins to Emerge

164.    On September 7, 2018, the SEC issued a press release announcing the filing of the SEC Action against, among others, Frost, OPKO, and FGIT. The release, titled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes," stated, in relevant part:

> ***The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock***.

> According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes. ***Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes***. . . .

> ***The SEC's complaint***, which was filed in federal district court in Manhattan, ***charges*** Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, ***Frost***, Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., ***OPKO Health Inc., Frost Gamma Investments Trust***, Southern Biotech Inc., and Stetson Capital

Investments Inc. **with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief**.

(Emphasis added.)

165.     On this news, the price of OPKO stock dropped $1.01 per share, or 18%, from the previous day's closing price, trading at $4.58 per share at 2:34 PM EDT on September 7, 2018, at which time NASDAQ halted trading of OPKO shares.

### False and Misleading Statements Continue

166.     In a press release issued September 7, 2018 (the "September 7, 2018 Press Release"), the Individual Defendants and FGIT caused OPKO to refute the claims in the SEC Action. The press release criticized the SEC for its "fail[ure] to provide notice of its intent to sue prior to filing the complaint" and for the SEC for purportedly failing to "follow[] its own standard procedures" and for "serious factual inaccuracies" in the SEC's complaint. However, in that press release, OPKO did not identify any of the "factual inaccuracies" in the SEC's complaint.

167.     On September 11, 2018, OPKO issued a press release (the "September 11, 2018 Press Release") disclosing that NASDAQ had suspended trading in OPKO stock in light of the SEC Action.

168.     On September 14, 2018, Frost released a statement in response to the SEC Action, denying the truth of its allegations. Frost's denial stated in relevant part:

> I was stunned by the SEC's lawsuit and deny the allegations it contains against me. It was particularly disturbing that the SEC departed from its own longstanding practice of providing advance notice and a meaningful opportunity to address their questions in advance of filing an action…. I intend to fight the charges that have been brought against me and will fight to clear my name.

### Trading of OPKO Stock Resumes, and Judgments are Entered in the SEC Action

169.     OPKO stock resumed trading on September 14, 2018. Upon the resumption of trading, the price of OPKO shares fell an additional $0.68, or approximately 15%, closing at $3.90 on September 14, 2018.

170.     On September 21, 2018, the Court in the SEC Action entered a judgment against Ford. Ford agreed to settle the SEC Action, without admitting or denying the allegations against him, in exchange for prohibitions on violating the federal securities laws in the future, a permanent bar from participating in any offering of penny stock, a civil penalty, disgorgement of all gains and prejudgment interest thereon.

171.     On January 10, 2019, the Court in the SEC Action entered judgments against Frost, OPKO, and FGIT. Frost, OPKO and FGIT agreed to settle the SEC's allegations against them and enter into the judgments without admitting or denying the allegations.

172.     In Frost's consent judgment, Frost agreed to pay a civil penalty of $5,000,000, plus disgorgement of his ill-gotten gains. Frost also agreed to be permanently enjoined from participating in any offering of a penny stock with limited exceptions. Frost also agreed to be enjoined from violating numerous provisions of the federal securities laws, including to be permanently enjoined from violating Section 17(a)(2) of the Securities Act by making materially untrue statements or omissions in connection with sales of securities, to be permanently enjoined from violating Section 13(d) of the Exchange Act and Rule 13d-1(a) thereunder by failing to file required stock-ownership reports on Schedule 13D, and to be permanently enjoined from violating Sections 5(a) and (c) of the Securities Act by selling unregistered securities.

173.     In OPKO's consent judgment, OPKO agreed to retain an independent consultant acceptable to the SEC to review, among other things, the Company's compliance with Section 13(d) of the Exchange Act in relation to investments made at the suggestion of and in tandem with

Frost. OPKO also agreed to establish a Management Investment Committee to make recommendations to an Independent Investment Committee of the Board of Directors "to handle existing and future strategic minority investments for so long as Dr. Phillip Frost . . . is a shareholder in or holds any management or board-level position at [OPKO]." In other words, OPKO agreed that its investment activities would no longer be controlled by Frost, but rather would be vetted by an independent board committee. OPKO also agreed to pay a civil penalty of $100,000 and to be permanently enjoined from violating Section 13(d) of the Exchange Act and Rule 13d-1(a) by failing to file required stock-ownership reports on Schedule 13D.

174.    In FGIT's consent judgment, FGIT agreed to be permanently enjoined from violating Section 17(a)(2) of the Securities Act by making materially untrue statements or omissions in connection with sales of securities and to be permanently enjoined from participating in any offering of a penny stock.

175.    On January 18, 2019, Groussman and Melechdavid also agreed to consent judgments under which Groussman agreed to pay $1,051,360 of disgorgement of ill-gotten gains, $170,555 of interest, and a penalty of $160,000, and he and Melechdavid were permanently enjoined from violating Sections 10(b) and 13(d) of the Exchange Act, Rules 10b-5 and 13d-1(a), and Sections 5 and 17(a) of the Securities Act, and were enjoined for five years from participating in any penny stock offering.

176.    On March 8, 2019, the SEC filed its First Amended Complaint against the remaining defendants in the SEC Action. Both the SEC's initial complaint and the First Amended Complaint demonstrate that the SEC's investigation was thorough and included access to substantial nonpublic information, including nonpublic emails and documents that were created by, sent to, or received by key individuals and entities. The First Amended Complaint also includes

factual discussions of meetings and conversations between those individuals and others. Considering that the SEC filed its First Amended Complaint after entering into consent judgments with Ford, Frost, FGIT, OPKO, Groussman, and others, it is highly probable that the SEC's allegations are based on interviews with those individuals and documents produced by those individuals and entities, in addition to documents and information gathered through subpoenas and informal requests.

177.    On March 21, 2019, Maza settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Section 10(b) of the Exchange Act, Rules 10b-5, and Section 17(a) of the Securities Act and from aiding and abetting any violation of Section 15(d) of the Exchange Act and Rule 15d-1. Maza also agreed that the court would determine whether he should be ordered to pay disgorgement of ill-gotten gains, a civil penalty, and interest.

178.    On March 26, 2019, Keller settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Sections 10(b) and 15(d) of the Exchange Act, Rules 10b-5 and 15d-1, and Section 17(a) of the Securities Act, from participating in any penny-stock offering, and from acting as an officer or director of any public company. Keller also agreed to pay disgorgement of ill-gotten gains, interest, and a civil penalty in an amount to be determined by the court.

179.    On April 26, 2019, the SEC and Honig notified the court in the SEC Action that the SEC staff and Honig had reached an agreement in principle to settle the SEC's charges against Honig, subject to approval by the SEC's commissioners and the court.

180.    The SEC Action continues against the other Frost Conspirators.

181.     In addition to the civil penalty that OPKO had to pay to resolve the SEC Action,

the Company is still open to substantial liabilities and expenses as a result of the Individual

Defendants and FGIT's actions. These exposures include the Securities Class Actions and the

potential for OPKO and/or Frost to be criminally charged for their participation in the Pump and

Dump Schemes. On September 11, 2018, Hindenburg Investment Research published the article

titled "OPKO Health: If These SEC Charges Were Surprising Then You Haven't Been Paying

Attention" on *Seeking Alpha*. The article stated that "[w]e anticipate that criminal charges could

follow given the reported FBI investigation that parallels the SEC charges."

## DERIVATIVE ALLEGATIONS

182.     Plaintiff brings this action derivatively and for the benefit of OPKO to redress

injuries suffered, and to be suffered, as a result of FGIT and the Individual Defendants' breaches

of their fiduciary duties as controlling shareholders, directors and/or officers of OPKO, unjust

enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting

thereof.

183.     OPKO is named solely as a nominal party in this action. This is not a collusive

action to confer jurisdiction on this Court that it would not otherwise have.

184.     Plaintiff is, and has been at all relevant times, a shareholder of OPKO. Plaintiff will

adequately and fairly represent the interests of OPKO in enforcing and prosecuting its rights, and,

to that end, has retained competent counsel, experienced in derivative litigation, to enforce and

prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

185.     A pre-suit demand on the Board of OPKO is futile and, therefore, excused. At the

time of filing of this amended complaint, the Board consists of the following nine individuals:

Frost, Hsiao, Rubin, Krasno, Pfenniger, Yu, and Lerner (the "Director-Defendants") and non-parties Paganelli and Robert S. Fishel, (collectively with the Director-Defendants, the "Directors" or the "Board"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this amended complaint is filed.

186.    Demand is excused as to all of the Director-Defendants and Paganelli because (a) each one of them faces, individually and collectively, a substantial likelihood of liability, and (b) they lack the requisite independence to objectively assess a litigation demand. For each of these reasons, the Director-Defendants and Paganelli are unable to impartially investigate the charges herein and decide whether to pursue action against themselves and the other perpetrators of the misconduct alleged herein.

187.    Three of the Board members, Frost, Hsiao, and Rubin, are also current OPKO employees, holding executive positions.

188.    As discussed herein, the web of interconnected personal and business relationships between Frost and members of OPKO's Board raise reasonable doubt that the Board members could impartially consider a demand to bring the claims herein had a demand been made.

**<u>Frost</u>**

189.    Frost is the founder, Chairman, and CEO of OPKO and owns approximately 35% of OPKO's outstanding common stock. Frost is alleged to be at the center of the Pump & Dump Misconduct that has so damaged OPKO.  Moreover, Frost was responsible for all of the false and misleading statements and omissions that were made by OPKO, including those in OPKO's SEC filings, each of which he either signed or signed a SOX Certification for. He also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. As OPKO's highest officer and as

Chairman of the Board, he conducted little, if any, oversight of OPKO's engagement in the schemes to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Frost is a defendant in the both the SEC Action and the Securities Class Actions. Therefore, demand is futile as to Frost because he faces a substantial likelihood of liability.

190.    Frost has served as the Chairman of the Board and CEO since 2007. Thus, as OPKO admits in the 2018 Proxy Statement, Frost is a non-independent director. In OPKO's SEC filings, Frost is considered integral to OPKO. For instance, the Form 10-K filed for the year ending December 31, 2017 stated in relevant part:

> Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business. The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations. Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments. If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.

191.    Frost receives handsome compensation for his services to OPKO, including over $3 million in 2016 and $870,800 in 2017. Moreover, as noted in the 2018 Proxy Statement, OPKO engages in a number of ongoing transactions with entities associated with Frost. For example, OPKO has indirectly paid Frost approximately $4.45 million in rent during the Relevant Period and $659,000 over the past two fiscal years for air travel.[4] Therefore, demand is also futile as to

---

[4] These arrangements include:

Frost because he lacks independence as a result of these contracts and being the top paid officer of OPKO.

192.    Frost has many suspicious connections and transactions in companies in addition to his involvement with BioZone/Cocrystal and MabVax. A list of other suspicious connections and transactions in which Frost was involved includes:

(a)    Landenburg Thalmann

i.    Until recently, Frost served as Chairman and board member of Ladenburg Thalmann. Frost had been a director of Ladenburg Thalmann from 2001 to 2002 and again since 2004 and became chairman since July 2016. Frost is the principal stockholder of Ladenburg Thalmann, owning nearly 36% of its outstanding shares, for a total of 73,549,630 shares. On March 9, 2011, OPKO issued 27,000,000 shares of Common Stock, through which FGIT purchased an aggregate of 3,200,000 shares for approximately $12 million. Ladenburg Thalmann & Co. Inc., a subsidiary of Ladenburg Thalmann, acted as co-manager for the offering. Ladenburg Thalmann is also closely associated with Frost-related companies with its analysts covering and promoting ChromaDex, VBI, Neovasc Inc. ("Neovasc"). Ladenburg Thalmann also invited ChromaDex and VBI to present at Ladenburg Thalmann's annual healthcare conference. Ladenburg Thalmann also maintains officers in the former IVAX Building. Ladenburg Thalmann has also acted as a banker for various Frost-related transactions:

---

(a)    A five-year lease between the Company and Frost Real Estate, entered into January 1, 2014, pursuant to which the Company initially paid $81,000 per month for approximately 29,000 square feet of office space. Beginning in 2018 and running into 2019, the rent increased to $86,000 per month.[4]

(b)    The Company uses an airplane owned by a company beneficially owned by Frost, for which that company is reimbursed. The Company paid approximately $361,000 and $298,000 in fiscal years 2017 and 2016, respectively for the use of the private plane.

- entered into a $30,000,000 revolving credit agreement with FGIT in 2007, which was amended and later replaced with a new credit agreement;

- entered into a management services agreement with Vector Group, where Frost is the largest stockholder;

- entered into amendment and renewal of an office lease agreement with Frost Real Estate;

- been party to an agreement with Castle Brands, Inc. ("Castle Brands") under which it provides certain administrative, legal, and financial services to Castle Brands. Ladenburg Thalmann's President and CEO is also the President and CEO of Castle Brands. Various of its directors serve as directors of Castle Brands, and Frost is the principal stockholder of both companies;

- issued a fairness opinion for the debt restructuring of MusclePharm Corporation (another Frost entity that invested in BioZone) in November 2017;

- served as lead manager for a $71.9 million follow-on offering at VBI in October 2017;

- issued a fairness opinion for ChromaDex's sale of analytical testing services in August 2017; acted as sole placement agent for ChromaDex's $25 million private placement in April 2017;

- served as co-manager for a $50 million follow-on offering for TransEnterix Inc. ("TransEnterix") in June 2015;

- served as co-manager for Neovasc's $86.8 million follow-on offering in January 2015;

- served as co-manager for TransEnterix's $56.4 million follow-on offering in April 2014;

- served as co-placement agent for OPKO's $175 million private investment in public equity ("PIPE") transaction in January 2013;

- served as exclusive placement agent for Castle Brand's $7 million PIPE transaction in June 2011;

- served as co-manager for OPKO's $101.25 million follow-on offering in March 2011;

- served as co-placement agent for a $24.4 million PIPE transaction done by Prolor Biotech, Inc. ("Prolor," which in August 2013 was acquired by OPKO) in March 2010; and

- served as a financial advisor to certain investors in connection with Castle Brand's $15 million PIPE transaction in October 2008.

ii.     On September 20, 2018, only 13 days after the commencement of the SEC Action, Landenburg Thalmann announced that Frost "had decided to retire" from the board. On December 24, 2018, Landenburg Thalmann announced that it entered into an agreement to buy out Frost's equity position in exchange for a combination of cash and 7.25% senior notes.

(b)     Neovasc

On August 17, 2011, OPKO invested $2 million in Neovasc, which was 36% owned by Frost. In exchange for this investment, OPKO received, 2 million shares of common stock and 1 million two-year warrants. OPKO also entered into a consulting agreement with Neovasc in exchange for an option to purchase 913,750 additional shares of common stock. of August 4, 2011, Frost owned 36%, Hsiao 6% and Rubin less than 1% of Neovasc. In August 2012, the Company received additional stock options to purchase 86,250 shares of Neovasc common stock as compensation under the consulting agreement. In November 2017, the Company invested an additional $3.0 million in Neovasc for 2,054,794 shares of its common stock, 2,054,794 Series A warrants, 2,054,794 Series B warrants, and 822,192 Series C warrants. As of December 31, 2017, the Company holds an approximately 8% beneficial ownership interest in Neovasc.

(c)     RXi Pharmaceuticals Corporation

In March 2013, OPKO entered into an Asset Purchase Agreement and a Stock Purchase Agreement with RXi Pharmaceuticals Corporation ("RXi"). In exchange, RXi agreed to issue RXi stock worth an aggregate of at least $10 million to OPKO and "certain accredited investors";

OPKO invested $2.5 million; FGIT invested $1,000,000, Hsu Gamma: invested $250,000, and Rubin invested $30,000. These investors also included Brauser. OPKO then invested another $200,000 in December 2016. As of December 31, 2017, the Company had an approximate 2.8% beneficial ownership interest in RXi.

(d)     Arno Therapeutics, Inc. ("Arno")

i.     In October 2013, the Company entered into an agreement with Arno pursuant to which the Company invested $2.0 million as part of an approximate $30 million financing. In connection with the transaction, Arno agreed that for so long as OPKO continued to hold at least 3% of the total number of outstanding shares of Arno's common stock on a fully-diluted basis, the Company would have the right to appoint a non-voting observer to attend all meetings of Arno's board of directors and the Company would have a right of first negotiation that provides the Company with exclusive rights to negotiate with Arno for a 45-day period regarding any potential strategic transactions that Arno's board of directors elects to pursue.

ii.     In January 2016, the Company made an additional $250,000 investment and in August 2016 invested an additional $250,000 in Amo. As of December 31, 2017, the Company had an approximate 8.7% beneficial ownership' interest in Arno. Arno announced on December 22, 2017 that it was liquidating its assets and planned to dissolve.

(e)     BioCardia, Inc. ("BioCardia")

In October 2016, the Company entered into a consulting agreement to provide strategic advisory services to BioCardia. In connection with the consulting agreement, BioCardia granted OPKO 418,977 common stock options after adjusting for a 1-for-12 reverse stock split in 2017. In December 2016, OPKO purchased 1,602,564 shares of BioCardia, (after adjusting for the reserve

stock split) from Frost for $2.5 million. The Company also purchased an aggregate of 5,022,000 shares of BioCardia in the open market. As of December 31, 2017, OPKO had an approximate 5.6% beneficial ownership interest in BioCardia.

(f)     Prolor

In August 2013, OPKO acquired Prolor pursuant to an Agreement and Plan of Merger dated as of April 23, 2013 (the "Prolor Merger Agreement") in an all-stock transaction. Under the terms of the Prolor Merger Agreement, holders of Prolor common stock received 0.9951 shares of OPKO stock for each share of Prolor common stock they held. Prior to the completion of the acquisition of, Prolor, Frost was a director of Prolor and held Prolor stock directly and through FGIT. The Phillip & Patricia Philanthropic Foundation also held approximately 20.22% of the outstanding shares of Prolor.

(g)     Zebra

In October 2013, the Company made an investment in Zebra, a privately held biotechnology company founded by Frost and Lerner. Zebra owned the license for a core technology developed by Lerner in his laboratory at Scripps.

(h)     Non-Invasive Monitoring Systems, Inc. ("NIMS")

OPKO owns 1% of NIMS which leases its 4400 Biscayne Boulevard headquarters from Frost Real Estate. Hsiao is Chairman and Rubin and Uppaluri are directors of NIMS. Frost finances NIMS through a series of high-interest (11%) promissory notes with FGIT. Frost, through FGIT, owns 25% of NIMS and is its largest stockholder; Hsiao owns 19% and is the second largest stockholder. NIMS has also rented warehouse space in Hialeah, Florida from an entity controlled by Frost and Hsiao.

(i)     Other Transactions Involving Frost

     i.      OPKO reimburses Frost for Company-related use by Frost and other executives of an airplane owned by a company that is beneficially owned by Frost. For the years ended December 31, 2017, 2016 and 2015, the Company reimbursed Frost approximately $373,000, $326,000 and $532,000, respectively, for Company-related travel by Frost and other OPKO executives.

     ii.     OPKO leases office space from Frost Real Estate, where its principal executive offices are located. Effective May 28, 2015, OPKO entered into an amendment to the lease agreement with Frost whereby it leased approximately 25,000 square feet of space for approximately $66 thousand per month in the first year increasing annually to $75 thousand per month in the fifth year. Effective January 1, 2017, the lease agreement was amended to increase the space to approximately 29,500 square feet increase the payments to approximately $81 thousand per month in the first year increasing annually to $86 thousand per month in the third year.

     iii.     November 2016, OPKO entered into a Pledge Agreement with the Frost Science Museum pursuant to which OPKO agreed to contribute an aggregate of $1.0 million over a four-year period for constructing, equipping and the general operation of the Frost Science Museum.

**<u>Rubin</u>**

193.   Rubin has served as a Company director and as Executive Vice President – Administration since 2007. Thus, as OPKO admits in the 2018 Proxy Statement, Rubin is a non-independent director. He receives handsome compensation, including over $2.7 million in 2016 and $820,800 in 2017. Since 2007, Rubin has earned roughly $15 million in compensation from his employment at OPKO. He is beholden to controlling shareholders FGIT and Frost, as he

depends on them for the primary source of livelihood; as FGIT and Frost clearly face a substantial likelihood of liability, demand is futile as to Rubin.

194.    Further, Rubin has strong personal and professional connections with Frost: in 2017 *Forbes* reported that Rubin is a "regular lunch mate" of Frost, and the two men have frequent face to face meetings.[5] Further, Rubin has been involved in securities violations with Frost in the past. A class action lawsuit for violations of the securities laws was filed in the Southern District of Florida against Searchmedia Holdings Limited, and Frost, Rubin, and Beier (among others) in 2010 and was partially settled in 2013 for consideration of $2.75 million.

195.    Rubin is also a controlling member of the Frost Group and is so closely connected with the Frost Group that he must disclaim ownership of the OPKO shares held by the Frost Group in OPKO's annual proxy statements.

196.    Rubin also has served in numerous capacities for Frost-affiliated or Frost-controlled entities, including:

(a)    Director of Castle Brands, a company in which Frost beneficially owns roughly 33.5% of the equity;

(b)    Interim CEO and Interim CFO and as a member of the Board of Directors of Tiger X Medical, Inc. ("Tiger X") until its merger with BioCardia in October 2016;

(c)    Advisor to MabVax;

(d)    Director of Cocrystal;

(e)    Senior Vice President, General Counsel and Secretary of IVAX from 2001 to 2006, during Frost's tenure as CEO.

---

[5]    Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

(f)     Director of SafeStitch Medical, Inc. ("SafeStitch") from 2007 until it merged into TransEnterix on September 3, 2013.

(g)     Director of Neovasc;

(h)     Director and stockholder of NIMS since 2008, along with Hsiao, who is Chairman and CEO.

(i)     Director of Prolor, from 2008 until it was acquired by OPKO in 2013;

(j)     Director of Sevion, which renamed itself Eloxx Pharmaceuticals, Inc. ("Eloxx"), starting in 2014-15, in which both OPKO and Frost have large investments.

(k)     Director of SciVac in 2012, after which OPKO made a large investment in the company. SciVac became VBI in 2015. OPKO is now a 17% beneficial owner of VBI;

(l)     Director of ChromaDex;

(m)     Board Observer at Arno;

(n)     Director and Vice Chairman of Cogint, Inc. ("Cogint" f/k/a IDI, Inc. and Tiger Media, Inc., n/k/a Fluent, Inc.), where Brauser and Frost served as chairman and vice chairman of the board, respectively;

(o)     Director of Dreams, Inc., where Frost was formerly the third-largest stockholder;

(p)     Secretary and Director of Ideation Acquisition Corp. of which Frost was a substantial stockholder and chairman;

(q)     Member of Supervisory Board of inter CLICK, Inc., in which Frost, Honig, and Brauser invested;

(r)     Director of Kidville, Inc. ("Kidville"), in which Frost led a group of investors who made a $10 million investment in which Rubin, Uppaluri, and Hsiao participated;

(s)     Director of Longfoot Communications Corp., which acquired Kidville;

(t)     Director of Red Violet, Inc. which was spun-off from Cogint and where Brauser and Frost remain directors;

(u)     Member of Supervisory Board of Teva Czech Industries s.r.o.;

(v)     Director of Tiger Media, Inc. prior to its acquisition by IDI;

(w)     Strategic Advisor at usell.com, Inc., a secondhand phone website in which Frost invested and where Brauser's son Daniel served as CEO; and

(x)     Registered Agent for Frost Real Estate.

197.    Frost was Vice Chairman of Cogint from 2015 to March 2018, and its largest stockholder with 28.5% beneficial ownership. Rubin was a Cogint director from 2009-March 2018, and served on the Cogint board's audit committee. For his service on the Cogint board and audit committee, Rubin received 30,000 restricted stock units ("RSUs") and additional stock awards for his service. As of December 31, 2016, Rubin held 150,000 shares of Cogint common stock and 32,000 additional shares subject to options awards.

198.    Through these Frost related positions, in addition to the undisclosed compensation from certain Frost related private and public companies, Rubin holds over 241,000 shares in Castle Brands and earned nearly $200,000 in cash compensation as a director, holds 564,952 shares of Cocrystal, held 336,156 shares of SafeStitch prior to its acquisition, held 124,753 shares of Prolor prior to its acquisition by OPKO and received over $65,000 in cash compensation as a director, holds 59,120 shares in Eloxx and has received over $236,000 as a director, holds 45,311 shares of VBI and has received $87,375 in director compensation and has received over $137,562 in compensation as a director of ChromaDex. For his director service at Sevion, Rubin received for fiscal year 2015, $16,875 in cash and $17,374 in options; for fiscal year 2016, $32,763 in options

(or 129,773 shares subject to options); and for fiscal year 2017, $17,625 in options (160,227 shares). Additionally, Rubin was paid 7,000 options (valued at $14,039) for his service on the SafeStitch board. In total, Rubin has earned more than $25 million in compensation from Frost-related companies.

199.    As a long-time Company director and executive during the Relevant Period, Rubin conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Rubin signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. In addition, Rubin received proceeds of over $1.5 million as a result of insider transactions executed during the period when OPKO's stock price was artificially inflated due to the false and misleading statements alleged herein. Such insider sales demonstrate Rubin's motive in facilitating and participating in the fraud, violated federal law, and violated Rubin's fiduciary duties. Thus, Rubin faces a substantial likelihood of liability.

**Hsiao**

200.    Hsiao has served as OPKO's Vice-Chairman and Chief Technical Officer since 2007. Thus, as OPKO admits in the 2018 Proxy Statement, Hsiao is a non-independent director. She received handsome compensation, including approximately $2.9 million in 2016 and $915,800 in 2017. She is beholden to controlling shareholders FGIT and Frost, as she depends on them for

the primary source of livelihood; as FGIT and Frost clearly face a substantial likelihood of liability, demand is futile as to Hsiao.

201.    Hsiao also shares a close, decades-long relationship with Frost which includes multiple companies and philanthropy. In profiling Hsiao, *Forbes* described Hsiao as "Frost's close confidante and business partner [who] has been working with him for year[s] at various pharma outfits." In January 2017, *Forbes* reported that Frost "lunches daily with senior executives, including Dr. Jane Hsiao . . . whose late husband, Charles, cofounded Ivax with Frost."[6] Charles Hsiao worked with Frost at Key Pharmaceuticals and was one of IVAX's first employees.

202.    Moreover, in a conference call held with analysts and investors on March 1, 2018, Frost touted the confidence that he and Hsiao had in OPKO, stating his confidence had been confirmed by his "investing an additional $25 million into the Company, alongside my colleague Dr. Jane Hsiao."

203.    These connections extend to shared philanthropic interests as Hsiao as made contributions to: the Phillip and Patricia Frost Museum of Science includes the Hsiao Family Special Exhibition Gallery. Further, as recently as June 2018, Hsiao's Jane Hsiao Asian Art Endowment funded an exhibit at the Frost Art Museum at Florida International University, underscoring the depth of her social and professional connections with Frost.

204.    Hsiao also served in numerous leadership roles with Frost-affiliated or Frost-controlled companies, including:

(a)    Director of Cocrystal;

---

[6] Matt Schifrin, *Meet Miami's Renaissance Billionaire*, FORBES (Jan. 24, 2017), https://www.forbes.com/sites/schifrin/2017/01/03/meet-miamis-renaissance-billionaire/#b47517f7306b.

(b)     Director and Vice Chairman – Technical Affairs of IVAX from 1995 through 2006, while Frost was Chairman and CEO of IVAX;

(c)     Chairman, CEO, and President of IVAX Animal Health from 1998 through 2006;

(d)     Director of IVAX Diagnostics, a subsidiary of IVAX;

(e)     Director of IVAX Pharmaceuticals s.r.o.;

(f)     Vice President of Quality Assurance and Compliance of IVAX Research;

(g)     Director of SafeStitch from 2007 until it was merged into TransEnterix, on September 3, 2013;

(h)     Director of TransEnterix, a company Frost owned 6.5 million shares in as of 12/5/13, with Pfenniger;

(i)     Director of Prolor, from 2008 until it was acquired by OPKO in 2013;

(j)     Director of Neovasc;

(k)     Director of Acuity;

(l)     Member of the Board of Managers of Fabrus, Inc. ("Fabrus") (later acquired by Senesco), where Frost was also a member of the Board of Managers. Lerner also owned 5% of Fabrus at the time OPKO filed its April 26, 2011 proxy solicitation;

(m)     Director of Froptix;

(n)     President of Ophthalmic Technologies, Inc., in which OPKO invested $5 million in 2007;

(o)     Director of Sorrento Therapeutics, Inc. ("Sorrento"), in which OPKO invested $2.3 million in 2009;

(p)     President from 2010-11 of Etamota Corporation, which listed an address at the former IVAX Building.

(q)     Chairman and CEO of NIMS since 2008; and

(r)     Director of Orthodontix Inc. ("Orthodontix"), which merged with Protalix BioTherapeutics Ltd. ("Protalix") in 2006. Protalix is an Israeli company which collaborated with Teva on recombinant plant cell expression technology and which was merged with Orthodontix. Frost is a stockholder of the combined company and was a large and early investor in Protalix.

205.    Through these Frost related positions, in addition to the undisclosed compensation from certain Frost related private and public companies, Hsiao holds over 306,000 shares in Cocrystal, 4,990,230 shares of TransEnterix, held 9,861,577 shares of IVAX prior to its acquisition and held 2,288,189 shares of Prolor prior to its acquisition by OPKO and received $70,093 in cash compensation. In total, Hsiao has earned more than $25 million in compensation from Frost-related companies.

206.    As a long-time Company director and Chief Technical Officer, she conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Hsiao signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. She also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. Hsiao also coordinated with Frost to perpetrate the Pump & Dump Misconduct. The complaint in the MN Action alleges that the plaintiff told Keller, that the Frost Conspirators' activities at BioZone constituted fraud and as a result, Nian Wu (a chemist involved with BioZone) would sue. The MN Action alleges that, in response, Keller represented that Hsiao

was negotiating with Nian Wu, in an effort to assuage the plaintiff's concerns about impending litigation. Thus, Hsiao faces a substantial likelihood of liability.

### Krasno

207.    Krasno has served as a Company Director since February 2017 and is a member of the Audit Committee. He receives handsome compensation, including $229,954 in 2017. Krasno is beholden to controlling shareholders FGIT and Frost, as he depends on them for his substantial income as a Company Director; as FGIT and Frost clearly face a substantial likelihood of liability, demand is futile as to Krasno.

208.    As a Company director and member of the Audit Committee, he conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Krasno signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. Thus, Krasno faces a substantial likelihood of liability.

209.    Krasno is also beholden to Frost due to their extensive business relationship. Krasno is or was involved in the following capacities at Frost-related or Frost-controlled companies:

(a)    Krasno is a director of Ladenburg Thalmann and was paid $249,400 in director compensation for the year ending May 30, 2018 and he holds roughly 683,000 shares of Ladenburg Thalmann common stock. In the aggregate, Krasno has been paid over $1.3 million in compensation for his years as a Ladenburg Thalmann director;

(b)     Krasno serves alongside Frost and Rubin as directors of Castle Brands, for which Krasno has accumulated 140,000 shares and received over $33,000 in compensation for the year ended March 31, 2018;

(c)     Krasno is a director of BioCardia, for which he has received 24,499 BioCardia shares and $257,030 in compensation for the year ending December 31, 2017;

(d)     As a director of OPKO, Krasno received over $229,000 in director compensation and 60,000 stock options for the year ended December 31, 2017.

(e)     Krasno was a director at Whitman Education Group, Inc. ("Whitman"), where Frost served as chairman of the board while owning more than a third of the company's stock. He also held 82,500 stock of Whitman before it was acquired by Career Education Group in 2003.

(f)     Krasno is a member of the Board of Advisors at the Frost School of Music at the University of Miami, together with Frost and Patricia Frost and where Baron had also served; and

(g)     Krasno is also Executive Director of the William R. Kenan, Jr. Charitable Trust, which gave $2 million to the Frost Science Museum in the fiscal year ended June 30, 2015, and president of four affiliated William R. Kenan, Jr. Funds. Indeed, there is now a "William R. Kenan, Jr. Charitable Trust Gallery" at the Frost Science Museum.

210.    According to certain Findings of Fact and Conclusions of Law reached in *SEC v. Zachariah, et al*., No. 08-cv-60698 (S.D. Fla), "Krasno had known Dr. Frost for at least ten years before being invited to join the board of IVAX, was a personal friend of Dr. Frost, and had served on a prior corporate board with him from the mid-1990's until 2004." In total, Krasno has earned

approximately $2 million in compensation from Frost-related companies. In fact, Krasno appears to only earn his annual compensation from OPKO and other Frost-related companies.

**Paganelli**

211.    Paganelli has served as a Company director since 2003 and is a member of the Audit Committee. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Paganelli signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. Thus, Paganelli faces a substantial likelihood of liability.

212.    Paganelli served as a director of the Company and its predecessor, eXegenics since December 2003 and served as the predecessor company's Interim CEO and secretary from June 29, 2005 through March 27, 2007, and Chairman of the eXegenics Board of Directors from December 2003 through March 27, 2007. Paganelli was also a member of eXegenics's Business Opportunities Search Committee, which led to his introduction to Frost and Frost's ultimate investment in eXegenics in 2006. As a result of his service on the eXegenics Business Opportunities Search Committee in 2007, Paganelli was awarded 50,000 shares of eXegenics stock. On March 27, 2007, eXegenics acquired Froptix and Acuity and ceased all operations relating to its historical business and adopted the business plan of Froptix and Acuity. In June of that year, eXegenics changed its name to OPKO.

213.    According to OPKO's annual proxy filings, Paganelli has been paid compensation worth approximately $864,428 while serving in such capacities at eXegenics/OPKO. This figure is approximate because the Company's 2008 proxy filing does not cleanly delineate between which compensation related to Paganelli's roles as a director on the Board and as Interim CEO of eXegenics. Paganelli held 401 shares in Prolor prior to its acquisition by OPKO in August 2013. In total, Paganelli has earned approximately $1 million in compensation from Frost related entities.

**Pfenniger**

214.    Pfenniger has served as a Company Director since 2008 and is a Chairman of the Audit Committee. He receives handsome compensation, including $109,700 in 2017. As a Company director and Chairman of the Audit Committee, he conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Pfenniger signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. Thus, Pfenniger faces a substantial likelihood of liability.

215.    Pfenniger also has an extensive business relationship with Frost dating back for approximately 30 years. Pfenniger joined IVAX in 1989, where Frost was Chairman and CEO and principal stockholder, as Senior Vice President-Legal Affairs and General Counsel. From May 1994 to March 1997, Pfenniger was COO of IVAX under Frost. In 1992, Frost invested in Whitman and became its Chairman and principal stockholder, and Pfenniger, who was still an executive at IVAX, was appointed a director of Whitman. When IVAX was acquired by Teva,

Pfenniger held 219,768 IVAX shares and 28,125 options of IVAX stock. In March 1997, Pfenniger left IVAX to join Whitman as Vice Chairman and CEO and served in that capacity until Whitman was acquired by Career Education Group in 2003. During his tenure at Whitman, Pfenniger acquired 613,049 shares and received over $1,000,000 in cash compensation.

216.    In 2003, Pfenniger joined Continucare Corp ("Continucare"), where Frost was the controlling stockholder and then-Vice Chairman. Pfenniger was CEO and Chairman of the board of Continucare from that time until Frost sold Continucare to Metropolitan Health Networks ("Metropolitan") in 2011. As of 2011, Pfenniger held 1,306,003 shares of Continucare, which were exchanged for $6.25 in cash and 0.0414 shares of Metropolitan stock on a per-share basis. He received about $5.1 million in cash for his cancelled Continucare options and received over $4.5 million in compensation from Continucare. Pfenniger also serves as a member of the board of directors of BioCardia, an entity in which Frost beneficially owns more than 30% of the equity. As a director of BioCardia, Pfenniger holds 258,286 shares and has received roughly $25,000 in cash compensation.

217.    Pfenniger has a longstanding professional and personal relationship with Frost. Since at least 2011 until the present, Pfenniger has served as a director of the 3-person board and the Secretary of Frost Administrative Services, Inc. Frost is one of the two remaining directors of Frost Administrative Services. Since at least 2012 until the present, Pfenniger has been a director of the 3-person board of the Phillip and Patricia Frost Philanthropic Foundation, Inc., and Frost and his wife consist of the remaining two directors of the board and the only executives of the company.

218.    In February 2016, Pfenniger was appointed to the Board of Trustees of the Frost Science Museum. At that time, the Frost Science Museum dissolved its 40-member Board of

Trustees and replaced its longtime co-chairs with a 4-person board, including Pfenniger and Frost's wife. Currently, Pfenniger is the Vice Chairman of the Board of Trustees and sits on the executive committee. Pfenniger's son has been a business analyst at the Frost Science Museum since February 2018. Pfenniger has been a director of BioCardia from 2016 to the present. Pfenniger was paid $45,000 cash and $213,280 in options in 2017 for is board service at BioCardia. In 2013, Pfenniger invested alongside Frost in Arno and currently holds 21,000 shares of Arno. Pfenniger also invested in RXi and currently holds 6,896 shares of RXi common stock. Pfenniger currently serves as a director of TransEnterix (formerly SafeStich), along with Hsiao, which has received considerable funding from Frost and OPKO. Pfenniger was paid $10,028 in option awards at SafeStitch in 2013 alone, bringing his total holdings to 71,400 SafeStitch shares (48,000 shares and 23,400 options) as of May 12, 2014.

**<u>Yu</u>**

219.    Yu has served as a Company director since 2009. As a trusted Company director, she conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Yu signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. She also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. Thus, Yu faces a substantial likelihood of liability.

220.    Yu receives handsome compensation for her membership on OPKO's Board. According to OPKO's annual proxy filings, OPKO paid Yu compensation worth $620,625.

**Lerner**

221.    Lerner has served as a Company director since 2007. As a long-time Company director, he conducted little, if any, oversight of OPKO's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Lerner also served on OPKO's Nominating Committee, which is charged with nominating members of the Board. Moreover, Lerner signed, and thus personally made the false and misleading statements in, the 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that are referenced herein. He also solicited the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged herein. Thus, Lerner faces a substantial likelihood of liability.

222.    Lerner also has an extensive business relationship with Frost and continues to rely on Frost and OPKO to fund his research at Zebra. Lerner is a scientific founder of Zebra, a biotechnology company that was co-founded by Frost and funded in large part by Frost and OPKO. Frost is a director of Zebra.

223.    Frost served as director, Vice Chairman and Chairman of Teva from 2006-2014. Lerner was a director of Teva from 2012 until 2015. For his work at Teva, Lerner was paid $190,000 annually plus a per meeting fee of $2,000 and an annual fee of $10,000 for each of his board committee members (of which he had two – human resources and compensation committee and the science and technology committee). Additionally, Lerner was paid an annual equity-based award of $130,000 in RSUs following each annual general meeting of stockholders. Accordingly, Lerner was paid a total of at least $570,000 in annual director compensation, $60,000 for his board committee memberships and $390,000 RSUs while at Teva.

224. Additionally, Lerner served as President of The Scripps Research Institute ("Scripps") from 1986 until December 2011 and is currently serving as an institute professor. During that time, Lerner's compensation at Scripps totaled over $1.2 million in annual salary. Frost was a member of the Scripps Board of Trustees from 2004 until November 2012 and served on the compensation committee of Scripps from 2011-2012. While Lerner was President of Scripps, Frost made numerous donations in the millions of dollars to Scripps: in 2008, Frost and his wife donated $1 million to Scripps, as a result of which, the entrance of the campus' drug discovery building was named the "Frost Lobby" and in January 2010, Frost and his wife donated $1 million to Scripps' Jupiter, Florida campus. Lerner publicly stated that "[o]ver the years of our expansion into Jupiter, Phil [Frost] has been an invaluable resource as a member of our Board of Trustees, and both he and Patricia [Frost] have been among the strongest supporters of the work we do."

225. Lerner is a consultant and scientific advisor to Sorrento, positions he held when OPKO and Frost invested in Sorrento on June 10, 2009. He is also a member of Scientific Advisory Board of Protalix.

226. In February 2012, Lerner invested alongside of OPKO and FGIT in ChromaDex as part of a $3.7 million private placement. Lerner serves on the scientific advisory board and the board of directors of InterX, Inc. ("InterX"), where former OPKO director Kolosov had previously served as CEO. Frost also sits on the board of directors of InterX. On its website, InterX touts its connection with Cocrystal, one of the companies whose stock was alleged by the SEC to have been pumped and dumped by Frost and his associates. In fact, on September 5, 2017, Cocrystal, InterX, and a third company announced that they had entered into a drug discovery collaboration.

227.     In total, Lerner has earned more than $927,000 in compensation for his services on OPKO's Board. This material amount of compensation is sufficient to render Lerner beholden to Frost when making business decisions for OPKO.

**Directors' Ties to and Dependence on Frost and FGIT**

228.     Demand in this case is further excused because the Directors are beholden to and controlled by Frost, who controls OPKO by virtue of his share ownership, which provided him with approximately 35% of the total shareholder voting power as of April 18, 2018. These shareholdings provide Frost with significant control over the continued employment of the remaining Directors, especially Hsiao and Rubin, who are also executives of OPKO, Krasno and Pfenniger, who receive handsome compensation as directors, and those Directors who have benefited from the related party transactions set forth above.

229.     Demand in this case is further excused because the Directors control OPKO and are beholden to Frost. The Directors have longstanding business and personal relationships with Frost, who faces a substantial likelihood of liability, that preclude them from acting independently and in the best interests of OPKO and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring OPKO's operations and internal controls and calling into question Frost's conduct, as well as that of each other.

230.     Hsiao and Rubin have the strongest connection to Frost, as they, along with FGIT, are each members of the Frost Group, the private equity firm specializing in PIPE investments founded in 2006. The Frost Group beneficially owned approximately 3.59% of OPKO's outstanding stock as of April 18, 2018. Hsiao and Rubin are controlling members of the Frost Group and are so closely tied to that entity that they must disclaim ownership of the OPKO shares held by the Frost Group in OPKO's annual proxies.

231. Frost and Pfenniger serve together on the Board of Trustees of the Frost Science Museum, where Pfenniger is the Vice Chairman of the board.

232. Also, many of the Individual Defendants, including four current Directors, have connections dating back decades through the IVAX. Frost founded IVAX and was its largest shareholder, with a 16.5% stock interest. The tenures of these Individual Defendants at IVAX overlap as follows:

    (a)    Frost was the CEO & Chairman from 1987 to 2006.

    (b)    Hsiao was the Vice Chair – Technical Affairs from 1995 to 2006.

    (c)    Rubin was the General Counsel and Secretary from 2001 to 2006.

    (d)    Pfenniger was the Chief Operating Officer from 1994 to 1997, and Senior Vice President of Legal Affairs and General Counsel from 1989-1994.

    (e)    Beier, who is not an OPKO director, was Senior Vice President of Finance and CFO from 1997 to 2007.

233. The strong connections between Frost, Hsiao, and Rubin are further evidenced by their shared memberships on boards of various companies. Frost, Hsiao, and Rubin all currently serve on the board of Cocrystal, which is a subject of the Securities Class Actions in connections with the Pump and Dump Misconduct.

234. Further, all three of them previously served on the Boards of several other companies, including Safestitch prior to its merger with TransEnterix (along with Pfenniger) and Prolor prior to its acquisition by OPKO in August 2013.

235. Frost and Rubin also both previously served on the boards of Cogint and Sevion (prior to its merger with Eloxx).

236. Frost, Rubin, and Krasno all serve together on the board of Castle Brands.

237.     Frost and Krasno serve on the board of Ladenburg Thalmann, and Kolosov formerly served on the board of Ladenburg Thalmann.

238.     Frost and Lerner both previously served on the board of Teva.

239.     Several of the Directors also serve together on boards for companies in which Frost and/or his entities invest or have an interest:

(a)     Hsiao is the board chair of NIMS where Rubin also serves as a Director.

(b)     Hsiao and Pfenniger both serve on the board of TransEnterix.

(c)     Krasno and Pfenniger both serve on the board of BioCardia.

240.     OPKO has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for OPKO any part of the damages OPKO suffered and will continue to suffer thereby.

## **FIRST CLAIM**

### **Against the Individual Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

241.     The elements of a Section 14(a) claim are: (a) a proxy statement contained a material misrepresentation or omission that; (b) caused the plaintiff injury; and (c) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.[7]

242.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

---

[7] This Section 14(a) Exchange Act claim is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this nonfraud claim.

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

243.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

244.    Under the direction and watch of the Directors, the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement failed to disclose the Material Facts.

245.    Moreover, the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement werer rendered false and misleading when they discussed OPKO's adherence to specific governance policies and procedures, including the Code of Conduct, when in truth the Individual Defendants were failing to abide by them by engaging in, and causing OPKO to engage in, the Pump & Dump Misconduct and failing to institute adequate controls.

246.    The Individual Defendants should have known that the statements contained in the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and other Company investors in voting on the matters set forth for shareholder determination in the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement, including, but not

limited to, election of directors, approval of undeserved and excessive officer and director compensation, and appointment of an independent auditor.

247.    The false and misleading elements of the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement were an essential link to allowing undeserved, excessive executive and director compensation and the re-election of Frost, Hsiao, Rubin, Krasno, Paganelli, Pfenniger, and Yu, which allowed them to continue breaching their fiduciary duties to OPKO and causing OPKO damages, as alleged herein.

248.    OPKO was therefore damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy Statement, the 2017 Proxy Statement, and the 2018 Proxy Statement.

249.    Plaintiff on behalf of OPKO has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants and FGIT for Breach of Fiduciary Duties**

250.    The elements for breach of fiduciary duty under Delaware law are (a) the existence of a fiduciary duty, and (b) breach of that duty.

251.    By reason of their positions as controlling shareholder, officers, directors, and fiduciaries of OPKO, and because of their ability to control the business and corporate affairs of OPKO, FGIT and the Individual Defendants owed OPKO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage OPKO in a fair, just, honest, and equitable manner. The Individual Defendants and FGIT were and are required to act in furtherance of the best interests of OPKO and its shareholders so as to benefit all shareholders equally.

252.    To discharge their duties, the officers and directors of OPKO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of OPKO. By virtue of such duties, the officers and directors of OPKO were required to, among other things:

(a)    ensure that OPKO was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to OPKO's own Code of Conduct and Business Ethics;

(b)    conduct the affairs of OPKO in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting OPKO's assets, and to maximize the value of OPKO's stock;

(c)    remain informed as to how OPKO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of OPKO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that OPKO's operations would comply with all applicable laws and OPKO's financial statements and regulatory filings filed with the SEC and disseminated to the public and OPKO's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by OPKO's officers and employees and any other reports or information that OPKO was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of OPKO; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of OPKO and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

253.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants also had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to OPKO's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause OPKO to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of OPKO's common stock would be based upon truthful and accurate information.

254.    FGIT and each of the Individual Defendants further owed to OPKO and the shareholders the duty of loyalty requiring that each favor OPKO's interest and that of its shareholders over their own while conducting the affairs of OPKO and refrain from using their position, influence or knowledge of the affairs of OPKO to gain personal advantage.

255.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with OPKO, each of the Individual Defendants and FGIT had access to adverse, non-public information about OPKO.

256.     Each of the Individual Defendants and FGIT violated and breached his, her or its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

257.     First, in breach of their fiduciary duties owed to OPKO, the Individual Defendants caused OPKO to participate in the Pump & Dump Misconduct described herein.

258.     Second, in further breach of their fiduciary duties owed to OPKO, the Individual Defendants willfully or recklessly made and/or caused OPKO to make false and misleading statements and omissions in the following filings with the SEC and press releases to OPKO investors:  The 2013 Q3 10-Q, the 2013 10-K, the Q1 2014 10-Q, the Q2 2014 10-Q, the Q3 2014 10-Q, the 2014 10-K, the Q1 2015 10-Q, the Q2 2015 10-Q, the Q3 2015 10-Q, the 2015 10-K, the 2016 Proxy Statement, the Q1 2016 10-Q, the Q2 2016 10-Q, the Q3 2016 10-Q, the 2016 10-K, the 2017 Proxy Statement, the Q1 2017 10-Q, the Q2 2017 10-Q, the Q3 2017 10-Q, the 2017 10-K, the 2018 Proxy Statement, the Q1 2018 10-Q, the Q2 2018 10-Q, the September 7, 2018 Press Release, and the September 11, 2018 Press Release.

259.     The foregoing filings and press releases failed to disclose the Material Facts, and further misrepresented (a) the purported benefits to OPKO from its CEO (Frost), who in truth was at the center of the Pump & Dump Misconduct, (b) OPKO's "growth strategy," by failing to disclose that such strategy involved OPKO acquiring interests in the Microcap Companies that were part of the Pump & Dump Misconduct, and (c) the fact that interests in the Microcap Companies that the Individual Defendants caused OPKO to acquire (including Biozone/Cocrystal and Mabvax) were part of the Pump & Dump Misconduct.

260. Third, in further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls, thereby allowing OPKO to issue the false and misleading statements alleged herein and permitting the Individual Defendants to engage in the Pump & Dump Misconduct.

261. Fourth, in further breach of their fiduciary duties, Logal, Rubin, and Baron engaged in insider transactions of Company shares based on material, insider information as described herein, collectively netting illicit proceeds of over $3.5 million.

262. These actions were not a good-faith exercise of prudent business judgment to protect and promote OPKO's corporate interests.

263. Rather, such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of OPKO's securities and engaging in insider sales.

264. FGIT and the Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by OPKO.

265. As a result of the misconduct alleged herein, the Individual Defendants and FGIT are liable to OPKO.

266. As a direct and proximate result of the Individual Defendants' and FGIT's breaches of their fiduciary obligations, OPKO has sustained and continues to sustain significant damages.

267. Sources of damages to OPKO include, but are not limited to, the following:

    i)     OPKO holding inflated shares of the Microcap Companies as a result of the Pump & Dump Misconduct;

    ii)     OPKO's being a defendant in the SEC Action;

iii)    OPKO's being a defendant in the MN Action;

iv)    OPKO's being a defendant in the Securities Class Actions;

v)    payments and costs in connection to any internal investigations, outside lawyers, accountants, and investigators;

vi)    lavish compensation and benefits paid to Individual Defendants who breached their fiduciary duties to OPKO; and

vii)    loss of reputation and goodwill.

268.    Plaintiff on behalf of OPKO has no adequate remedy at law.

## **THIRD CLAIM**

### **Against Individual Defendants and FGIT for Unjust Enrichment**

269.    The elements of unjust enrichment under Delaware law are (a) an enrichment, (b) an impoverishment, (c) a relation between the enrichment and impoverishment, (d) the absence of justification, and (e) the absence of a remedy provided by law.

270.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and FGIT were unjustly enriched at the expense of, and to the detriment of, OPKO.

271.    The Individual Defendants and FGIT were enriched unjustly at the expense of OPKO because of the following:

(i)    Frost and FGIT benefitted financially and profited from the Pump & Dump Misconduct;

(ii)    the Individual Defendants received bonuses, stock options, or similar compensation from OPKO that was tied to the performance or artificially inflated valuation of OPKO stock based on the improper conduct alleged herein; and

(iii)   Logal, Rubin, and Baron profited from insider trades of Company shares that were artificially inflated as a result of the Individual Defendants' and FGIT's improper conduct.

272.   Plaintiff, as a shareholder and a representative of OPKO, seeks restitution from the Individual Defendants and FGIT and seeks an order from this Court disgorging all profits, including from insider transactions, and/or excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and FGIT due to their wrongful conduct and breach of their fiduciary and contractual duties.

273.   Plaintiff on behalf of OPKO has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in OPKO's favor against all Individual Defendants and FGIT as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of OPKO, and that Plaintiff is an adequate representative of OPKO;

(b)   Declaring that each of the Individual Defendants and FGIT breached or aided and abetted the breach of their fiduciary duties to OPKO;

(c)   Determining and awarding to OPKO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and FGIT, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing OPKO, the Individual Defendants, and FGIT to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect OPKO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to OPKO's Bylaws or

Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of OPKO to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding OPKO restitution from each of the Individual Defendants and FGIT;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: June 4, 2019                     Respectfully submitted,


*s/ Walter J. Mathews*
Walter J. Mathews
Fla. Bar No.: 0174319
**MATHEWS GIBERSON LLP**
200 S. Andrews Avenue, Suite 800
Fort Lauderdale, FL 33301
Telephone: (954) 463-1929
Email: wjm@mathewsllp.com

Timothy Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Andy Yu, am a plaintiff in the within action. I have reviewed the allegations made in this first amended shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 th day of May 2019.

_____
Andy Yu